UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------X

JIMMIE MECCYA WILLIAMS,                    :
                                           :  Case No.: 05 Civ. 5909 (HB)
                        Plaintiff,         :
                                           :
                                           :
            vs.                            :  **DECLARATION OF JOSHUA R.**
                                           :  **GELLER IN SUPPORT OF**
TADD LAZARUS, M.D., P.C., ET AL.           :  **PLAINTIFF'S MOTION IN LIMINE**
                                           :  **TO EXCLUDE EVIDENCE OF OR**
            and                            :  **REFERENCE TO ANY PRIOR OR**
                                           :  **SUBSEQUENT "BAD ACTS" BY OR**
ST CLARE'S HOSPITAL AND HEALTH             :  **CRIMINAL CONVICTIONS OF**
CENTER,                                    :  **PLAINTIFF**
                                           :
                        Defendants.        :
                                           :
                                           :
-------------------------------------------------------------x

I, Joshua R. Geller, submit this declaration pursuant to 28 U.S.C. § 1746 and

declare as follows:

        1.      I am an associate of the law firm Simpson Thacher & Bartlett LLP,

counsel for Plaintiff Jimmie Meccya Williams in the above-captioned action.  I make this

declaration in support of Plaintiff's Motion in Limine to Exclude Evidence of or Reference to

Any Prior or Subsequent "Bad Acts" by or Criminal Convictions of Plaintiff.  I have personal

knowledge of the facts stated herein, and, if called to testify as a witness, I could and would

testify competently thereto.

        2.      Attached hereto as Exhibit A is a true and correct copy of the transcript of

the November 17, 2006 deposition of Mr. Williams in this case.

3.    On February 9, 2007, I spoke by telephone with Ms. Rachel Poritz, Esq. of the law firm of Silverson, Pareres & Lombardi LLP, counsel for Defendant St. Clare's Hospital and Health Center ("St. Clare's").  Ms. Poritz indicated to me that St. Clare's intends to introduce evidence of Mr. Williams' criminal convictions at the trial of this case.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 14, 2007

Joshua R. Geller

# EXHIBIT A

COPY

1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

--------------------------------------x

JIMMIE MECCYA WILLIAMS,

               Plaintiff,

                   05 Civ.5909

                   (HB)

    -against-

TADD LAZARUS and ST. CLARE'S HOSPITAL
and HEALTH CENTER,

              Defendants.

--------------------------------------x

           November 17, 2006
           10:05 A.M.

        Deposition of JIMMIE MECCYA

    WILLIAMS, taken by the Defendants,

    pursuant to Court Order, held at the

    offices of Simpson, Thacher & Bartlett,

    LLP, 425 Lexington Avenue, New York, New

    York 10017, before Joseph Meltzmacher, a

    shorthand reporter and Notary Public

    within and for the State of New York.

2

APPEARANCES:

    SIMPSON, THACHER & BARTLETT, LLP

        Attorneys for the Plaintiff

        425 Lexington Avenue

        New York, New York 10017

    BY:   JOSHUA GELLER, ESQ.

          -and-

        EMMA LINDSAY, ESQ.

    SILVERSON, PAREKES & LOMBARDI, LLP, ESQ.

        Attorneys for Defendants

        300 East 42nd Street

        New York, New York 10017

    BY:   ROBERT SILVERSON, ESQ.

3

          IT IS HEREBY STIPULATED AND AGREED,

by and among the attorneys for the respective

parties here, that the sealing, filing and

certification of the within deposition be

waived; and that such deposition may be signed

and sworn to before any officer authorized to

administer an oath with the same force and

effect as if signed and sworn to before the

officer whom said deposition is taken;

          IT IS FURTHER STIPULATED AND

AGREED, that all objections, except as to form,

are reserved to the trial;

4

               Williams

J I M M I E  M E C C Y A  W I L L I A M S,

called as a witness, after having first been

duly sworn by a Notary Public of the State of

New York, was examined and testified as follows:

EXAMINATION BY

MR. SILVERSON:

    Q.   What is your name?

    A.   Jimmie Meccya Williams.

    Q.   Where do you reside?

    A.   20 West Walnut Street, Richwood,

West Virginia 26261.

    Q.   Good morning Mr. Williams, I'm

going to be asking you some questions regarding

the matter of Williams against St. Clare's

Hospital and others.

        If there is a question that I ask you

that you don't understand or that needs

repetition or clarification, please indicate

that to me and I'll try to rephrase the question

or ask another one.

        If there is anything you don't understand

or you want to confer with your attorney for any

reason, please let me know and we'll stop the

deposition at that point.

Williams                5

1
2      If you need a break for any reason please
3  indicate that and we'll stop; is that
4  understood?
5      A.   Yes.
6      Q.   How long have you lived at the
7  address that you've just given?
8      A.   I've lived at that address this
9  particular time, since October of this year.
10      Q.   Prior to that, where did you live?
11      A.   311 1/2 Highland Street, Beckley,
12  West Virginia.
13      Q.   How long had you lived at that
14  address?
15      A.   Seven months.
16      Q.   So that would be, if my math is
17  correct, February or March of '06?
18      A.   Correct.
19      Q.   Somewhere in that time frame?
20      A.   Yes.
21      Q.   Is that a rental, is it an
22  apartment or house?
23      A.   It's a one bedroom apartment over a
24  two car garage.
25      Q.   Prior to that, where did you live?

---

Williams                6

1
2      A.   P.O. Box 1, Huttonsville, West
3  Virginia.
4      Q.   That's a Federal or state prison?
5      A.   It's a state prison.
6      Q.   When were you released from
7  Huttonsville?
8      A.   August 8, 2005.
9      Q.   So from August 8 of 2005, you moved
10  to Highland Street or somewhere else?
11      A.   Highland Street.
12      Q.   You then moved in October to
13  Richwood, West Virginia; is that correct?
14      A.   That's correct.
15      Q.   Was that an apartment or a home?
16      A.   That's a home.
17      Q.   Do you own that home?
18      A.   That residence belongs to my
19  mother.
20      Q.   Can I have your date of birth?
21      A.   9/13/1963.
22      Q.   Your social security number?
23      A.   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.
24      Q.   Mr. Williams, I want to ask you
25  some questions about your prior medical history.

---

Williams                7

1
2  In that regard, there was reference in some of
3  your medical records to an accident or an
4  incident that occurred in 1984 regarding your
5  arms or an injury to your arms or your upper
6  body somewhere.  Can you tell me something about
7  that?
8      A.   I have never had an accident in
9  '84.  Can you clarify?
10      Q.   Yes, I'll be glad to.
11          There are some records, I believe from
12  one of the prison facilities that you were in,
13  by way of medical history that you gave,
14  indicating that you had numbness in your arms
15  and there was an on or about date of 1984.  Does
16  that refresh your memory as to whether or not
17  you sustained any injury to your arms at that
18  time or close to that time?
19      A.   In 1984 -- the only injury I
20  sustained in 1984 was a burn that I obtained
21  from doing construction.
22      Q.   I believe you were an iron worker
23  at one point?
24      A.   Yes; that's correct.
25      Q.   In the '80s?

---

Williams                8

1
2      A.   Yes.
3      Q.   Did you ever have any injury
4  on-the-job where you were disabled for any
5  period of time during the 1980s, more
6  specifically injury to your upper body or to
7  your arms?
8      A.   There was another incident, yes.
9      Q.   When was that?
10      A.   I can't remember exactly what time,
11  but I remember there was another injury.
12      Q.   Can you describe for me in brief or
13  in substance what that injury was?
14      A.   It was my upper back.
15          What else do you want to know?
16      Q.   How did the injury occur?
17      A.   The injury occurred when we had to
18  move a girder.  Now a girder is a beam that is
19  constructed with rebar.  At this particular
20  time, I was the foreman on the job.  This beam
21  was 60 feet long.  And you use a crane to move
22  it.  And the injury that I sustained was because
23  the beam -- when the crane picks it up, it's
24  like spaghetti, because it's so long.  And as we
25  were setting the beam in it's form, I sustained

Williams                                                                        9

1
2       an injury to my upper back.
3           Q.    Did the beam strike some part of
4       your body?
5           A.    The beam never touched me.
6           Q.    Did you fall off, injuring your
7       back?
8           A.    No.  What happened, it was
9       basically trying to put a beam inside a girder.
10      And it's moving like spaghetti and it's 60 feet
11      long.  And it's shaking.  What happened, I would
12      say, that it like jerked my arm to where my
13      upper back was injured.
14          Q.    Were you hospitalized or did you
15      receive medical treatment for the injury?
16          A.    Therapy.
17          Q.    When you say therapy, meaning
18      physical therapy?
19          A.    Yes.
20          Q.    For what period of time were you in
21      therapy; in terms of weeks or months?
22          A.    In terms of weeks, six weeks.
23          Q.    Did you file a workers'
24      compensation claim at that time for your injury?
25          A.    No.

Williams                                                                       10

1
2           Q.    In terms of your arm, which arm was
3       it that was injured?
4           A.    My right.
5           Q.    The extent of the injury was that
6       arm casted, placed in a sling or anything else?
7           A.    No.
8           Q.    Can you describe, if you recall,
9       what sensations, if any, you were feeling in
10      your arm or something else?
11          A.    Pain.
12          Q.    Did the therapy help the arm?
13          A.    Yes.
14          Q.    Did you have any reoccurrence of
15      that injury in terms of future pain after that
16      six week period?
17          A.    None.
18          Q.    Do you recall, was it in the early
19      1980s somewhere, in terms of time?
20          A.    On or around the year of '85.
21          Q.    I'm still referring to the 1980s.
22      At any time during the 1980s up until 1990, were
23      you hospitalized for any medical condition?
24          A.    Hospitalized for any medical
25      condition, no.  I don't recall.

Williams                                                                       11

1
2           Q.    From, let's call it, 1985 to 1990
3       were you working in the construction field?
4           A.    Yes.
5           Q.    At any time during that period of
6       1985 to 1990, were you incarcerated for any
7       reason?
8           A.    1985 to 1990, no.
9           Q.    In terms of your emotional health
10      during that time period, were you under the care
11      or treatment of any mental health professional,
12      either psychiatrist, psychologist or social
13      worker for any condition?
14          A.    Absolutely not.
15          Q.    Did there come a time in 1990, that
16      you were hospitalized for a suicide attempt?
17          A.    Absolutely not.
18          Q.    Did you ever tell anyone, either a
19      medical professional or psychiatrist or
20      psychologist, that you had been hospitalized and
21      treated for depression and attempted suicide by
22      taking an overdose of medication?
23              MR. GELLER:  Object to the compound
24          question.  You can answer if you
25          understand.

Williams                                                                       12

1
2              MR. SILVERSON:  Do you understand
3          the question?
4           Q.    I can shorten it if you would like.
5           A.    Please.
6           Q.    You indicated you were not under
7       the care of a psychiatrist or a psychologist; is
8       that correct, in the 1990 area, 1989, 1990,
9       1991?
10          A.    I was not under the care of any
11      psychiatrist or any other medical treatment
12      program.
13          Q.    Did there come a time on or about
14      those dates, that you attempted suicide by
15      taking pills?
16          A.    During what year?
17          Q.    More specifically to 1990, but if
18      there is another time period that this occurred,
19      I'm asking you if you have any recollection of
20      that?
21          A.    I have no recollection of ever
22      trying to commit suicide.
23          Q.    Did you ever tell anyone, at any of
24      the correctional institutions that you were
25      housed at, that you had attempted suicide in

Williams    13

1990?

A.   Absolutely not.

Q.   From 1990 to 1993 were you still working in the field of construction?

A.   Repeat that question.

MR. SILVERSON:  Would you read it back.

(Whereupon, the prior question was read back by the reporter.)

A.   Yes.

Q.   Where were you working, what part of the country?

A.   Dulles, West Virginia, outside of D.C.

Q.   During the years prior to that, had you worked for the same company or were you going to different jobs and working for different employers?

A.   I worked for the highest paid, highest bidder.

Q.   Were you a member of the iron workers union?

A.   Local 201.

Q.   Did there come a time in the 1990s

---

Williams    14

that you were arrested and convicted of a crime?

A.   I'm not sure.

Q.   By way of refreshing your recollection, were you incarcerated at Rikers Island in New York City on December 8, 1993; on or about that date?

A.   Yes.

Q.   What were you either arrested for and ultimately convicted of?

A.   I don't know.

Q.   Did there come a time that you were sentenced, based on either a conviction or by plea or by verdict to a term in jail?

A.   Do you have an idea of what that term was.

Q.   I do.  From December 22 of 1993 to October of 1995, I believe starting at either Oneida Correction and to Downstate and then ultimately to Franklin.

A.   Yes, I remember.

Q.   Can you give me some detail of what you were convicted for and what your sentence was?

MR. GELLER:  That calls for a

---

Williams    15

narrative.  Can you ask more specific questions.

MR. SILVERSON:  I can.

Q.   What were you convicted for?

A.   Welfare fraud.

Q.   Was that a felony?

A.   Yes.

Q.   Were you sentenced to a term in prison as a result of your plea to the welfare fraud?

A.   I was sentenced, yes.

Q.   What was your sentence?

A.   No less than 1, no more than 3.

Q.   Was this in New York State or someplace else?

A.   This was right here in Manhattan.

Q.   Where did you go by way of correctional facilities?

A.   I started out on Rikers Island. Next stop was Downstate.  After Downstate, it was Oneida.  After Oneida, I went to six months shock camp, where it was located I can't remember.

Q.   That was a confined facility?

---

Williams    16

A.   It was program that you do six months, come out, do shock parole.  I didn't want the program.  After that, I went to Dannemora.  After Dannemora I went to Franklin. From Franklin, I was released.

Q.   Do you recall your release date?

A.   No, I do not.

Q.   Would it refresh your memory if I told you it was in October of 1995?

A.   No, it would not.  It would not refresh my memory.

Q.   Would it be in the year of 1995 that you were released, you indicated it was a 1 to 3 sentence?

A.   Yes.

Q.   Did you serve roughly two-thirds of that sentence?

A.   Yes.

Q.   Somewhere between 1994 and 1995 you were released, would that be a fair statement?

A.   I can't say if it would be fair.

Q.   Do you have any documents that would refresh your recollection?

I'll leave a blank space in the

Williams 17

1
2    transcript and request you fill in the date.
3    (INSERT)_____.
4        Q.    Do you have documents at home?
5        A.    No, I do not.
6        Q.    I'm just trying to establish when
7    you got out?
8        A.    No.
9        Q.    During the time that you were in
10   these various facilities, did you have any
11   medical problems at all?
12       A.    I had blood in my urine.
13       Q.    When was that?
14       A.    That was when I was at shock.  The
15   name of the facility I don't know.
16       Q.    Did you receive medical treatment
17   for that condition?
18       A.    No.  I was just told not to work
19   out so hard.
20       Q.    Did you have any complaints of
21   either chronic constipation or abdominal pain
22   during that time period?
23       A.    Chronic constipation.
24       Q.    When was that, if you can time
25   frame it; that was while you were in the

Williams 18

1
2    facilities, correct?
3        A.    The chronic constipation was during
4    the time that I was -- started around the time I
5    was at Oneida.
6        Q.    Prior to that, did you have any
7    history in your background of having difficulty
8    with bowel movements or constipation?
9        A.    Not that I can recall, no.
10       Q.    So the condition started at Oneida
11   and then you were treated for the condition?
12       A.    No.
13       Q.    Did you take any medication to
14   relieve the constipation, such as milk of
15   magnesia or a laxative or something else?
16       A.    Occasionally a laxative, yes.
17       Q.    Did you ever make any complaints
18   during the time period you had this constipation
19   of hemorrhoids?
20       A.    No.
21       Q.    No, you didn't make any complaints,
22   or you don't recall?
23       A.    No, I didn't make any complaints.
24       Q.    Do you ever recall making a
25   complaint to someone at the correction facility

Williams 19

1
2    that you hadn't had a bowel movement in 9 to 10
3    days, does that refresh your memory?
4        A.    Yes.
5        Q.    Did you also at that same time
6    indicate that you developed hemorrhoids as a
7    result of constipation?
8        A.    I have never made the assumption of
9    having hemorrhoids.  However, it was suggested
10   to me that maybe the problem.
11       Q.    Did you ever make a complaint to
12   anyone while at the correction facility with
13   regard to the constipation, regarding finding
14   blood in the toilet after you attempted to make
15   a bowel movement?
16       A.    Yes.
17       Q.    Was it after that that they told
18   you that it was possibly a hemorrhoidal
19   condition?
20       A.    I can't answer that.  I don't know.
21       Q.    Also, in either years between 1993
22   and 1995 while incarcerated, did you make any
23   complaints of stomach pain and pain on the side
24   of your body regarding your liver?
25       A.    The only time that I can recall

Williams 20

1
2    making an issue of my stomach is during
3    constipation.  The medical staff at Downstate
4    recommended that I do a liver biopsy.
5        Q.    Why was that, if you know?
6        A.    When you're incarcerated they don't
7    give you any information.
8        Q.    Prior to that recommendation, did
9    you have a blood test, and they looked at how
10   the blood related to your liver functions?
11       A.    I've had numerous blood tests.
12   Now, what they were in regards to, I don't know.
13       Q.    Do you recall, I think, they had
14   scheduled a liver biopsy for you?
15       A.    Yes.
16       Q.    That was at St. Agnes Hospital in
17   White Plains?
18       A.    It was at a hospital.
19       Q.    Would it refresh your memory
20   whether it was St. Agnes Hospital in White
21   Plains or somewhere else, would that help you
22   remember?
23       A.    I can tell you that they brought me
24   from the correctional facility.  At the time, I
25   don't even remember what facility I was at.

Williams    21

```
 1                  Williams                 21
 2      They brought me down to a regular public
 3  hospital.  Whether it was in White Plains, in
 4  the Bronx, I do not know.
 5          Q.     Just let me stop you for a second.
 6  Did you keep any memos or notes or records of
 7  your medical treatment over the years?
 8          A.     No.
 9          Q.     Did you in fact go and have a liver
10  biopsy?
11          A.     Yes.
12          Q.     That was due to elevated liver
13  levels in your blood, would that be a fair
14  statement?
15          A.     Could you repeat that question.
16          MR. SILVERSON:  Could you read that
17  back.
18          [Whereupon, the prior question was
19  read back by the reporter.]
20          A.     What is an elevated liver level?
21          Q.     I'll ask you another question.
22  Did a doctor meet with you after you had
23  the liver biopsy in regard to what the biopsy
24  showed, if anything?
25          A.     Yes.
```

Williams    22

```
 1                  Williams                 22
 2          Q.     What do you recall the doctor
 3  telling you about your liver?
 4          A.     He said that I need to eat healthy,
 5  drink a lot of water, and any deterioration that
 6  I've incurred to my liver would eventually heal
 7  itself.  But I had to start immediately, because
 8  if I go -- if I continue, I could create
 9  cirrhosis of the liver.
10          And then -- it wasn't a he, it was a she.
11  She said, that your liver can get holes inside.
12  Once fat grows inside those holes, that's when
13  you begin to get cirrhosis.  But if you eat
14  healthy, drink a lot of liquids, healthy liquids
15  that is, that the liver is an organ that
16  refurbishes itself and you'll be fine.
17          Q.     Were you diagnosed with any medical
18  condition after the biopsy of your liver?
19          A.     I don't know.  They never told me.
20          Q.     Have you ever been diagnosed with
21  Hepatitis C?
22          A.     I was told that I had Hepatitis C.
23  Then it was questionable when I was at
24  Huttonsville.
25          Q.     If you can recall, when were you
```

Williams    23

```
 1                  Williams                 23
 2  diagnosed with Hepatitis C; who told you that
 3  and when?
 4          A.     Downstate.
 5          Q.     What led them to that diagnosis; in
 6  other words, were you complaining of pain in
 7  your body somewhere or had they done routine
 8  testing and discovered it or something else?
 9          A.     Blood in my urine.
10          Q.     Was that what you had referred to
11  before when you mentioned it?
12          A.     No.  Before I mentioned it, if I'm
13  not mistaken, we was talking about when I was in
14  shock.
15          Q.     From the shock camp?
16          A.     Yes.
17          Q.     This was before, while you were
18  incarcerated at Downstate?
19          A.     Yes.
20          Q.     Other than blood in your urine,
21  were there any other other symptoms that you had
22  before you received the diagnosis of Hepatitis
23  C?
24          A.     I can't recall all the times that I
25  have had any ailments.
```

Williams    24

```
 1                  Williams                 24
 2          Q.     I know it's a long time ago, but in
 3  terms of your ability to function at Downstate
 4  in terms of either a job that you may have had
 5  there or work duty or whatever it might be, were
 6  you put on any kind of limited details because
 7  of the illness that you had?
 8          A.     Downstate is a 23 lockdown
 9  facility.
10          Q.     I'm not familiar with that.
11          That meant you were in your cell for 23
12  hours?
13          A.     When you're in a 23 hour lockdown
14  facility there is no work.
15          Q.     What, if any, treatment did they
16  give you for Hepatitis C?
17          A.     None.
18          Q.     What medications did they prescribe
19  for you, if any?
20          A.     None.
21          Q.     What medical advice did they give
22  you, if any, regarding your care of yourself
23  after the diagnosis of Hepatitis C?
24          A.     I told you that.
25          Q.     Eat healthy?
```

Williams    25

1
2       A.    Eat healthy and drink lots of
3    water.
4       Q.    As of today, are you still
5    diagnosed with the condition of Hepatitis C?
6       A.    As I said before, Huttonsville said
7    it was questionable.  That they need to have a
8    panel test conducted, which I never had done.
9       Q.    So you don't know?
10      A.    I don't know.
11      Q.    Mr. Williams, just so I have an
12   order of things, you went from Downstate
13   correctional to Oneida.  Then to a six month
14   shock camp.  Then to Dannemora and then to
15   Franklin; would that be a correct order of
16   things?
17      A.    Pretty much, yes.
18      Q.    This was all under the sentencing
19   of a 1 to 3 sentence; correct?
20      A.    That's correct.
21      Q.    Since this is basically a white
22   collar crime, was there a reason why you were in
23   a 23 hour lockdown, other than being in the
24   general population of the prison?
25            I'm sorry to have to ask these questions,

J & M REPORTING AGENCY         (516) 785-4690

---

Williams    26

1
2    I apologize.
3       A.    I have to elaborate on this one.
4    Apparently you all are not familiar with how
5    corrections operate.
6            When you're incarcerated -- when you're
7    sentenced to a correctional facility, a/k/a
8    penitentiary, you have to be classified.  And
9    before this classification is conducted where
10   they give you a level, you're locked down.
11           Once you're classified, then they put you
12   in an area most conducive to what they call,
13   "rehabilitation."  Now everyone who thresholds
14   the penal system goes through a lockdown.
15   Because you just can't put a person in prison
16   and he's not a violent criminal and put him with
17   violent criminals.
18           So once classification has been
19   completed, then they put you in what they would
20   consider an area that is safe and poses no
21   danger for you or to the people that are around
22   you.
23      Q.    So that the lockdown wasn't because
24   of any infraction in prison or any conduct of
25   that nature?

J & M REPORTING AGENCY         (516) 785-4690

---

Williams    27

1
2       A.    That's correct.
3       Q.    Since you were convicted basically
4    of a so called white collar crime, they wanted
5    to find out where you fit into the correctional
6    system, therefore transfer you to a prison that
7    would be appropriate for your rehabilitation, as
8    you put it?
9       A.    Yes.
10      Q.    That would explain the 6 month
11   shock camp didn't work out for you, because you
12   seem to have gone on to Dannemora after that?
13      A.    That is correct.
14      Q.    From Dannemora you went to
15   Franklin.  Was there a reason for the transfer
16   between those two prisons?
17      A.    Dannemora is a maximum security.
18   It's behind a wall.
19      Q.    It seems inconsistent with the crime
20   that you committed that you would go to such a--
21      A.    Actually it's not inconsistent.
22      Q.    Could you explain?
23      A.    You have to understand, these
24   prisons are right next to Canada.
25           They're so far up and to transport

J & M REPORTING AGENCY         (516) 785-4690

---

Williams    28

1
2    prisoners to these facilities, not only do you
3    have to have layovers sometimes, but in my
4    situation, they took me to Dannemora, to either
5    wait -- mind you, the correctional system, they
6    don't tell us anything.  And I'm not guessing at
7    this, because during my research I realized this
8    was a fact.  This is what happened.  Dannemora
9    was just layover period.  I only stayed there
10   for a few weeks, until a bed came open either at
11   Franklin or Berry Hill.  Franklin and Berry Hill
12   are facilities that are next door to each other.
13      Q.    That puts it in perspective for me.
14           When I've looked at these documents, it
15   seemed you were in a lot of places for a crime
16   where you got sentenced to a 1 to 3.
17      A.    Right.
18      Q.    Let me just get back to the
19   medical, Mr. Williams.
20           There are a number of hospitals that were
21   listed in your medical records.  I'd like to ask
22   you a little bit about each one.  If you don't
23   remember, that's fine.  If not, maybe you can
24   explain it.  There was a hospital called Alice
25   Hyde Hospital.

J & M REPORTING AGENCY         (516) 785-4690

Williams    29

A.    Address?

Q.    Alice Hyde Hospital, 115 Park Street, Malone, New York 12953.

Does that refresh your recollection?

A.    Do you know the time frame?

Q.    I don't.  Other than the fact that there was some record of you being there for some laboratory testing and I have a patient number for you.  But I thought perhaps that would refresh your memory as to what you were in the hospital for on that visit?

A.    This is Malone, New York?

Q.    Does it ring a bell?

A.    No.

Q.    How about Oneida Health Care Center, Genesee Street, Oneida, New York?

That would be up near where the prison was.  Do you recall being hospitalized for any reason or treating in the emergency room?

A.    I recall blood in my urine.

Q.    Do you recall being hospitalized there or just going there for medical consultation?

A.    I just recall going there for

---

Williams    30

testing.

Q.    You would obviously be transported from prison to that place; is that correct?

A.    Correct.

Q.    How about Bassett Hospital in Schohari County, in Cobble Skill, New York.  Does that ring a bell as ever having been treated there?

A.    No, I don't recall going to there.  Maybe that's another individual.

Q.    The hospitals that I'm giving you Mr. Williams are all hospitals that there are medical records that we've requested, where it's been indicated that you received some type of treatment at.  And it was at the time you were in upstate New York incarcerated.

So, we don't have the records as yet.  I'm trying to save time and not having to have a further deposition, so that we can find out what the treatments were, if any, at these particular institutions.

So, the first one Oneida, you've explained.

Alice Hyde Hospital you don't have any

---

Williams    31

recollection.

Bassett Hospital, there was some indication that you received some type of X-rays and medical treatment there.

A.    I don't recall.

Q.    Do you have any records at home or you gave to your attorney that would help you refresh your memory?

A.    No.

Q.    How about Rome Hospital and Murphy Memorial Hospital in Rome, New York; do you have any recollection of ever being treated at that hospital or hospitals?

A.    I can only recall a substantial amount of blood being in my urine.  So that can only be the reason.

Q.    I'm going to ask you a little bit later on in the deposition, there had been some HIV testing while you were incarcerated during that period of '93 to '95.  Would that refresh your memory as to one of these hospitals being the facility where you received the HIV testing?

A.    No.  Any HIV testing that I received were received at the correctional

---

Williams    32

facility.

Q.    Finally, a hospital called Grand Strand Regional Medical Center.

A.    Located?

Q.    Myrtle Beach, South Carolina.

A.    That's when I got burned.

Q.    Do you have a recollection of going to the hospital at that time?

A.    Yes.

Q.    Was that while you were on the job?

A.    Yes.

Q.    Mr. Williams what is the extent of your education, how far did you go in school?

A.    As of when?

Q.    As of the present.

A.    I'm presently working on a bachelor's in accounting.

Q.    Where are you attending classes?

A.    Mountain State University.

Q.    That's in West Virginia?

A.    Beckley, West Virginia.

Q.    I assume you're a part-time student, not full-time?

A.    Full time.

Williams                                          33

Q.   You matriculated into a semester;
is it a semester or a trimester program?

A.   Actually, this semester I wasn't
able to get in because of some situation that
happened, but I'm already scheduled for the
spring semester.

Q.   Are you telling me you're
registered at the school to enter classes in
whatever spring means, January, February?

A.   Yes.

Q.   Is this your first exposure to
college or have you been at Mountain State
before this?

A.   Yes.

Q.   When were you in attendance?

A.   The fall 2005.

Q.   How many credits did you take and
how many did you complete?

A.   Four.

Q.   So you were not fully matriculated,
you were part-time?

A.   That would be four classes.

Q.   I was talking about credits.

A.   Four classes is considered

---

Williams                                          34

full-time.

Q.   That would be from September to
December or September to January?

A.   December.

Q.   Would you be considered a freshman
student, in other words are you being considered
a first year student?

A.   That was my second.

Q.   You have completed one year of
college?

A.   Yes.

Q.   Where was that?

A.   Fairmont State.

Q.   What part of the country is that?

A.   West Virginia.

Q.   Mountain State has given you credit
for the first year of Fairmont State?

A.   That's correct.

Q.   You went to school full-time from
September to January of '05. And then from '05
to the present, you haven't started again, but
you will be starting in the spring?

A.   Correct.

Q.   I assume you have a high school

---

Williams                                          35

diploma from high school or equivalency?

A.   I have an equivalency.

MR. SILVERSON:   I don't know if
it's relevant, if not already provided,
we would just like some authorizations to
validate educational aspects. We'll put
the request in writing as per the rules,
but just for the record.

On any document request, we'll
follow-up with a formal demand.

While I'm on it, we've already sent
you a request.

MR. GELLER:   Yes. We have those
and we will be getting those to you
shortly.

MR. SILVERSON:   We have previously
requested in writing from counsel,
authorization for Mr. Williams from
Oneida Health Care Center, Alice Hyde
Hospital Association, Bassett Hospital of
Schohari County, Rome Hospital and Murphy
Memorial Hospital, St. Agnes Hospital,
Oneida Correctional Facility medical
records and Grand Strand Regional Medical

---

Williams                                          36

Center.

In addition we have asked for
records under Medicaid, any claims under
social security administration, Project
Return Foundation Incorporated, and the
New York State Department of Health
prescription plan, it's an RX plan
through the Department of Health.

MR. GELLER:   We're in receipt of
the request.

Q.   Mr. Williams, in reviewing some of
your records, it appears that you did attend
City College in New York City at one point?

A.   Yes.

Q.   In 1996?

A.   Yes.

Q.   So in addition to Fairmont State
you also attended City College. Was that
full-time or part-time?

A.   Part-time.

Q.   When I say City College I'm talking
about the City University of New York?

A.   135th and Amsterdam.

Q.   That's the one?

Williams    37

A.    That's the one.

Q.    Mr. Williams, I'm going to ask you some information regarding your time either at Franklin Correctional Facility or one of the ones in the interim that you were transferred from and to, during the period 1993 to 1995.

The first thing I want to talk to you about is your HIV testing that you took at that institution. Your records indicate that in February of 1994, more specifically February 4, that you took a HIV test called an ELISA test, do you recall that?

A.    I remember taking that test. I don't recall the time.

Q.    In fact, while you were incarcerated these two tests were given at the institution, do you recall that at least two for HIV testing?

A.    Yes.

Q.    Do you recall the results of either of those tests?

A.    Yes.

Q.    What were the results?

A.    Negative.

Williams    38

Q.    Was there a reason that the HIV test was given while you were in prison?

A.    Specifically, to know the status of my health.

Q.    Had you requested the test or is this part of the protocol for the hospital to give such a test, if you know?

A.    That I could not answer.

Q.    You in fact did take the two tests and both tests were negative?

A.    That is correct.

Q.    While in the correctional institutions, they do a psychological profile or examination of you while there?

A.    Yes.

Q.    In 1994, had you had any prior psychiatric history or care in your background at all?

A.    Clarify.

Q.    From birth to adulthood had you had any experiences or problems emotionally or mentally up and through 1994?

MR. GELLER:    Objection. What's the question?

Williams    39

You asked about treatment then you asked about problems.

Q.    What I'd like to know, is find out if there were things in your background, either your childhood or teenage years that required intervention with either a psychiatrist, psychologist, mental health worker, social worker; was there anything in that period of time?

A.    From the time that I was born up until now?

Q.    The basis for my question is this, in your medical record there are references to this. If you can explain, if you would like me to be specific or you can give me a brief narrative?

A.    I would like for you to be specific but, yes.

Q.    Was there an incidence in your childhood where you either were an abused child or had some intervention with a psychologist for incidence that occurred in your home with your family?

A.    Yes.

Williams    40

Q.    Can you tell me what that was and what care or treatment you received, if any?

I apologize for going into your background. It may or may not be painful to you, but we need to know about this.

A.    In 1972 I was sent to Albany Home for Children. Let me clarify that. On or around 1972, I was sent to Albany Home for Children. During this period I was told that I was mentally retarded.

Q.    When you say sent, was this something through your mother or father or was this a court intervening decision to get you there?

A.    I have no idea.

Q.    You ended up being away from home and put into this home?

A.    Yes.

After that, I don't recall being in any other psychiatric institution.

Q.    About how old were you?

A.    I was 8 or 9 years old.

Q.    How long were you there?

A.    Approximately a year.

Williams    41

Q. When released from there, did you return to your family?

A. Yes.

Q. What did your family consist of at that point?

A. What do you mean, what did it consist of?

Q. Was it your mother, your father, or mother and father or a relative or something else?

A. Like who was in the household?

Q. Yes.

A. One brother, one sister, my mother, stepfather and a dog named Butch.

Q. What kind of dog was it?

A. A boxer.

MR. GELLER: Off the record.

(Whereupon, a short recess was taken.)

Q. You returned home from Albany Home for Children and from that date forward, you were in school?

A. Very briefly.

Q. I'd say from 8 years to 18, for the

Williams    42

next ten years, in very brief summary, can you tell me were you in any other institutions or under the care of a psychiatrist, psychologist or other medical?

A. Clarify those years?

Q. From age 8 to age 18.

A. From age 8 to 18 was I in any other institution--

Q. Or treated by a psychiatrist, psychologist or mental health professional?

A. Absolutely not.

Q. In terms of your schooling, did you finish grammar school, meaning first to eighth grade?

A. I didn't. I left school in fifth grade.

Q. This is all in West Virginia?

A. No. At this point I was living in Cornwall, New York, Cornwall off the Hudson.

Q. Leaving school in the fifth grade how old were you in fifth grade?

A. I was nine going on ten.

Q. In terms of requirements of the state to attend school, what did you do if you

Williams    43

weren't going to school, were you just kept at home and home taught or something else?

A. I left home.

Q. You ran away?

A. Yes.

Q. Where did you run to?

A. Here, to the city?

Q. At age 9 with whom did you live or where did you live?

A. Wherever I could.

Q. Were you homeless at the time?

A. Very much so.

Q. Did you live in any shelters or any other places?

A. Nine year olds can't get into shelters.

Q. Nine year old, it's pretty hard to take care of yourself at nine. How did you survive?

A. You'd be surprised what a nine year old has to do when he has to survive. I survived the best I could.

Q. During that time period from 9 to age 18, were you ever arrested as a juvenile?

Williams    44

A. Between the ages of 9 and 18, that's very broad.

Q. Your attorney would usually say that.

What I'm trying to find out is, in those years did you ever return home to Cornwall, New York or did you remain in New York City?

A. Yes.

Q. You lived on your own or with somebody else?

A. I lived on my own for quite a bit of those years.

Q. I'm not going to take you through the experience, but was it pretty much living on the street; would that be a fair statement of your lifestyle at that point?

A. If you call living in a domicile that's a derelict building living on the street, that's pretty much.

Q. During those years, was there any involvement with either drugs or alcohol by yourself?

A. Yes.

Q. Were you ever treated for either

Williams 45

1
2  alcohol or drug abuse during that time period?
3          MR. GELLER:  Can you clarify the
4      time period.
5          MR. SILVERSON:  From the age of 9
6      years old to 18.
7      A.    No.  We need to back up a little
8  bit.  When you say treated, you mean was there
9  any documentation of my being treated.
10     Q.    What I meant by treatment, let me
11 explain, is that if you were involved -- let's
12 start with drugs.  Were you using drugs between
13 the ages of 9 and 18?
14     A.    Yes.
15     Q.    What drugs were you using?
16     A.    Heroin.
17     Q.    Were you using intravenous drugs or
18 something else?
19     A.    Yes.
20     Q.    Did you ever try to kick the habit
21 by going methadone or something else?
22     A.    Absolutely not.
23     Q.    You were on heroin for how long?
24     A.    About four years.
25     Q.    Did there come a time when you

Williams 46

1
2  stopped using heroin?
3      A.    Yes.
4      Q.    Why was that?
5      A.    I stopped using heroin because I
6  got tired of the lifestyle.
7      Q.    Did you have any help in stopping
8  the use of the drugs and this is what I meant by
9  treatment, did you go to a drug treatment center
10 or a program of some kind?
11         MR. GELLER:  That's a compound
12     question.  Could you break it up.
13     Q.    Did you go to a program?
14     A.    No.
15     Q.    Did you go to a treatment center?
16     A.    No.
17     Q.    Was there some other institution or
18 facility that helped you either reduce or stop--
19     A.    No institution, no facility, but an
20 organization.
21     Q.    What was that organization?
22     A.    The National of Islam.
23     Q.    Are you a member of the Nation of
24 Islam?
25     A.    No.

Williams 47

1
2      Q.    Were you a member at that time?
3      A.    No.
4      Q.    Did you come in contact with
5  members of the Nation of Islam that helped you
6  or gave you guidance in terms of your reduction
7  or non-use of heroin?
8      A.    Repeatedly.
9      Q.    Where was that, in New York City
10 here?
11     A.    Here in the City.
12     Q.    In terms of treatment was there any
13 medical treatment that you received or was this
14 just counseling and mentoring let's call it?
15     Do you understand what I mean?
16     A.    Cold turkey.
17     Q.    You were able to stop the use of
18 heroin?
19     A.    Never used it again intravenously.
20     Q.    In terms of your heroin use; did
21 you develop any medical conditions from the use
22 of heroin, either from the use of bad needles or
23 the drug itself?
24     A.    None whatsoever.
25     Q.    Did it have any effect on your

Williams 48

1
2  general health, as best as you can recall,
3  during that time period?
4      A.    None whatsoever.
5      Q.    Other than heroin, did you take any
6  other drugs during that time period?
7      A.    Marijuana.
8      You are talking about what time period?
9      Q.    In your teen years, when you were
10 in New York City living on your own.
11     A.    Maybe alcohol, beer.
12     Q.    That was going to be the next area.
13 Did you ever have a problem with the use of
14 alcohol, meaning alcohol abuse, to the extent
15 where it became a threat to your health?
16     A.    Yes.
17     Q.    When was that?
18     A.    When was what?
19     Q.    The alcohol abuse that became a
20 threat to your health.
21     A.    Prior to becoming incarcerated at
22 those various facilities that you wrote down
23 recently.
24     Q.    I have an idea of what I mean by
25 alcohol abuse.  Can you tell me how you abused

Williams                                49

1   
2  alcohol; what alcohol you drank, the amount,
3  quantity?
4      A.  The amount I couldn't tell you.
5  well, I couldn't possibly.  To give you an idea
6  of the amount, that's sunup to sundown.
7      Q.  You were intoxicated for a good
8  part of the day to say the least?
9      A.  I was intoxicated pretty much all
10 the time.  Yes.
11     Q.  If you can give me a time frame of
12 when, what years this covered or maybe it was
13 less than a year you tell me, I don't know?
14     A.  I can't.
15     Q.  As a result of this, this was prior
16 to your heroin use or after your heroin use?
17     A.  After.
18     Q.  As a result of that, of the alcohol
19 abuse, did you develop any medical conditions
20 that you required medical treatment for?
21     A.  The alcohol consumption was the
22 factor that deteriorated my liver.
23     Q.  Was there any other effect on your
24 body, either from the heroin or the alcohol
25 abuse that you know of, that was told to you

J & M REPORTING AGENCY          (516) 785-4690

---

Williams                                50

1   
2  medically?
3      A.  None.
4      Q.  Other than the liver?
5      A.  Correct.
6      Q.  Let's say, from 18 years of age to
7  again, I apologize for not having the exact
8  times.  You were born in '63, from about 18 to
9  let's say 30, you somehow got into the iron
10 working business.  How did that occur, you
11 became a member of the local?
12     I've got you in New York to about 18
13 years of age.  There must come a time that you
14 must leave New York to go back to West Virginia
15 or somewhere elsewhere, where you became an iron
16 worker; is that correct?
17     A.  I became an iron worker in South
18 Carolina.
19     Q.  When did you get your card?
20     A.  I didn't have a card.  They had a
21 program which you can -- local 201 is out of the
22 Washington D.C.  They had a program where
23 minorities could receive the benefits without
24 becoming a member and get the same pay scale.
25     Q.  Was it a training program of some

J & M REPORTING AGENCY          (516) 785-4690

---

Williams                                51

1   
2  kind?
3      A.  I was very much trained.  In fact
4  they used me to train some of their people, but
5  they refused to let me get the full benefits of
6  being in local 201.
7      Q.  Why is that?
8      A.  Probably because I'm an
9  African-American.
10     Q.  Didn't you tell me that program was
11 to basically benefit minorities of getting into
12 iron working business, by getting the benefits
13 and work in the same pay scale without having to
14 go through the union process?
15     A.  If you're not going to have any
16 union, what are you doing.
17     Q.  You're part of this 201 local,
18 which is a national local of some kind?
19     A.  While I was working on certain
20 jobs, yes.
21     Q.  The pay for an iron worker is
22 pretty good?
23     A.  Yes.
24     Q.  It's one of the top construction
25 fields?

J & M REPORTING AGENCY          (516) 785-4690

---

Williams                                52

1   
2      A.  Yes.
3      Q.  It's also high risk, in terms of
4  injury and so forth.
5      MR. GELLER:  Is that a question.
6      MR. SILVERSON:  Just a comment.
7      Q.  Let me get back to the Franklin
8  Correctional Facility.  In June of 1994, there
9  was some indication that you were suffering from
10 depression and received some type of counseling
11 at or in the institution or near the
12 institution, while there.
13     MR. GELLER:  Object to the form.
14     It assumes fact not in evidence.
15     Q.  Does that refresh your recollection
16 of whether you had a psychiatric evaluation
17 while at Franklin Correctional or one of the
18 other correctional facilities?
19     A.  Every individual that goes into the
20 division of correction goes through a
21 psychiatric evaluation.
22     Q.  That consists of you speaking to
23 psychiatrists or psychologists about your
24 background and other information?
25     A.  It requires that we speak to

J & M REPORTING AGENCY          (516) 785-4690

Williams 53

1    someone in that profession. Whether they're
2    psychologists, psychiatrists or an analyst. I
3    don't know.
4        Q.    You don't know their
5    qualifications?
6        A.    Exactly. Nor do they show us their
7    credentials.
8        Q.    Do they tell you or give you
9    information as a result of that questioning, in
10   that process?
11       A.    Absolutely not.
12       Q.    Do you know whether or not you were
13   categorized into a particular level of
14   psychiatric profile of some kind?
15       A.    Absolutely not.
16       Q.    Did you ever, while at those
17   institutions between 1993 and 1995, ever
18   indicate that you were suffering from
19   depression?
20       A.    I have to elaborate on that one.
21   Anyone who goes through the department of
22   corrections and don't show any signs of
23   depression, they're not normal. Because when
24   you're away from society and your family, that

J & M REPORTING AGENCY          (516) 785-4690

Williams 54

1    is a depressive state.
2        Q.    Other than that, being incarcerated
3    and being taken out of society and being put in
4    that environment, other than those factors, was
5    there any other factors in either your prior
6    life or that occurred in prison which caused you
7    to suffer from depression?
8        A.    Not that I can recall, no.
9        Q.    Were you given any medication for
10   this depression that you had in prison?
11       A.    No.
12   Let me rephrase that. I don't recall
13   taking any medication while incarcerated.
14       Q.    For depression?
15       A.    For depression.
16       Q.    Do you recall either discussing
17   with a medical professional the idea of taking
18   your own life, committing suicide?
19       A.    See that's a very tricky question.
20   You need to clarify that.
21       Q.    Mr. Williams, you are making claim
22   against St. Clare's Hospital for their alleged
23   negligence. As part of your claim you're
24   claiming emotional injuries. By my questioning

J & M REPORTING AGENCY          (516) 785-4690

Williams 55

1    now, I'm just trying to find out if you have any
2    history of emotional injuries that either have
3    been exacerbated by this case or existed prior
4    to this case.
5        There is an indication in your records
6    that there have been discussions, either from
7    the records or their interview of you, that
8    indicated that you had contemplated taking your
9    own life or had actually attempted to do that on
10   occasion.
11       That's my question. Do you have any
12   recollection of having that type of conversation
13   with a medical professional, during the years of
14   '93 to '95 while incarcerated?
15       A.    Can I elaborate?
16       Q.    Certainly.
17       A.    The dialogue, basically that
18   conversation with their mental staff there, they
19   ask every individual that comes through those
20   doors about committing suicide, because they need
21   to know whether they need to keep them under
22   close supervision. I have never been under
23   close supervision, in a straight jacket. I have
24   never been an area of any institution where I

J & M REPORTING AGENCY          (516) 785-4690

Williams 56

1    would be considered a risk to myself or anyone
2    else.
3        So, if it's in the record that I said
4    something to that effect, that I would take my
5    life and they didn't put me under close
6    observation, they're in grave error. And I was
7    never in a position where I was under close
8    supervision, period.
9        Q.    You've answered part of my
10   question. The other part was, did you tell any
11   of these doctors or medical professionals, that
12   in the past that you had contemplated, whether
13   it be recent past or way back in your past, to
14   commit suicide?
15       A.    I may have discussed it with them.
16   But I have never told anyone about taking my
17   life.
18       Q.    Did you ever relate an incident,
19   whether it be when you were very young or in
20   recent times while at Franklin, concerning
21   taking an overdose of pills; intentionally
22   taking an overdose of pills.
23       MR. GELLER: I object to the form.
24   Could you read back the question. I

J & M REPORTING AGENCY          (516) 785-4690

Williams 57

1
2    don't understand the time frame.
3         MR. SILVERSON: Maybe I can explain
4    and let me rephrase it to save time.
5       Q.   Again, the time I'm talking about
6    is when you were in jail from '93 to '95,
7    approximately.
8        During your discourse with a medical
9    doctor or medical professional about your
10   emotional background, did you at any time tell
11   anybody there that you had attempted to take
12   suicide by ingesting or taking an overdose of
13   pills; not that you were doing it in the prison,
14   but in the past?
15      A.   I can't recall.
16      Q.   Do you recall having any discussion
17   in January of 1994 while institutionalized,
18   regarding an infection that you developed which
19   they diagnosed as possibly tuberculosis?
20      A.   What?
21      Q.   Do you recall a test called a PPD
22   test, where they tested you for exposure to
23   tuberculosis?
24      A.   Every time you go into an
25   institution they give you that test.

Williams 58

1
2      Q.   Do you recall having any
3   conversation with any medical doctor about the
4   results of that test?
5      A.   I don't recall having a need to
6   discuss it with a doctor, anything regarding a
7   PPD test.
8      Let me elaborate. When they give you
9   that skin test, if the centimeters is large, you
10   got an issue, a large one. If you don't have no
11   redness there, what is there to discuss. I've
12   never had that.
13      Q.   You do recall getting the test?
14      A.   Every time.
15      Q.   In close populations like that,
16   people can be carriers?
17      A.   Right.
18      Q.   Also, in terms of your lower
19   extremities, your legs. In or about January of
20   1995, did you ever have a problem with either
21   your calves or parts of your legs that had
22   ulcerations, sores?
23      A.   I can't recall.
24      Q.   More specifically on your right
25   calf, where you had to have medical treatment

Williams 59

1
2    for an ulcerated sore or sores that wouldn't
3   heal?
4      A.   No.
5      Q.   I believe at that time you were
6   still in jail, because the release date that we
7   have is late 1995.
8      So, I just have a medical record which
9   indicates that you had made a complaint of
10   ulceration of your legs and some problems with
11   your legs. If you don't recall, just indicate
12   that and I'll go on.
13      A.   I don't recall.
14        MR. GELLER: Can we take a break.
15        (Whereupon, a short recess was
16    taken.)
17      Q.   It seems from my records, and you
18   don't have to rely on that Mr. Williams, it
19   seems that you were released in October of 1995,
20   that's the date I have; October 10?
21      A.   That's what I put down.
22      Q.   The date of transfers from all
23   these facilities are a little unclear from the
24   records. For the purpose of this deposition,
25   would you agree that it would be sometime in

Williams 60

1
2   October of '95 that you got out of the prison
3   system from Franklin?
4      A.   I would agree that it was in '95.
5   But I would not confirm the month.
6      Q.   When one gets out of prison in
7   those days, did you have to go to a halfway
8   house or a program before you were let into a
9   free society?
10      A.   No.
11      Q.   You went directly, you were
12   released, you had served your sentence, there
13   was no probationary period after that; is that
14   correct?
15      A.   In the State of New York during
16   that time, you have parole, mandatory parole.
17   Then you have a minimal discharge date and a
18   maximum discharge date.
19      I did not make parole. When I got out in
20   the year '95 that was mandatory parole. And I
21   achieved that by not getting any infractions.
22   Therefore, when that date come, it doesn't
23   matter whether I have a place to stay. It
24   doesn't matter whether I'm sick or dying, you're
25   gone. So it really doesn't matter, you're out.

Williams                                              61

Q.    When you got out Mr. Williams, how would you describe your general health in 1995?

A.    Euphoric.

Q.    I know that was your mental attitude, but in, the terms of physical health, how would you describe your physical health?

A.    Fit; I was fit.

Q.    What did you do when you got out, where did you go to live?

A.    I went to -- I was in Washington Heights.  The address I don't know.

Q.    Was it an apartment, did you move in with someone, was it a program facility or an outreach program for people who were released?

A.    It wasn't Washington Heights.  178 Mount Eden Parkway, Bronx, New York 10457.

Q.    Was that an apartment?

A.    That was a home.

Q.    Meaning a private house?

A.    Yes.

Q.    Whose private house was that?

A.    It belonged to Gina Huddelston.

Q.    Who was Gina Huddelston?

A.    She was my mother's half sister.

---

Williams                                              62

Q.    Did you remain with her for a period of time or did you move away?

A.    Long enough to accumulate my own funds, to get my own place.

Q.    What kind of work did you do when you first got out, during that first year?

A.    I think I did some roofing work for company out of Queens.

Q.    Were you just a part-time employee or something else?

A.    I don't do construction part-time.  Its full-time.

Q.    Were you on the books or off the books?

A.    It was both.

Q.    Did you file tax returns?

A.    No.  I could have, but I don't think that I did.  I know I didn't do it, I think I got fine for that, for not filing.

Q.    Again, Mr. Williams correct me if I'm wrong, your records seem to indicate that when you left prison in '95, within a short period of time thereafter you entered something called Project Return drug program, located at

---

Williams                                              63

814 Amsterdam Avenue?

A.    That was after.

Q.    So, you left Mount Eden Parkway and you went where?

A.    I got a room on 158th Street.

Q.    Single room occupancy, SRO?

A.    Beg your pardon?

Q.    Single room occupancy or did you rent an apartment or a room in an apartment?

A.    It was a room inside of an apartment.

Q.    You continued to work at various jobs or at a particular job?

A.    As I said, I did some work with a roofing company.  Then I got involved in some -- I used to sell stuff down on Green Street down near Canal.  I would buy merchandise and go down there and sell it on weekends.  That's how I supported myself.  During that time I caught a violation of my parole from the '93 to '95 conviction, which in turn resulted in my being at Project Return.

Q.    What was the violation of your parole; what caused you to be there, not

---

Williams                                              64

reporting something or something else?

A.    I couldn't answer that honestly.  I don't remember.

Q.    It did require you to go into Project Return as a result of the violation?

A.    Yes.  It wasn't serious enough for me to go back to prison.

Q.    Project Return, from our information is a drug program?

A.    Yes.

Q.    Were you involved with drugs in 1995, that required you to go into a drug program?

A.    I think it was drugs or alcohol.  I'm not going to confirm either, because I don't remember.

Q.    Was it heroin again or something else?

A.    No.  It was either drugs or cocaine.  I'm sorry, I mean alcohol or cocaine.

Q.    As a result of going into the drug program, that was a confined program where you had to live there and you were released, you had to stay there at night or it was a lockdown

Williams    65

1  facility or something else?

2      A.    No, it's not a lockdown facility.

3  It's actually pretty much voluntary, because you

4  can come and go as you pleased.  It was a six

5  month program designed to help people

6  reintegrate themselves back into society.

7      The reason why they put emphasis on it

8  being a drug program, because most of the

9  individuals that come through there did have a

10  drug problem, but not all.

11      Q.    While at Project Return, did any

12  medical conditions develop that required medical

13  intervention or for you to go see a doctor?

14      A.    Spellman Clinic.

15      Q.    When you say Spellman Clinic, are

16  you saying that a doctor referred you to

17  Spellman Clinic?

18      A.    No.  I'm saying that Spellman

19  Clinic had me under their treatment.

20      Q.    How did you get from Project Return

21  to the Spellman Clinic; did you walk in off the

22  street to the Spellman Clinic or did somebody at

23  Project Return refer you or did a doctor refer

24  you or something else?

J & M REPORTING AGENCY        (516) 785-4690

---

Williams    66

1      A.    While at Project Return, there were

2  several individuals at Project Return who

3  brought patients at Spellman Clinic a/k/a St.

4  Clare's Hospital.  These people were, I suppose,

5  busy this particular day and I had to take Jose,

6  to escort him to St. Clare's.  His last name I

7  don't remember.

8      While there, I was asked to take some

9  test.  Jose said, go ahead man take it, do a

10  physical or something to that effect.  I had my

11  public assistance card with me, because as soon

12  as you go under Project Return, you are not

13  allowed to work.  You immediately go on public

14  assistance medical; whatever they call,

15  Medicaid.  I had my credentials on me.  So I

16  gave them the credentials.  They did the

17  paperwork.  Next thing you know they extracted

18  blood.

19      Q.    Let me just back up a little bit.

20  While at Project Return, somebody there asked

21  you to accompany Jose to Spellman Clinic?

22      A.    Somebody, the staff, when you are

23  classified, certain people under certain

24  classifications have to be escorted and I was

J & M REPORTING AGENCY        (516) 785-4690

---

Williams    67

1  elected to escort him to 415 West 51st Street,

2  St. Clare's Hospital and Health Center.

3      Q.    If you know, what was Jose's

4  condition or medical problem which required him

5  to be escorted by you to the Spellman Clinic?

6      A.    I did not have privilege to that

7  information.

8      MR. GELLER:  I'm just going to

9      object to the form.  Was the question

10      what was his condition that caused him to

11      be escorted?

12      MR. SILVERSON:  If he knew,

13      apparently there was some patients that

14      could go voluntarily and others who

15      needed escort.

16      MR. GELLER:  I just want to make

17      sure I understood the question.

18      A.    I just told you that.

19      Q.    Did he need physical assistance,

20  was he in a wheelchair, was he on crutches?

21      A.    No.  It was due to his

22  classification.

23      Q.    Do you know what that

24  classification was?

J & M REPORTING AGENCY        (516) 785-4690

---

Williams    68

1      A.    Yes.  He has to be escorted where

2  he goes for a certain period of time.

3      Q.    Do you know whether or not Jose,

4  was treating at Spellman for an AIDS related

5  disease, if you know?

6      A.    Now let's back up, when you say did

7  I know, did I know at what point in time?

8      Q.    At the time you took him.

9      A.    No.

10      Q.    Tell me, when you took him to the

11  hospital where in the hospital did you take

12  Jose?

13      A.    To the third floor.

14      Q.    What's on the third floor, if you

15  know?

16      A.    When you go to the third floor--

17      Q.    It's not the emergency room, is it?

18      A.    No.

19      Q.    It's another part of the hospital.

20  Do you know what department it is?

21      A.    It's the area where they see people

22  with HIV AIDS related diseases.

23      Q.    While you were there with Jose,

24  were you required to stay with him when he met

J & M REPORTING AGENCY        (516) 785-4690

Williams                                    69

1
2    with the medical professional, whoever he was
3    going to see?
4         A.    I was required to be with him
5    everywhere except when he was in consultation.
6         Q.    Do you recall whether Jose had a
7    consultation that day?
8         A.    That was the reason why I escorted
9    him.
10        Q.    Did you remain in the hospital
11   while he had that consultation?
12        A.    After we arrived there, he had to
13   wait until the physician was available to see
14   him.  During this time he urged me to do some
15   paperwork and take a test.
16        Q.    This is on the third floor of St.
17   Clare's which treats HIV patients.  Mr.
18   Williams, why would you want to take a test at
19   that part of the hospital dealing with HIV
20   patients?
21        A.    First of all, let's get something
22   understood here.  I didn't know this was an HIV
23   clinic, that was number one.
24        Number two, I just thought it was a
25   medical facility that does physicals and stuff

Williams                                    70

1
2    of that nature.
3         Q.    Were you suffering from any
4    symptoms at that time, on that particular day
5    that you took Jose?
6         A.    Absolutely not.
7         Q.    So what would be the reason for you
8    wanting to take tests at a hospital without
9    symptoms, without feeling sick, what would
10   possess you to do that?
11        A.    What possessed me to do that, just
12   get a status of my health.
13        Q.    When you went to the drug program,
14   didn't they do a physical examination prior?
15        A.    Absolutely not.
16        Q.    Weren't your medical records
17   available to the personnel at Project Return to
18   determine what the status of your health was?
19        A.    Repeat that.
20        Q.    Let me ask another question.
21        Did you wait for Jose that day after his
22   consultation and then take these tests that you
23   talked about, or was it before you went in for
24   his consultation?
25        A.    It was during his consultation.

Williams                                    71

1
2         Q.    Did you have to fill out some
3    forms?
4         A.    Absolutely.
5         Q.    When you filled out those forms,
6    did you realize then that it was an HIV section
7    of the hospital, that was testing for HIV?
8         A.    I did not find out that that was an
9    HIV clinic until approximately two weeks later.
10        Q.    So even though you took Jose to the
11   third floor, which you told me was an HIV
12   section of the hospital and he was going for a
13   consultation, you had no idea that either he was
14   being treated for HIV or patients there were
15   being treated for HIV?
16        A.    I didn't even know he was HIV
17   positive.
18        Q.    I didn't say whether he was
19   positive or negative.  Did you at some time find
20   out that he was HIV positive?
21        A.    Everyone of them was being treated.
22   I shouldn't say everyone, because I wasn't.
23        MR. GELLER:  Could the court
24   reporter read back the question that you
25   just asked.

Williams                                    72

1
2         (Whereupon, the prior question was
3    read back by the reporter.)
4         MR. GELLER:  Do you understand the
5    question?
6         MR. SILVERSON:  The question was,
7    did he find out that Jose was HIV
8    positive.
9         MR. GELLER:  What's the time period
10   for the question?
11        MR. SILVERSON:  That day he went
12   there with Jose, that's the only time
13   period.
14        A.    No, I did not.
15        Q.    When you filled out the forms, did
16   you indicate any symptoms that you were
17   suffering at that time to be tested at St.
18   Clare's Hospital on that particular day?
19        A.    Mr. Silverson, I don't recall
20   filling out the forms myself.  I do recall
21   having someone ask me questions while filling
22   out the forms.  Neither they or anyone else
23   indicated to me the status or the practice of
24   this particular area of the hospital.
25        Q.    Mr. Williams, prior to the time

Williams    73

2  that you went to St. Clare's on that particular

3  day, did you have knowledge of what HIV and AIDS

4  was, in terms of a disease?

5      A.    Like any other person of ignorance,

6  I just thought it was a disease that homosexuals

7  and intravenous drug users get and people who

8  are careless and promiscuous.

9      Q.    You knew that because you had been

10  tested in the prison, you had taken an HIV test?

11      A.    I knew that because of the -- I

12  knew that information because of general

13  information.

14      Q.    You also knew when you got out of

15  prison and while in prison that having been

16  tested for HIV you were found to be negative for

17  HIV?

18      A.    Correct.

19      Q.    So my question to you now is, when

20  you went to St. Clare's on that day with Jose,

21  what was the purpose of you, number one, filling

22  out forms to be examined and be tested at St.

23  Clare's, what was your purpose and intent?

24          MR. GELLER:  Objection to the form.

25      That was asked and answered.

J & M REPORTING AGENCY        (516) 785-4690

---

Williams    74

2      Q.    Was there anything that happened

3  from the time you got out of prison until that

4  day that you went to St. Clare's by way of

5  having unprotected sex, intravenous drug use or

6  any homosexual activity, that would lead you to

7  believe that you might have contracted the

8  disease?

9      A.    When I was at St. Clare's I didn't

10  undergo those tests, because I thought it was

11  basically a physical.

12      I was in the streets, I was drinking,

13  possibly even doing some drugs.  And mind you I

14  was already told prior to leaving prison that I

15  should eat healthy and drink if I wanted my

16  liver to refurbish it's own self.  Having not

17  abided by that particular suggestion by a

18  medical physician, I just wanted to see if I can

19  possibly get information on whether I did any

20  further damage to myself in that regard.

21      Q.    So are you saying that from the

22  time you were released from prison, that you

23  used intravenous drugs?

24          MR. GELLER:  Objection.  That

25      mischaracterizes his testimony.

J & M REPORTING AGENCY        (516) 785-4690

---

Williams    75

2      Q.    There was something that made you

3  want to be further tested; correct?

4      A.    No.  There was something that made

5  me want to just get checked out.  Not tested.

6      Q.    By the way, how long had you been

7  at Project Return before you escorted Jose to

8  St. Clare's?

9      A.    I don't recall.

10      Q.    Would it be more than a month?

11      A.    I can't recall.

12      Q.    Would it be fair to say that you

13  resided at Project Return from about February of

14  1996 through January of 1997; would that be fair

15  to say?

16      A.    That's not a fair assumption,

17  because I just said I can't recall.

18      Q.    If I were to tell you that the

19  records reflect that you were in Project Return

20  from February of '96 to January of '97, would

21  that refresh your memory as to whether you were

22  there during that time period?

23      A.    It would not.

24      Q.    Would it be fair to say that before

25  you were given the duties of an escort, to

J & M REPORTING AGENCY        (516) 785-4690

---

Williams    76

2  escort people to and from the hospital, that you

3  would have had to have been in Project Return

4  for a certain period of time?

5      A.    Yes.

6      Q.    During that certain period of time,

7  whatever it was, whether it was a week, a month,

8  two months, whatever that time period was, did

9  you have any concerns about your health?

10      A.    No.

11      Q.    So that on the particular day that

12  you took Jose to the hospital, was that the

13  first time that you had any concerns about

14  testing yourself, to determine the status of

15  your health?

16      A.    I wouldn't call it a concern.  I

17  would call it being compulsive.  Because I was

18  in a medical institution.  They do test.  I was

19  free, Jose was occupied.  I couldn't leave until

20  he was ready.  So why not take a test, take a

21  checkup.

22      Q.    Had you ever escorted Jose before

23  this?

24      A.    No.

25      Q.    Did you know Jose from living in

J & M REPORTING AGENCY        (516) 785-4690

Williams                    77

2  Project Return?

3       A.    I've seen him.  I didn't associate

4  with him.

5       Q.    On that particular day, did Jose

6  discuss anything with you regarding his

7  condition or anything else regarding his health?

8       A.    Absolutely not.

9       Q.    Did you have any general

10  discussions about factors, to the extent that

11  people that are diagnosed with HIV, being found

12  HIV positive, get certain housing benefits and

13  financial subsidies once found to be HIV

14  positive?

15            MR. GELLER:  Object to the form.

16       Is that a question?

17            MR. SILVERSON:  Yes.

18            MR. GELLER:  Could you repeat the

19       question.

20       Q.    Did you have any knowledge of the

21  fact that people who are found to be HIV

22  positive are entitled to certain financial

23  benefits, such as housing subsidies and the

24  benefits of prescription medications to treat

25  the virus, were you aware of that?

---

Williams                    78

2       A.    Aware when?

3       Q.    At the time you went to St. Clare's

4  Hospital with Jose.

5       A.    The initial time?

6       Q.    Yes, sir.

7       A.    Absolutely not.

8       Q.    Did there come a time that you did

9  learn about that, the benefits that one

10  receives?

11       A.    Yes.

12       Q.    When was that?

13       A.    After St. Clare's diagnosed me as

14  being HIV positive.

15       Q.    What information did you learn

16  after being diagnosed HIV positive regarding

17  housing?

18       Let's start with housing allowance as a

19  subsidy.

20       A.    What did I learn?

21       Q.    Yes.

22       A.    That I can get assistance.

23       Q.    What type of assistance would that

24  be?

25       A.    Just assistance with housing.

---

Williams                    79

2       Q.    How about food?

3       A.    I didn't need food.  I had food at

4  Project Return.

5       Q.    If you were found to be HIV

6  positive, didn't you learn that if you found a

7  residence to live, that you would get some

8  benefit from the State or the Federal government

9  in regard to defraying the cost of paying for

10  that housing?

11       A.    You get food and public assistance

12  without being sick, from Welfare.

13       Q.    In addition to the public

14  assistance that you were getting, did you learn

15  that people who are diagnosed with HIV and found

16  to be positive, in addition to their public

17  assistance, got additional monies for having

18  been found to be HIV positive?

19       A.    People don't get additional money.

20  You may get some assistance with housing, but

21  you do not get any increase other than what you

22  would get when you're normally homeless on the

23  street.  You get nothing additional to that.

24  And if you did, I was never informed of it.

25       Q.    What tests did you take on the day

---

Williams                    80

2  you went with Jose to St. Clare's?

3       A.    What tests did I take?

4       Q.    Yes.

5       A.    All I can tell you is that they

6  extracted blood.

7       Q.    Where within the hospital did you

8  go for that?

9       A.    Where in the hospital did I go for

10  that?

11       Q.    Yes.

12       A.    I went right there on the third

13  floor.

14       Q.    The forms that you filled out--

15            MR. GELLER:  Just to have a clear

16       record, this is the same certified copy

17       that was sent over to us maybe a week or

18       so ago?  What's the date on the front?

19       For the record, the first page is

20       the same.

21            MR. SILVERSON:  This is a copy of

22       the record.  We got an original

23       signature, I guess you got one as well.

24            MR. GELLER:  Yes.  From that date,

25       November 9.

Williams                        81

1
2          MR. SILVERSON:  I may want to make
3     a reference to the record.
4          MR. GELLER:  Off the record.
5          (Whereupon, a discussion was held
6     off the record.)
7          MR. SILVERSON:  Let's mark these
8     records as Defendant's Exhibit A subject
9     to the originals.
10         (Whereupon, the above referred to
11    document was marked, "Defendant's Exhibit
12    A for identification," as of this date,
13    by the reporter.)
14    Q.    Mr. Williams, let me show you what
15    has been marked as Defendant's Exhibit A for
16    identification.  It's entitled a consent form
17    from St. Clare's Hospital dated November 11,
18    1996.
19          I just ask if that's your signature on
20    the page?
21    A.    Yes, it's my signature.
22    Q.    Would that indicate, Mr. Williams,
23    that you were present at St. Clare's Hospital on
24    November 11, 1996?
25          MR. GELLER:  I'm just going to

J & M REPORTING AGENCY          (516) 785-4690

---

Williams                        82

1
2     state for the record that the date here
3     next to the signature is the 10th of
4     November 1996.
5          MR. SILVERSON:  In that
6     regard--
7     Q.    The date you took Jose to St.
8     Clare's Hospital, and the date which you say you
9     scheduled some tests for yourself, do you recall
10    what that date was?
11    A.    No, I do not.
12    Q.    By looking at what's been marked as
13    Defendant's A for identification on which you've
14    identified your signature thereon, would either
15    November 10 or November 11 refresh your memory
16    as to what date you went to St. Clare's Hospital
17    with Jose?
18    A.    No.  It doesn't actually refresh my
19    memory.  This is the document that I signed on
20    the initial visit.  I would have to conclude
21    that it's correct.
22    Q.    There are two dates on this form,
23    one says November 11 and one says November 10.
24    The date that you took Jose to St. Clare's, was
25    that the same date that you took the test or was

J & M REPORTING AGENCY          (516) 785-4690

---

Williams                        83

1
2     that the date that you just filled out the
3     forms?
4     A.    That's the date I filled out the
5     forms and took a test.
6     Q.    What test did you take on the date
7     that you filled out the forms?
8     A.    I don't know.
9     Q.    There are many tests in a hospital.
10    Did you take a urine test?
11    A.    No.
12    Q.    Did they do what's called an EKG?
13    A.    No.
14    Q.    Do you know what an EKG is?
15    A.    Yes.
16    Q.    Did you have a physical exam by a
17    medical doctor or a nurse?
18    A.    That's what I thought I was going
19    to have, but no.
20    Q.    Did someone check your extremities,
21    meaning arms, legs, ears, nose, throat, head,
22    that kind of thing?
23    A.    That's what I thought I was going
24    to have.
25    Q.    What test did you have?

J & M REPORTING AGENCY          (516) 785-4690

---

Williams                        84

1
2     A.    All they did was extract blood.
3     Q.    At the time that happened, did you
4     ask anybody what other tests you would need to
5     take or anything about the blood test that was
6     being given to you at that time?
7     A.    Only thing that I asked was, what
8     happened to the checkup that I thought I was
9     going to have.
10    Q.    What did they tell you?
11    A.    They just said you'll be scheduling
12    another appointment.
13    Q.    This first blood test, did you ask
14    them whether you would get results that very
15    same day or did they tell you to come back at
16    another day?
17    A.    I can't recall.
18    Q.    Did you come back another day after
19    that first test?
20    A.    Yes.
21    Q.    Did you ever get the results of
22    that first test?
23    A.    Yes.
24    Q.    What were the results of that test?
25    A.    Non-reactive.

J & M REPORTING AGENCY          (516) 785-4690

Williams                                     85

Q.    What did you understand the words, non-reactive, to mean?

A.    I had no idea what they were talking about.

Q.    Did you ask somebody? You've been in hospitals and treated with doctors before. Did you think to ask anybody what the words, non-reactive, meant in terms of your blood test?

A.    No.

Q.    Did it seem to be a good thing or a bad thing to you at the time?

A.    I had no idea. I mean, it really didn't register.

Q.    Did you know at the time that the blood that was taken from you, whatever date that was, was going to be tested for HIV virus?

A.    No.

Q.    You did not know that?

A.    No.

Q.    Did you have any idea what the blood test was being taken for and what results the doctors were looking for within the blood?

A.    No.

Williams                                     86

MR. GELLER:  Object to the form. If you could break it up.

MR. SILVERSON:  I'll just ask another question.

Q.    Who told you the test was non-reactive?

A.    The physician who gave me the results.

Q.    Other than saying those words to you, was there any other explanation given?

A.    I don't understand what you mean.

Q.    Did the doctor say, you're non-reactive and we'd like you to take another test, or you don't need to worry, your blood is fine or something else?

A.    It was more or less, like, your blood is non-reactive, we're going to take another test. Because I recall them saying something wasn't conclusive to what they were looking for. And that's why they wanted to run more tests.

Q.    Did they tell you what it was they were looking for?

A.    No.

Williams                                     87

Q.    Do you recall the name of this person?

A.    No.

Q.    Do you know whether this person was a doctor, nurse or technician?

A.    No. A technician would be someone like a phlebotomist; correct?

Q.    Who is the technician?

A.    Well, meaning a medical technician of some kind, meaning a phlebotomist or an aide, a nursing aide, somebody that would draw blood?

A.    It was someone who had a medical degree.

Q.    When they said they were looking for something, did you make any inquiry as to what it was that they were looking for?

A.    No.

Q.    Did they tell you what other testing they wanted to do, because you had indicated they said they wanted to do further tests.

A.    No. At this particular point, I'm quite sure I just wanted to hurry up and get out of there. On this particular day I was

Williams                                     88

escorting someone.

Q.    What you just said, you took the blood test on the day you brought Jose there; right?

A.    Right.

Q.    Then you went back to get the results on another day?

A.    Yes.

Q.    Were you escorting Jose again on that particular day?

A.    Yes.

Q.    When you say, you wanted to get out of there, meaning you wanted to get back to wherever you were taking Jose?

A.    Yes.

Q.    So he had gone with you the second time?

A.    Actually, I didn't even tell Project Return that I had an appointment. As far as I was concerned, it was just a checkup, you know. Whether I got the results or not, it really wasn't -- I felt good. So it really didn't matter.

Q.    You felt good?

Williams    89

1
2    A.    I felt excellent, yes.
3    Q.    Do you recall at Project Return
4    that there was a nursing staff there?
5    A.    Yes.
6    Q.    Do you recall that during the time
7    you were there and prior to going for this test
8    that you had been either examined or had a
9    consultation with the nursing staff?
10    MR. GELLER:  Object to the form.
11    Q.    Prior to escorting Jose and then
12    subsequently for your blood test, had you made
13    any medical complaints to the nurse at Project
14    Return?
15    A.    Regarding?
16    Q.    I'll tell you in a second.
17    While at Project Return, did you
18    regularly go for medical checkups, was that part
19    of the requirement while you were there?
20    A.    I don't understand your question.
21    Q.    It's a drug program, so for
22    example, do they periodically test your urine to
23    see if you are using drugs?
24    A.    Yes.
25    Q.    If you're sick, if you are not

Williams    90

1
2    feeling well, if you have a cold or if you have
3    complaints of headaches or other ailments, do
4    you have the availability of going to the nurse
5    or the medical person at Project Return to get
6    treatment or to get help?
7    A.    Yes.
8    Q.    Do you recall at or about the time
9    that you went to St. Clare's with Jose that you
10    had made any such complaints about your health,
11    meaning that you were sick and not feeling well?
12    A.    I got a cold or something.  I don't
13    understand the question.
14    Q.    You said your health was
15    excellent?
16    A.    Yes.  My health was excellent.
17    Q.    You went to St. Clare's with Jose
18    and you decided to get a further check up on
19    your health?
20    A.    Yes.
21    Q.    What I'm saying is, prior to that,
22    had you had any complaints that you made to the
23    Project Return Foundation nurse about your
24    health condition?
25    A.    I don't recall.

Williams    91

1
2    Q.    Do you ever recall speaking to a
3    Dr. Akum?
4    A.    No.
5    Q.    Were you on any medications while
6    at Project Return for any health condition that
7    you had?
8    A.    I don't recall.
9    Q.    Did you ever have a neurological
10    consult while at Project Return for any
11    complaints of pain in any of your extremities?
12    A.    Neurological, meaning something
13    regarding my nervous system?
14    Q.    Yes.
15    A.    Not that I recall.
16    Q.    Do you recall being prescribed
17    Naprosyn or Motrin as a drug for pain while
18    there?
19    A.    I recall getting Naprosyn from
20    Spellman Clinic.
21    Q.    But not from Project Return?
22    A.    No.
23    Q.    Did you receive any medications to
24    your knowledge from Project Return while there
25    and while you were attending St. Clare's

Williams    92

1
2    Hospital, for these tests that you recall?
3    A.    From my recollection, Project
4    Return cannot prescribe medication.
5    Q.    Did you have any type of major
6    depression or psychotic episodes while at
7    Project Return?
8    A.    After St. Clare's gave me those
9    diagnosis, yes.
10    Q.    Meaning the diagnosis of HIV
11    positive?
12    A.    Yes.
13    Q.    Then you had a psychotic episode?
14    A.    I wouldn't say I was psychotic.  I
15    would say depressive.
16    Q.    Can you describe for me what
17    reaction you had after learning that you had the
18    HIV virus?
19    A.    I was completely overwhelmed.  All
20    I thought of was my day of death is sure to come
21    soon.
22    Q.    Did you request help from a
23    psychologist or psychiatrist to deal with this
24    issue at that time?
25    A.    I'm not sure if I did or not, but I

Williams                                    93

1    think I did speak to one and I'm not sure whom.

2        Q.    After the first visit and after

3    that first test when the doctor said they wanted

4    to retest you, did you go back for another blood

5    test to St. Clare's?

6        A.    Repeat that?

7        Q.    The day you went with Jose, you had

8    a blood test, the first time?

9        A.    Yes.

10       Q.    You came back a second time and you

11   met with a medical doctor who told you that they

12   wanted to do further tests.  Did you, in fact,

13   go back to St. Clare's and have further blood

14   tests?

15       A.    I was already at St. Clare's when

16   they did the test.

17       Q.    There was a second test done on or

18   about, I guess, the 19th of November according

19   to the records.  Does that refresh your

20   recollection as to the date the second test was

21   done?

22       A.    Whenever I went to St. Clare's it

23   usually was to get results of the previous test.

24   And they take more tests.

J & M REPORTING AGENCY          (516) 785-4690

---

Williams                                    94

1        Q.    The first test that you got there,

2    did you ever state to anyone at the hospital

3    that that test and that blood was not your

4    blood?

5        A.    No.

6        Q.    Did there ever come a time that you

7    went for a test at St. Clare's for a blood test

8    and that you had to wait too long and you got

9    impatient and left and didn't take the test?

10       A.    I can't recall ever leaving or

11   being impatient.

12       Q.    Did there come a time that a blood

13   test was scheduled at St. Clare's, you showed up

14   at St. Clare's, and at some point you left

15   before taking the test?

16       A.    Usually when it's time to take

17   blood, the phlebotomist is always available.

18       We used to call them dracula.

19       Q.    Let's go to the second test.  The

20   first test, there was something there but they

21   weren't sure.  And the second test shows that

22   your --

23       MR. GELLER:  Objection to form.

24       That's mischaracterizing the testimony.

J & M REPORTING AGENCY          (516) 785-4690

---

Williams                                    95

1        MR. SILVERSON:  Whatever the

2    testimony is, it is.

3        Q.    The second test apparently showed

4    that you were HIV positive; is that correct?

5        A.    The first test was what?

6        Q.    You told me about the first test.

7    I have no idea what the first did.  You told me

8    the test--

9        A.    Repeat the question, please.

10       Q.    Let me start again.  There was a

11   series of blood tests that you took at St.

12   Clare's, which is the subject of this lawsuit.

13   There was a first test that you took when you

14   went with Jose.  Then you got some results, and

15   that there was no finding of HIV on those tests.

16       Then there was a second test scheduled

17   for you.  I don't know whether you recall the

18   dates or not, but for the purposes of this

19   deposition assume that it was a week or so

20   later.

21       Do you remember going for a second blood

22   test?

23       A.    I remember going in.

24       Q.    This was the test that would have

J & M REPORTING AGENCY          (516) 785-4690

---

Williams                                    96

1    showed up positive.

2        A.    Your question is, did I go back for

3    a blood test?

4        Q.    Let me try again.

5        There is a series of blood tests that you

6    took at St. Clare's in the months of November

7    and December of 1996.  Do you recall doing that?

8        A.    Yes.

9        Q.    There was also one in 1997 that you

10   took as well at St. Clare's?

11       A.    Yes.

12       Q.    The first test that you took, the

13   first day that you got there, we're trying to

14   find out that date, it's somewhere around 11 or

15   12th of November.

16       MR. GELLER:  Objection to form.  I

17   think the record says the 10th or 11th.

18       MR. SILVERSON:  Yes, the 10th or

19   11th.

20       Q.    Either of those dates, that was the

21   first time that you took blood at St. Clare's

22   and that was the one where you told me that the

23   doctors were equivocal, they couldn't make any

24   findings as to whether or not there was any HIV

J & M REPORTING AGENCY          (516) 785-4690

Williams 97

1
2    virus?
3        A.    I took a test on that day.  No
4    results was given to me that day.
5        Q.    You came back and got the results?
6        A.    Right.
7        Q.    What were the results?
8        A.    As I said, something to the effect
9    that non-reactive and they want further testing
10   done.
11       Q.    Now I'm going to the next test,
12   after the non-reactive finding.
13       The next test, would it be fair to say it
14   was about a week later?
15       A.    It was when I went back the second
16   time.
17       Q.    Yes.
18       A.    They extracted more blood.
19       Q.    Did you get a result of that second
20   test?
21       A.    Yes.
22       Q.    That result was an HIV positive
23   finding?
24       A.    Yes.
25       Q.    Did there come a time that you took

Williams 98

1
2    a third test?
3        A.    Yes.
4        Q.    Do you recall how soon after that
5    second test the third test came?
6        A.    Do I recall?
7        Q.    Yes.
8        A.    How soon?
9        Q.    Well, if I were to tell you that it
10   was approximately a month later, would that be a
11   fair statement?
12       A.    I couldn't say.
13       Q.    Would it refresh your memory if I
14   told you that the records reflect that you had a
15   blood test on the 17th of December 1996, which
16   was approximately almost 30 days after the
17   second test?
18       A.    Yes.
19       Q.    And that third test came back and
20   showed HIV positive?
21       A.    Yes.
22       Q.    Then there was a fourth test in
23   January of 1997, approximately a couple of weeks
24   after that also?
25       A.    Yes.

Williams 99

1
2        Q.    Having had those tests and having
3    found out that you were HIV positive, were you
4    prescribed some medication and treatment?
5        A.    Yes.
6        Q.    First of all, do you recall any
7    doctor that you dealt with after finding out
8    that you were HIV positive, do you know the name
9    of the doctor?
10       A.    No.
11       Q.    Who is Dr. Lazarus?
12       A.    Dr. Lazarus is the doctor who was
13   named on most of my medical documents from St.
14   Clare's.
15       Q.    When did you first meet Dr.
16   Lazarus?
17       A.    I can't recall.
18       Q.    Was it at any time within the time
19   frame of those blood tests that you had, that
20   showed that you were HIV positive?
21       A.    I beg your pardon?
22             MR. SILVERSON:  Can you repeat the
23   question.
24             (Whereupon, the prior question was
25   read back by the reporter.)

Williams 100

1
2        A.    I can't recall that either.
3        Q.    Does the name, Miss Roehrig, a
4    physician's assistant, ring a bell as to
5    refreshing your memory?
6        A.    Yes.
7        Q.    Was she the person that you dealt
8    with during the time period that the blood tests
9    were being given?
10       A.    Not exclusively, no.
11       Q.    What contact did you have with Miss
12   Roehrig during the months of November and
13   December of 1996 and January of 1997?
14       A.    She is the physician who told me
15   the results of the blood work.  And she is the
16   physician who had -- well, this is what I
17   remember her saying.  She said that she had to
18   confirm with someone in order to see if they
19   were going to start treatment.  I remember her
20   leaving the examination room, coming back and
21   saying that treatment needs to be started
22   immediately.
23       Q.    Was she the person that first told
24   you that you were HIV positive?
25       A.    That I don't remember.

Williams 101

1
2      Q.   I believe her first name is Dawn
3   Roehrig?
4      A.   I can't be absolute.
5      Q.   Dr. Lazarus, what part did he take
6   in these blood tests that you had?
7           When I say blood tests, I'm referring to
8   the tests that were taken in November, December
9   and January.
10      Q.   What part did he play?
11      Q.   Yes.  What did he do with you by
12   way of medical treatment or consultation?
13      A.   I can't recall Dr. Lazarus.  As I
14   said before, I met, I've interacted with
15   numerous physicians at St. Clare's Hospital and
16   Health Center.  And whom they were by name, I
17   don't know.
18      Q.   Dr. Lazarus, was he one of the
19   persons that drew your blood, did he actually
20   draw?
21      A.   No.  It was a phlebotomist who drew
22   the blood.
23      Q.   Dr. Lazarus, on any of the
24   occasions that you got your blood results back,
25   did he discuss with you what the findings were?

J & M REPORTING AGENCY          (516) 785-4690

---

Williams 102

1
2      A.   I can't recall that.
3      Q.   Did you go to his office for
4   treatment after, the year of 1997, after being
5   diagnosed with HIV?
6      A.   Well, since he was the chief
7   physician I would think that, yes, from the
8   beginning I was entering his offices within the
9   confines of St. Clare's Hospital.
10      Q.   Did you meet with him and did he
11   conduct physical examinations?
12      A.   I can't say I had.  I can't say I
13   met him.  I met numerous physicians there and
14   who they are, I can't recall.
15      Q.   Mr. Williams, when you started this
16   lawsuit, you did it by what they call pro se, by
17   yourself?
18      A.   Yes.
19      Q.   You named him as a named defendant
20   in the lawsuit?
21      A.   Yes.
22      Q.   You made certain allegations as to
23   what he did or didn't do in regards to treating
24   you?
25      A.   That is correct.

J & M REPORTING AGENCY          (516) 785-4690

---

Williams 103

1
2      Q.   What I'm trying to find out is what
3   things he did or didn't do in terms of your
4   treatment, what you can recall.
5           For example, when was the first time that
6   you met Dr. Lazarus?
7      A.   May I confer with my counsel?
8      Q.   Sure.
9           MR. SILVERSON:  Off the record.
10           (Whereupon, a discussion was held
11           off the record.)
12      Q.   The question, more simply put is,
13   when did you first meet Dr. Lazarus?
14      A.   I don't recall if I ever met Dr.
15   Lazarus or not.
16           The reason why I had Dr. Lazarus as a
17   defendant is because he is on all my paperwork,
18   his name is on all my paperwork.  I had my
19   sister make an inquiry for me back in 2003 or
20   2004 when I was drafting my complaint and
21   interrogatories as to who Dr. Lazarus was.  And
22   I was apprised that Dr. Lazarus was the chief
23   physician.  So he, to me of course, appeared to
24   be the most credible defendant to name in my
25   petition.

J & M REPORTING AGENCY          (516) 785-4690

---

Williams 104

1
2      Q.   So your answer to my question about
3   meeting with him is, you don't have any
4   recollection of any specific meetings and
5   whatever allegations you set forth in your
6   complaint as to him was based on the fact that
7   he was head of the department or in some
8   capacity showed up on your name plate on various
9   medical documents at St. Clare's?
10      A.   Correct.
11      Q.   You had more direct contact then
12   with Miss Roehrig in terms of your testing in
13   the initial stages of your appearances at St.
14   Clare's, that she was the physician's assistant
15   who had some discussion with you about your
16   condition; right?
17      A.   I spoke with her on numerous
18   occasions.
19      Q.   What advice did she give you in
20   terms of how to treat the condition that had
21   been diagnosed as being HIV positive, did she
22   give you a checklist of things to do or did she
23   refer you to a physician or some other entity to
24   help you with this condition?
25           MR. GELLER:  I object to the form.

J & M REPORTING AGENCY          (516) 785-4690

Williams 105

1                   Williams       105

2      I think that mischaracterizes his

3 testimony. You can go ahead and answer

4 if you understand.

5      A.   Miss Roehrig was -- basically she

6 gave advice on how I should not miss taking the

7 medication. I should be consistent with taking

8 the medication. She put emphasis on how

9 dangerous it would be for me to discontinue it

10 at any time. She told me that I should be

11 careful to let -- to keep my viral load down.

12 In the beginning I had no idea what she was

13 talking about, until we had a little more in

14 depth conversation of what viral loads are and

15 stuff of this nature, which helped me to be more

16 informative about the diagnosis which they were

17 treating me for.

18      Q.   As best as you can remember by way

19 of substance of what she told you, what did she

20 tell you about viral loads and your treatment;

21 you said she went into some depth, as best as

22 you can remember.

23      A.   She said that the viral load is

24 something that determines the virus in like

25 regard to your blood or something to that

J & M REPORTING AGENCY       (516) 785-4690

---

Williams 106

1                   Williams       106

2 effect -- that there is an amount of virus that

3 you have in your blood. Then she was saying

4 that the medication would keep it low. And for

5 me to be very prompt and being on time taking

6 this medication.

7      Q.   Do you recall the names of the

8 medications that was prescribed for you to

9 combat the HIV positive virus that they

10 identified?

11      A.   Epivir, Retrovir and Saquinavir.

12      Q.   These are pills?

13      A.   Yes.

14      Q.   Are they to be taken daily?

15      A.   Yes.

16      Q.   They're three different types of

17 pills that you would take?

18      A.   Well, actually there were numerous

19 of other medications.

20      Q.   Can you identify those for me?

21      A.   No.

22      Q.   Were they related to the treatment

23 of the virus?

24      A.   Yes.

25      Q.   Can you tell me what they were?

J & M REPORTING AGENCY       (516) 785-4690

---

Williams 107

1                   Williams       107

2      A.   I can tell you some of the names.

3 I can't give you the complete list of all of

4 them.

5      Q.   It's in your record, so just do the

6 best you can?

7      A.   She had me on two types of Prozac,

8 Zithromax.

9      Q.   Prozac is an antidepressant drug;

10 is it not?

11      A.   That is correct.

12      Q.   That was part of your treatment

13 plan?

14      A.   That was part of what they were

15 giving me.

16           MR. GELLER: I'm just going to ask

17      for a pause for one second. I want to

18      confer with him.

19           Off the record.

20           (Whereupon, a discussion was held

21      off the record.)

22           MR. SILVERSON: You can continue

23      with your answer.

24      A.   All these various medications that

25 were prescribed to me were not prescribed

J & M REPORTING AGENCY       (516) 785-4690

---

Williams 108

1                   Williams       108

2 exclusively by Roehrig. They were prescribed by

3 a number of doctors under the supervision of Ted

4 Lazarus. So when I give you some of the names

5 of the medications that was prescribed to me, it

6 wasn't prescribed exclusively by Dawn Roehrig.

7      Q.   I understood that, but I'm glad you

8 clarified it.

9      A.   Zithromax, Prozac, Naprosyn,

10 Megace, Elavil. The list goes on.

11      Q.   Were some of these pills taken as

12 needed or were they taken on a daily basis or

13 several times a day depending on the

14 prescription?

15           MR. GELLER: Object to the form,

16      compound.

17      Q.   For example, the drugs that were

18 combating the AIDS virus, the ones that you

19 mentioned, the Epivir, Retrovir and Saquinavir,

20 those were all drugs that you took on a daily

21 basis; is that correct?

22      A.   Yes.

23      Q.   When did you commence or when did

24 you start taking those drugs?

25      A.   They had me start on that

J & M REPORTING AGENCY       (516) 785-4690

Williams    109

medication -- when I say, they--

Q.    Meaning someone at the hospital?

A.    Meaning people, the staff.

Q.    Any reference to they, it will be understood that you're meaning people at St. Clare's Hospital.

A.    Right.  And not specifically or exclusively any one person.

Q.    A variety of staff people?

A.    Yes.

Q.    Understood.

A.    It started after the first viral load -- no, yes, the first result of their viral load that came back as my being positive.

Q.    Just so that we're clear, our records, the records for St. Clare's show that you treated at Spellman Clinic from November 11, 1996 through August 15, 1997.  So roughly nine months.  Would that be about the right time period, would you agree with that?

A.    Say those dates again, please.

Q.    Those are the dates that you set forth in your complaint about the period of malpractice?

Williams    110

A.    Okay.

Q.    Those were the dates while at the Spellman Clinic, that there was a departure from the standard of care during that time period?

A.    Right.

Q.    The drugs that you just named them, those are drugs that you took during that time frame period, which is approximately nine months?

A.    Right.

Q.    In terms of side effects or results of taking these drugs, what if any occurred?

A.    I felt like I was dying every time I ingested these pills.  They had me keeled over as though my stomach was pushed to the far crevices of my back.  I could not stand up straight.  I could not see straight.  I was nauseated.

Q.    Are you saying abdominal pain?

A.    Yes.

Q.    Severe abdominal pain?

A.    Yes.

Q.    Would that occur immediately after taking the drug?

Williams    111

A.    Shortly after.  I would say, once the drug had been dissolved and you know it's supposed to be doing its work for me, then the symptoms come.

Q.    The first symptom you would experience after taking the antiretroviral drugs was severe abdomen pain?

A.    Yes.

Q.    It took place within a short period of time after taking the drug?

A.    Yes, and it lasted.

Q.    For how long?

A.    A long time.  I mean, because mind you these pills are taken several times a day.  So they, you know, I'm in pain several times a day, excruciating pain.

Q.    How many times a day were you taking the antiretroviral drugs in the early months of your treatment?

A.    I think four times a day.

Q.    Would you take one pill of each type of drug or do you remember the dosages?

A.    I can't remember that.

Q.    You're telling me that each time

Williams    112

you took these drugs that you would experience side effects, one of them that you stated already is the severe abdominal pain that would last for a long time?

A.    Yes.

Q.    Can you give me in terms of minutes, hours, how long this abdominal pain lasted?

A.    Hours.  Hours on end.  By the time the pain would subside, it's time to take another dose of medication.

In other words, I was taking medication to constantly stay in pain and to have diarrhea.  I was constantly taking medication to be nauseated and sick.

Q.    Let me just stay with the abdominal pain for a minute.  You are saying that the reaction to the drugs, the antiretroviral drugs, was severe abdominal pain that lasted pretty much from the time you took it almost to the next time you had to take it during the day?

A.    Pretty much.  By the time it subsided I had to ingest the pills again.  The pills obviously dissolved in my stomach and it

Williams                    113

2   caused it again.

3      Q.   This occurred from the time you

4   started taking it, which was after the viral

5   load showed high, for how long a period of time

6   did you have to take these drugs, until when?

7      A.   Throughout the period of my

8   treatment at St. Clare's.

9      Q.   During that approximately whole

10  nine-month period of time, you had daily pain,

11  severe abdominal pain from this.

12     A.   Yes.

13     Q.   In addition to the abdominal pain,

14  you mentioned nausea. When did that occur?

15     A.   All this occurred simultaneously,

16  right behind one another, at the same time

17  period. If I ingested pills today at 12:00, by

18  1:00, 1:30, I'm in pain.

19     Q.   You're in pain and you're nauseous

20  as well?

21     A.   Right. I mean, there are numerous

22  things.

23     Q.   I just want to stay with the nausea

24  now. This was a daily occurrence?

25     A.   Daily occurrence.

---

Williams                    114

2      Q.   So would it be fair to say that

3   during that time period you were at Spellman and

4   under treatment and taking these drugs, that you

5   experienced daily nausea?

6      A.   Yes.

7      Q.   For long periods of time or shorter

8   periods of time?

9      A.   I was nauseated shortly after

10  ingesting the pills.

11     Q.   Did it pass within a short time or

12  did it stay with you; as you said with the

13  abdominal pain it lasted from pill to pill. How

14  about the nausea, did that last the same amount

15  of time or something else?

16     A.   Sometimes when I throw up, then I

17  regurgitated something, and I feel a little bit

18  better. But then I would have to ingest

19  medication again within a few more hours, which

20  would put me right back in that state.

21     Q.   You mentioned diarrhea. What was

22  the frequency of diarrhea during the time period

23  you treated at Spellman, was it something that

24  you experienced daily, weekly, infrequently,

25  everyday or something else?

---

Williams                    115

2      A.   The diarrhea, it has gotten bad to

3   where I've defecated in my clothes.

4      Q.   Mr. Williams I'm asking in terms of

5   frequency, was it everyday, every other day,

6   every week or something else?

7      You've been able to describe the

8   abdominal pain and nausea as being daily.

9      A.   It was everyday that I took my

10  medication. Everyday.

11     Q.   You had an episode of diarrhea?

12     A.   And I think they prescribed

13  something for my stool, where it helped because

14  the diarrhea wasn't -- how could I put it, when

15  I had an episode of diarrhea, I mean it was

16  just -- I couldn't, I had no control of my

17  bowel.

18     Q.   You had to get to the bathroom

19  quickly?

20     A.   Yes. And if I didn't make it, it

21  was like a child having to urinate, you couldn't

22  hold it. They gave me something to the point

23  where I was able to have some control over it.

24     And I think that they took me off the Megace,

25  I think that was Megace, because Megace was

---

Williams                    116

2   considered a stool softener. With diarrhea you

3   don't need a stool softener. They took me off

4   of that and put me on something else and my

5   diarrhea wasn't as frequent.

6      Q.   Other than the abdominal pain,

7   nausea and diarrhea, what other side effects, if

8   any, did you incur as a result of taking this

9   medication; that medication, again, meaning the

10  drugs that were combating the HIV positive

11  virus?

12     A.   Numbness.

13     Q.   Can you describe what part of your

14  body felt numb?

15     A.   My arms and legs.

16     Q.   In terms of frequency of the

17  feeling of numbness, how would you allocate that

18  in terms of time?

19     A.   It's kind of hard for me. It

20  wasn't as frequent as the nausea. It wasn't as

21  frequent as the abdominal pain. But sometimes

22  when I did have those excruciating pains it felt

23  like my blood had stopped circulating in my arms

24  and legs. That if I tried to stand I couldn't

25  feel my legs. If I tried to grab something I

Williams                                                117

didn't feel it, because I didn't have the normal
usage of my hands and my limbs. The numbness
that I got wasn't as frequent, like I said, with
those episodes of abdominal pain.

Another time I can recall being aware of
the numbness was if I go through an episode
of abdominal pain and laid down, you know, until
I can recoup enough to get up and try to
function a little bit throughout my household, I
would feel this tingling. And the Naprosyn that
they gave me didn't work. But the numbness
wasn't -- I mean, if I moved, exert my hands and
feet.

Q.   Meaning clutching your fists and
stretching?

A.   Yes. It was like trying to get the
blood to circulate, I don't know what. I'm not
a medical practitioner, but all I could say is
that I had numbness.

Q.   What is your best estimate of how
long the numbness lasted in terms of time, as
best as you can estimate it, or whatever the
frequency was, how long did it last?

A.   No more than an hour and a half to

---

Williams                                                118

two hours at length.

Q.   Other than the numbness, diarrhea,
nausea and abdominal pain, what other symptoms
were you exhibiting that you attribute to the
medication that you were taking?

A.   That I attributed--

MR. SILVERSON:  Would you read back
the question, please.

(Whereupon, the prior question was
read back by the reporter.)

A.   Fatigue.

Q.   Anything else?

A.   Being weak, I didn't have any
energy. I lost weight, because I couldn't hold
down my food.

Q.   Since you mentioned weight, what
was your height and weight in November of 1996
when you went to St. Clare's Hospital for that
blood test?

A.   I don't recall. I'm 6 foot 3.

Q.   What is your weight now?

A.   My weight now is 185.

Q.   Do you have any recollection, the
records will bear out what it is, how much

---

Williams                                                119

weight loss do you feel that you incurred as a
result of having to take these drugs?

A.   I would say five pounds -- five to
eight pounds.

Q.   So you would be down to the 170s in
your weight?

A.   No. I was down in the 160s.

Q.   Let me start with the severe
abdominal pain. Once you started taking these
drugs and you got this daily severe abdominal
pains, did you tell anyone at St. Clare's
Hospital that you were experiencing this side
effect?

A.   Yes.

Q.   Who did you tell?

A.   Their staff.

Q.   A staff person?

A.   Yes.

Q.   Do you recall when you first
started to tell them about the complaints?

A.   I don't recall.

Q.   From the day you first started
taking these drugs, did these side effects start
hitting you right away or did it take a little

---

Williams                                                120

while for them to develop?

A.   I recall complaining about -- like,
some drugs give me different reactions. When I
took the medication for the virus, that's when I
got the stomach pain and nausea and everything
else.

But there was other drugs too that I've
taken. I don't know if it was the Zithromax or
the Naprosyn or whatever, but I experienced
feelings, but I don't remember what they were at
this time.

Q.   In your complaint you refer, in
addition to the things that you've mentioned,
that you suffered liver damage as a result of
taking these drugs. Did you ever speak to a
physician or have testing on your liver during
this time period that you were at Spellman,
which would indicate that you suffered liver
damage from the ingestion of the antiretroviral
drugs?

A.   No. But I do recall them telling
me that my enzymes, the enzyme level was high.

Q.   As of today, are you suffering from
any type of liver disease or liver damage?

Williams                    121

     A.   Not that I know of, no.  I'm not
being treated for anything.
     Q.   As of today, are you suffering from
diarrhea?
     A.   No.
     Q.   How about abdominal pain and/or
nausea?
     A.   No.
     Q.   In terms of numbness?
     A.   No.
     Q.   Did there come a time when you
stopped taking the antiretroviral drugs?
     A.   Yes.
     Q.   When was that?
     A.   I don't recall exactly when, but I
remember just stopping.
     Q.   Did you take these drugs for the
nine-month period that you treated at Spellman?
     A.   I can't answer that.  I don't know.
I would say, yes, but I can't be sure.
     Q.   Did you take them after 1997 into
1998 and forward?
     A.   They just made me too sick.  I
couldn't stomach them.

J & M REPORTING AGENCY          (516) 785-4690

---

Williams                    122

     Q.   Would it be fair to say that once
you stopped taking the drugs the symptoms that
you described to me stopped?
     A.   Oh, yes.
     Q.   Did you ever complain to anyone at
St. Clare's, the staff members, Dr. Lazarus,
Miss Roehrig, about these other symptoms, the
nausea, the diarrhea and numbness?
     A.   Repeat that question.
     Q.   Did you tell anybody at St. Clare's
during the time period in which you treated,
about the nausea, the diarrhea and the numbness?
     A.   Yes.
     Q.   Did any of those staff people at
St. Clare's either give you medication or change
your treatment so as to alleviate the symptoms
while you were there?
     A.   Some of the medication was changed,
but they would not change the cocktail that they
was giving me.
     Q.   The cocktail, meaning the three
drugs that we talked about?
     A.   Yes.  Right.
     Q.   Prior to getting these drugs, did

J & M REPORTING AGENCY          (516) 785-4690

---

Williams                    123

any medical person at St. Clare's describe for
you that there might be side effects in taking
these drugs?
     A.   No.  Not at all, no.
     Q.   So that you went ahead and took
these drugs with the understanding that there
would be no side effects?
     A.   I took these drugs because they
said that it would keep the viral load down.
The viral load staying down would allow me to
fight off any colds, bacteria or anything that I
may become infected with, which therefore would
help me live longer.  That's why I took them.
     Q.   With the nausea and the diarrhea
and the pain, how about the diet that you were
on, were you given any restrictive diet or a
particular diet to follow while you were under
treatment?
     A.   They gave me Ensure.
     Q.   What is Ensure?
     A.   It's a dietary supplement.  It's
like a dairy product.
     Q.   It's like a vitamin enhancement?
     A.   Yes.

J & M REPORTING AGENCY          (516) 785-4690

Williams                                    124

2    Q.    Would you be prescribed to take
3    that along with the meals that you were eating
4    as well?
5    A.    I was told to take it according to
6    the prescription, the prescribed times that they
7    told me.  Whether it was with meals or not, I
8    don't recall.
9    Q.    During this time period you were
10   being treated at St. Clare's, did you ever
11   request that they allow you to work, that you
12   wanted to go back to work?
13   A.    I don't recall.
14   Q.    Were you ever advised by anyone at
15   St. Clare's, more specifically Miss Roehrig,
16   that you were able to go to work even though you
17   were taking these medications?
18   A.    Yes.  I think I was told that.  But
19   my question to her at the time was how could I
20   work when this medication had me in the state
21   that it does.
22   Q.    So that you did tell Miss Roehrig
23   that you were having symptoms from the
24   medication?
25   A.    Yes.  Oh, yes.

---

Williams                                    125

2    Q.    Did she advise you, either she or
3    someone at St. Clare's, to change the dosages or
4    change the medications to help you alleviate the
5    symptoms that you were experiencing?
6    A.    I don't recall.
7    Q.    Did she refer you to a nutritionist
8    at St. Clare's to help you with your diet,
9    during this time period?
10   A.    Yes.
11   Q.    Did they give you written material
12   and things of that nature to guide you in what
13   to eat and try to stay healthy?
14   A.    That and the Ensure.
15   Q.    During the time period that you
16   were at Spellman, were you still living at
17   Project Return?
18   A.    Part of the time.
19   Q.    There came a time when you were
20   able to leave Project Return?
21   A.    Yes.
22   Q.    Where did you go from there?
23   A.    To the Bronx.
24   Q.    Was that the Mount Eden address
25   that you gave us earlier?

---

Williams                                    126

2    A.    No.  I forgot the address that I
3    had in the Bronx.  I think it was in South
4    Bronx, like, 170th Street.
5    Q.    Did you live alone or with somebody
6    else?
7    A.    No, alone.
8    Q.    Were you working at the time?
9    A.    No.
10   Q.    Now, were you paying for your rental
11   each month?
12   A.    Through public assistance.
13   Q.    In addition, once you were
14   diagnosed HIV positive, did you apply for any
15   grants or any additional assistance due to the
16   fact that you were diagnosed HIV positive?
17   A.    I applied, but was denied.
18   Q.    Did you ever reapply after that
19   denial?
20   A.    Not to my recollection.  They
21   denied me.  By the time I got my denial from
22   social security administration, you know, I was
23   so tired of being sick everyday, from ingesting
24   this medication.  So I was just ready to give it
25   all up and go on about my life.  And if I get

---

Williams                                    127

2    sick and die, I just get sick and die, because
3    this medication was killing me.  So I left and
4    went to West Virginia.
5    Q.    You left the City?
6    A.    Yes.
7    Q.    You mentioned social security
8    administration and previously today we requested
9    authorizations and they've either been provided
10   or will be.
11   Did you apply for disability under social
12   security?
13   A.    Did I?
14   Q.    Did you fill out an application and
15   apply for benefits?
16   A.    Yes.
17   MR. SILVERSON:  If it hasn't
18   already been provided, I request a copy.
19   MR. GELLER:  Yes.
20   Q.    Did that application indicate the
21   nature and extent of what your disability was at
22   the time?
23   A.    Yes.
24   Q.    What was that?
25   A.    HIV positive.

Williams    128

2    Q.    Did you document that application
3    with any medical reports?
4    A.    I don't understand the question.
5    Q.    When you fill out an application
6    for disability and social security, there's
7    boxes to fill out, the name of the doctor,
8    treatment dates, and so forth.  In addition to
9    that, you can attach supplemental records to it.
10    Did you attach any documents from any
11    medical professional?
12    A.    I don't recall.
13    Q.    If you did it would be attached to
14    the application, would it not?
15    A.    Yes.
16    MR. GELLER:  For the record, I'm
17    going to object to the form of that
18    question as a hypothetical.
19    Q.    Do you recall the date that you
20    filed the application for social security?
21    A.    No.
22    Q.    Do you recall the date that it was
23    denied?
24    A.    No.
25    Q.    Was it within the time frame of the

J & M REPORTING AGENCY        (516) 785-4690

---

Williams    129

2    time that you were at Spellman, those nine
3    months?
4    And when I say Spellman, I mean St.
5    Clare's.
6    A.    I don't remember.
7    Q.    Did you have some type of fungal
8    infection during the time you were treating at
9    St. Clare's?
10    Do you know what a fungal infection is?
11    A.    No.  I don't know what a fungal
12    infection is.
13    Q.    Did you ever take a drug called
14    Sporanox?
15    A.    Whatever I took, it's in the
16    record.  Like I said, I don't recall all the
17    medications.
18    Q.    Were you suffering, at the time, in
19    December of '96 and following, the time period
20    you were at Spellman/St. Clare's, from
21    depression?
22    A.    Yes.
23    Q.    Were you treating with a
24    psychiatrist or psychologist for the depression?
25    A.    At St. Clare's you mean?

J & M REPORTING AGENCY        (516) 785-4690

---

Williams    130

2    Q.    Or anywhere.
3    A.    I wasn't seeing anybody.  St.
4    Clare's was exclusively the medical facility
5    that I was frequenting.
6    Q.    Who did you see at St. Clare's for
7    your depression?
8    A.    Again, I don't know all these
9    doctors.  In fact, I don't know any of them by
10    name.  All I could tell you is that it was a
11    physician within the confines of St.
12    Clare's/Spellman Clinic.
13    Q.    How frequently did you meet with or
14    treat with a psychologist or psychiatrist at St.
15    Clare's?
16    A.    I don't know.
17    Q.    Would it be more than once a month?
18    A.    I would say it was frequently.
19    Frequent enough for them to give me medication.
20    Q.    You described, I think, Elavil and
21    Prozac.  These are drugs that are frequently
22    prescribed by psychiatrists.  Did you meet with
23    a psychiatrist?
24    A.    Yes.
25    Q.    You don't recall his or her name?

J & M REPORTING AGENCY        (516) 785-4690

---

Williams    131

2    A.    No.
3    Q.    You don't know how frequently you
4    met with him or her?
5    A.    No.
6    Q.    Do you remember whether it was a he
7    or a she?
8    A.    No.
9    Q.    Do you remember the nature of the
10    discussions and the reason for the depression,
11    did you get into any details with the doctors?
12    A.    I remember I was depressed from
13    being diagnosed with the HIV virus.  I recall
14    being more depressed when the viral load was
15    like real high.  I recall the psychotropic drug
16    that they were giving me was increased, because
17    my depression became more intense.  But how
18    often I met with them, I don't know.  I don't
19    recall.
20    Q.    Would it be fair to say that you
21    met with them during the nine months that you
22    were treating at St. Clare's?
23    A.    Many times, yes.
24    Q.    After you left St. Clare's in
25    August of 1997, did you continue treatment with

J & M REPORTING AGENCY        (516) 785-4690

Williams                132

1
2      any psychiatrist?
3          A.    Yes.
4          Q.    Who was that?
5          A.    Shawnee Hills.
6          Q.    Is that the name of a person or the
7      name of a place?
8          A.    That's the name of a medical
9      institution.
10         Q.    Where is that?
11         A.    Charleston, West Virginia.
12               MR. GELLER:  I think we're
13         going into another area.  It might be a
14         time for a lunch break soon, it's getting
15         on to 1:30.
16               After this question, if you want
17         to finish a particular line.
18               MR. SILVERSON:  Whatever is your
19         pleasure.  I think we're going to be here
20         for another hour or two.
21               Off the record.
22               (Whereupon, a lunch break was
23         taken.)
24     CONTINUED EXAMINATION BY
25     MR. SILVERSON:

---

Williams                133

1
2          Q.    When did you start treating at
3      Shawnee Hills?
4          A.    I think it was October of 1998.
5          Q.    What was the nature of the
6      treatment that you received?
7          A.    I had problems coping with
8      employment due to my fear of dying because of
9      AIDS.  I had a problem with interacting with
10     people, because of my fear that they knew of my
11     being contracted with the AIDS virus.
12               I had problems rearing my son, to the
13     point where he had to seek psychiatric
14     evaluation and help and medication.  I mean, he
15     literally had to go on medication because of
16     what I was putting him through.
17               I was just in constant fear of dying, not
18     being able to live a normal life, a life that we
19     know to be normal.  And it just was too
20     overwhelming for me to have to endure.  And
21     having to go to Shawnee Hills was somewhat of a
22     help.
23         Q.    This was a facility.  Did you move
24     into the facility or was this an out-patient or
25     in-patient facility?

---

Williams                134

1
2          A.    Out-patient.
3          Q.    What was your frequency of your
4      treatment at Shawnee Hills?
5          A.    I went -- one month I went about
6      two times.  And after that I'm quite sure, but
7      don't quote me, but it was pretty much every
8      month.
9                Now there was times that I had to just
10     walk in because the anxiety that I was going
11     through because of my diagnosis, and just
12     leaving New York, and I had nobody to converse
13     with, compelled me to go in.
14         Q.    You mentioned your 10 year old son.
15     While you were in New York, was he living with
16     you here?
17         A.    No.
18         Q.    Was he living with your mother or
19     someone else?
20         A.    He was living with his mother.
21         Q.    When you left New York, did you
22     move back in with the mother or did you live in
23     the same community where your son was living?
24         A.    Repeat that?
25         Q.    When you moved back to West

---

Williams                135

1
2      Virginia after you left New York, did you move
3      in with your son's mother or someplace else?
4          A.    That was two questions.  You asked
5      me did I move in with his mother and I said no.
6          Q.    Or someplace else?
7          A.    I moved to West Virginia.
8          Q.    Where did you live in West
9      Virginia?
10         A.    The first few weeks I lived at 20
11     West Walnut Street in Richwood, West Virginia.
12     The address where I'm at now.  From there I
13     moved to Charleston, West Virginia, 1819 Kanawha
14     Boulevard.
15         Q.    You mentioned you had trouble
16     interacting with people when you knew you had
17     been infected with the AIDS virus.  Did you tell
18     people when you got back to West Virginia that
19     you were HIV positive?
20         A.    That I had the AIDS virus?
21         Q.    You mentioned before that you had
22     employment problems and you had a fear of dying.
23     You further mentioned that you had difficulty
24     interacting with people who knew you had the
25     disease, AIDS.

Williams                                                          136

1
2          MS. LINDSAY:  Objection.
3     Mischaracterizes his testimony.
4          MR. SILVERSON:  I'll go back then.
5     Q.    Did you state earlier in your
6  testimony that you had difficulty interacting
7  with people because of the fact that you had the
8  HIV virus?
9     A.    Yes.  But I didn't mention anything
10 that I told them.
11    Q.    When you got back to West Virginia,
12 how did people know that you had the HIV virus
13 if you didn't tell them?
14    A.    It wasn't the point that I didn't
15 tell them.  Being here in New York, you see
16 someone who looks sick, you immediately think
17 that they have something.  And as in my
18 situation, you know, I thought that I looked
19 sick.  I thought my looking sick, feeling sick,
20 was probably at that time all mental.  That
21 people instinctively thought that I was sick
22 with something deadly.
23    Q.    When you moved back to Charleston,
24 West Virginia, by way of your appearance, you
25 believed that people felt you had some type of

J & M REPORTING AGENCY          (516) 785-4690

---

Williams                                                          137

1
2  deadly disease; would that be a fair statement?
3     A.    No, it wouldn't be a fair
4  statement.
5     Q.    What's unfair about the statement?
6     A.    What is unfair about it is, because
7  I couldn't tell you what people believed.  This
8  is what I thought.
9     Q.    You thought that because you felt
10 you looked sick; is that correct?
11    A.    Yes.
12    Q.    That's what I was trying to say,
13 Mr. Williams.
14          Other than going to the Shawnee Hills
15 Clinic, did you tell your friends that you had
16 in West Virginia or your family that you
17 believed that you had the AIDS virus?
18    A.    I told nobody at that time, that
19 particular time.
20    Q.    You mentioned having difficulty
21 with your son during this time period?
22    A.    Yes.
23    Q.    You said that it was your
24 interaction with him that might have caused some
25 of his problems or something else?

J & M REPORTING AGENCY          (516) 785-4690

---

Williams                                                          138

1
2     A.    No.  It was my having to support a
3  child on my own as a single parent with having
4  undergone -- it was difficult for me to raise
5  him, very difficult for me to raise Andre
6  because of my fear of dying of AIDS, and my
7  reluctance to interact with people because of
8  those diagnoses.
9     Q.    How did that affect Andre?
10          Andre's your son's name?  What's his last
11 name?
12    A.    Andre Mecoya Williams.
13    Q.    Are you still married to his
14 mother, or something else?
15    A.    I've never been married.
16    Q.    Did you acknowledge paternity of
17 your son?
18    A.    Yes.
19    Q.    You're on the birth certificate as
20 his father?
21    A.    Yes.
22    Q.    You mentioned--
23    A.    Well, I don't know.  I've never
24 seen his birth certificate, but I would imagine
25 so.  He has my last name.

J & M REPORTING AGENCY          (516) 785-4690

---

Williams                                                          139

1
2     Q.    You mentioned you had difficulty
3  supporting the child.  Did you mean by that
4  financial support or something else?
5     A.    By emotionally, financially.
6     Q.    Is there any family court order or
7  what would be equivalent to a family court here
8  in New York that's in West Virginia that
9  required you to support your child?
10    A.    No, never.
11    Q.    In the past, had you supported your
12 child financially?
13    A.    Yes.
14    Q.    In what manner?
15          Is there a monthly payment that you would
16 make or something else?
17    A.    You would have to clarify what you
18 mean by that.  During what period?
19    Q.    Your son is ten years old.  In the
20 ten years that he was born, did you make child
21 support payments to his mother during that
22 ten-year period, at any time?
23    A.    I gave his mother money.  I
24 wouldn't call it child support.  Because he's my
25 child, I have to take care of him.  I mean,

J & M REPORTING AGENCY          (516) 785-4690

Williams                     140

1 usually child support is something that is
2 ordered by the court for you to pay.
3        Q.    That's what I was referring to, but
4 you said that--
5        A.    No.. I never had a court order to
6 take care of any of my children.
7        Q.    You took care of them?
8        A.    On my own.
9        Q.    In terms of support, did this in
10 some way affect your emotional being at that
11 time, either the failure to support him or
12 having to support him in some way?
13        A.    Prior to the diagnosis given to me
14 by St. Clare's Hospital and Health Center, I've
15 never had a problem taking care of my son
16 financially, nor in any other capacity.  It
17 became very strenuous upon me after the
18 diagnosis, because this was something that was
19 not common for me to have to undergo.
20        Q.    What's the date of birth of your
21 child?
22        A.    July 1, 1996.
23        Q.    In terms of income and support for
24 the child, on the average, in the years that you

Williams                     141

1 did support him, what was the average payment
2 that you would make on an annual basis for his
3 support?
4        A.    I couldn't give you a figure.
5        Q.    From, I guess, other than the years
6 you were in correctional facilities and I just
7 want to jump to another area, you made a claim
8 for lost wages in your claim against the
9 hospital.  I assume that you're only accounting
10 for those years that you were in the working
11 world, which would mean, I guess, '96 through
12 the year 2000, and then I think you had been
13 imprisoned again until 2005.
14        So for those four or five years, what was
15 your annual income, for example, in the year
16 1996, if you know?
17        A.    I don't know.
18        Q.    How about in 1997?
19        A.    I don't know.
20        Q.    1998?
21        A.    I don't know.
22        Q.    1999?
23        A.    Again, I don't know.
24        Q.    Do you have any records, either by

Williams                     142

1 way of a W-2 statement or notations of the
2 amount of money that you made during those
3 years?
4        A.    At that time in my life I was never
5 one to keep documentation of anything.
6        MR. SILVERSON:  I've asked the
7 question about tax returns.  We've asked
8 for copies of them, whether you filed
9 them late or not at all or amended.
10 If you do have tax returns for those
11 years, again, I make a request for their
12 production.
13        Q.    Is there anything other than that
14 I've asked you about that you can substantiate
15 your income loss for those years?
16        A.    Other than having to grab a pen and
17 paper and trying to figure out correctly, that's
18 the only way.
19        MR. SILVERSON:  I'll leave a space
20 in the transcript.  If you can come up
21 with a computation for those years,
22 please fill in the blanks for those years
23 and, if not, indicate that you can't.
24 (INSERT):  _____

Williams                     143

1 _____
2
3        MS. LINDSAY:  Objection.
4        MR. GELLER:  I'll just note for the
5 record that there was a request by
6 counsel.
7        Q.    In terms of expenses, during that
8 time period from the time you were diagnosed at
9 Spellman in '96 through '97 while you were there
10 and thereafter, have you had any out-of-pocket
11 expenses that hasn't been covered by either
12 Medicaid, Social Security or insurance?
13        In other words, cash out of your pocket,
14 money you've had to layout for doctors and
15 medicines?
16        A.    For what time period?
17        Q.    From the time period you were
18 diagnosed with the HIV and then afterwards, from
19 1997 up and through the present.
20        A.    Yes.  The amount, I couldn't tell
21 you what it was.
22        Q.    Do you have an approximation of the
23 amount?
24        A.    I would say maybe $1,500 to $2,000.
25 And these bills were paid for by my mother at

Williams    144

Shawnee Hills.

Q.    Mr. Williams, I'm not talking about
that. I'm talking about in total. As a basis
of this lawsuit, you are asking for a sum of
money to be compensated for the negligence and
the injuries that you incurred.

I'm just trying to find out how much
you've lost in terms of monies you had to pay
for things related to your medical condition?

A.    I couldn't give you a figure on
that.

Q.    Again, if you have documentation
for it, we'd ask that you produce it or I'll
leave a space and you can do the computation, as
long as you explain how you arrived at the
number so we can see how you came to the number.
Would that be fair?

A.    Yes.

(INSERT)_____

Q.    Are there any liens against you by
way of insurance or Medicaid or Social Security,
liens that you know of?

A.    No.

Q.    Now back to Shawnee Hills. Who was

J & M REPORTING AGENCY        (516) 785-4690

---

Williams    145

the doctor who you treated with at Shawnee
Hills?

A.    I've seen several doctors there.

Q.    Do you have a name for me?

A.    No, I do not.

MR. SILVERSON:    Off record.

(Whereupon, a discussion was held
off the record.)

Q.    Mr. Williams, in that regard, if
you could be helpful in the sense that -- you
have no recollection of any name of any doctor
that you treated with there?

A.    No, I do not.

Q.    Do you know the length of time that
you treated there?

You mentioned October of '98, until when,
would you say?

You mentioned months so I assume it would
be more than a month.

A.    It was up until probably June or
July of '99 that I like stopped seeing them.

Q.    Was there a reason that you stopped
seeing them?

A.    I got indicted.

J & M REPORTING AGENCY        (516) 785-4690

---

Williams    146

Q.    Did that indictment result in a
conviction?

A.    Yes.

Q.    What were you convicted of?

A.    I was convicted of abduction.

Q.    Did you plead guilty or were you
convicted after trial?

A.    After trial.

Q.    Were you sentenced to prison?

A.    Yes.

Q.    What was your sentence?

A.    No less than 1, no more than 10
years.

Q.    Was this a conviction in the state
of West Virginia?

A.    Yes. That was the first
conviction.

Q.    Briefly, what was the accusation?

A.    The accusation was that I had
abducted a 15-year old white girl out of the
County of Nicholas, for the purposes of sexual
gratification in the County of Kanawha,
Charleston, West Virginia for a period of nine
days.

J & M REPORTING AGENCY        (516) 785-4690

---

Williams    147

Q.    Where were you sentenced; in what
prison did you go to?

A.    Huttonsville.

Q.    Correctional Center?

A.    Yes.

Q.    While at Huttonsville Correctional
Center, did you have any medical complaints
while you were there?

A.    Constipation.

Q.    While at Huttonsville Correctional
Center, were you still taking the antiretroviral
drugs?

A.    No.

Q.    Again, if I've asked you this I
apologize. When was the last time, prior to
being convicted and sent to the Huttonsville
Correctional facility, prior to that, when was
the last time you had taken the drugs?

A.    I don't know. I can't exactly give
you a date on that.

Q.    You had left St. Clare's in '97,
correct, in August of '97?

A.    Yes.

Q.    Then I guess you went to West

J & M REPORTING AGENCY        (516) 785-4690

Williams     148

Virginia after that?

A.   Yes.

Q.   Were you treating with any medical doctors there that gave you prescriptions for these antiretroviral drugs?

A.   As I said before, when I decided not to take anymore drugs, I meant it.

Q.   So then--

A.   I got tired of being sick from medication.

Q.   So, after August 15, whenever that drug supply ran out, you stopped taking them and never renewed your prescriptions?

A.   Actually, I stopped before that supply ran out.

Q.   Then the symptoms all abated or stopped?

A.   No, not -- no.

Q.   When did the symptoms stop?

A.   For the most part--

Q.   I'm giving you August of '97.

A.   For the most part, I've had diarrhea maybe for about three months. Not daily.

Williams     149

Q.   After you stopped taking--

A.   Periodically, I would have diarrhea. I was constantly nauseated.

Q.   On a daily basis, after stopping?

A.   No, not on a daily basis. I couldn't tell you how frequently it was. I really didn't take a notation of it. I did have the symptoms pretty much for about three months afterwards.

Q.   Symptoms meaning diarrhea?

A.   Yes.

Q.   Some nausea?

A.   Yes.

Q.   What about the abdominal pain?

A.   All these symptoms that I gave you earlier, I've experienced those very symptoms for about three months, but not as intense as I did when I was taking the medication. It faded itself out.

Q.   So that by stopping the drugs, the symptoms became less and less and ultimately you had no more symptoms after three months?

A.   Correct.

Q.   Then while at Huttonsville

Williams     150

Correctional, did you have any testing for HIV?

A.   Yes.

Q.   What testing did you have?

A.   The test for HIV.

Q.   The results of those tests?

A.   Negative.

Q.   Was there more than one test or just one?

A.   I had the initial test and then I think they gave me -- I think there was a follow-up test. I'm not sure.

Q.   Do you know when you found out that you were HIV negative?

A.   March 2004.

Q.   Up until that time you believed you were HIV positive?

A.   I believed I was getting ready to die, yes.

Q.   When you stopped the medication in 1997, there was some seven years that you lived with this fear?

A.   Yes.

Q.   During that 7-year period, from the time you stopped taking the drugs, other than

Williams     151

the blood test that you had at Huttonsville, did you have any other blood test in the interim?

A.   There were blood tests taken again when the penal system takes blood. They're not really -- they're not required to tell you what they're taking blood tests for. At least that's what they tell you.

Q.   What I'm trying to say is, that you left New York in 1997, so in--

A.   I left New York in 1998.

Q.   In '98, all right. So you start going to Shawnee Hills for psych problems?

A.   Correct.

Q.   And things with your son?

A.   Correct.

Q.   While at Shawnee Hills, did they administer blood tests to test for HIV?

A.   While at Shawnee Hills?

Q.   Yes.

A.   No.

Q.   Did you ever tell them at Shawnee Hills that you had been diagnosed as HIV positive?

A.   Yes.

Williams                    152

```
 1                    Williams              152
 2        Q.    That's why they were treating you
 3   basically; isn't that true?
 4        A.    They were treating me because I was
 5   depressed.
 6        Q.    Because of the fact that you were
 7   HIV positive, or something else?
 8        A.    No, because of the fact that I had
 9   to live with HIV.
10        Q.    Did you talk to them about the fact
11   that you had discontinued your medication?
12        A.    Yes.
13        Q.    Did they say anything in regard to
14   that, did they give you any recommendations?
15        A.    They tried to compel me to seek
16   medical attention, to get back on my drugs.  I
17   didn't want to get back on something that's
18   going to make me sick.
19        Q.    If it kept you alive though,
20   wouldn't that be a better alternative than to be
21   sick?
22        MS. LINDSAY:  Objection.
23        It's hypothetical.
24        Q.    You stopped taking the drugs, did
25   you not?
```

J & M REPORTING AGENCY          (516) 785-4690

```
 1                    Williams              153
 2        A.    Yes, I did.
 3        Q.    Then you stopped taking the drugs
 4   for almost seven years?
 5        A.    I stopped taking the drugs because
 6   it made me felt like I was dying.
 7        Q.    Understood.  I don't--
 8        A.    Why continue something when it
 9   doesn't make you feel any better.
10        Q.    Other than the fact the medical
11   people you were dealing with were telling you
12   that you should take it because it would prolong
13   your life?
14        A.    Like the medical people at St.
15   Clare's that was telling me to take it.  It was
16   making me sick.
17        Q.    Mr. Williams, at any time that you
18   were treating at Shawnee Hills, did any of the
19   doctors or nurses or any of the medical
20   professionals ask you to take a blood test to
21   confirm the fact that you had the AIDS virus?
22        A.    At Shawnee Hills?
23        Q.    Yes.
24        A.    Yes.
25        Q.    Did you take such a test?
```

J & M REPORTING AGENCY          (516) 785-4690

```
 1                    Williams              154
 2        A.    No.
 3        Q.    Why didn't you take such a test?
 4        A.    One, I wasn't financially able to
 5   pay for testing.  Like I said earlier, I was a
 6   single parent.  My first concern was taking care
 7   of my child.
 8        Q.    Who paid for the psych visits to
 9   Shawnee Hills?
10        A.    My mother had to pay for them,
11   because I wasn't able to.
12        Q.    You've been in hospitals before.
13   You know a blood test isn't like a major
14   expense.  You know that; right?
15        A.    It's not what?
16        Q.    It's not a major expense, a blood
17   test.
18        A.    I've never paid for one.  So, no, I
19   don't know.
20        Q.    Just so I know your reason, the
21   reason you didn't take a blood test was because
22   you couldn't afford to pay for one?
23        A.    That was a partial reason.
24        Q.    The other reason?
25        A.    The other reason, I wasn't going to
```

J & M REPORTING AGENCY          (516) 785-4690

```
 1                    Williams              155
 2   take any medication, once you take a blood test
 3   they see your viral load and it confirms -- I
 4   wasn't about to take anymore medication that was
 5   going to have me stay in the state that I left
 6   New York in, sick.
 7        Q.    So despite the doctors requesting
 8   you, you refused; is that fair?
 9        A.    Again--
10        Q.    For the reasons that you gave?
11        A.    Right.
12        Q.    In terms of your general health,
13   when you stopped taking the medication, you got
14   better, didn't you?
15        In other words, you didn't have the
16   symptoms that you were having after that initial
17   three months of--
18        A.    Right.
19        Q.    Your general health was better, was
20   it not?
21        A.    No.
22        Q.    It wasn't?
23        A.    No.
24        Q.    What was wrong with your health?
25        A.    I was still psychologically
```

J & M REPORTING AGENCY          (516) 785-4690

Williams 156

2    damaged.

3        Q.    I'm talking about your physical

4    health. In other words, you had been gaining

5    weight?

6        A.    Yes.

7        Q.    You weren't getting colds?

8        A.    No, I was not.

9        Q.    You never had pneumonia or anything

10    like that?

11        A.    No.

12        Q.    You didn't feel fatigued?

13        A.    I still had a little bit of

14    fatigue, but that was, in part, due to probably

15    the stress and lack of sleep, but I still felt--

16        Q.    Despite the fact that your body,

17    your physical body, was getting better or seemed

18    to be getting better, you still had this fear

19    that you still had the AIDS virus and that you

20    were going to die?

21        A.    Yes.

22        Q.    Other than the refusal to take the

23    blood test at Shawnee Hills, did you seek any

24    other medical treatment in 1998 regarding your

25    condition?

J & M REPORTING AGENCY        (516) 785-4690

---

Williams 157

2        A.    After Shawnee Hills tried to compel

3    me to take blood tests and to start treatment

4    again, I lost faith in the medical profession.

5    Because why continue to have someone take

6    medication if it involves killing you over. So,

7    no.

8        Q.    You didn't have any further medical

9    treatment?

10        A.    I didn't have any further desire to

11    deal with people in the medical profession, not

12    unless it was absolutely necessary.

13        Q.    What kind of employment, if any,

14    did you have from that time period in 1998 going

15    forward; did you have a job?

16        A.    Yes.

17        Q.    What kind of job?

18        A.    I worked for a construction company

19    out of Jane Lew, West Virginia. The name of the

20    construction company was Clyde Hyde Construction

21    Company. Don't quote me on it, but that's what

22    I'm quite sure what the name was. I know his

23    name was Clyde, and his last name is Hyde. Kind

24    of ironic that it rhymes. He was out of Jane

25    Lew, West Virginia. I stayed there from shortly

J & M REPORTING AGENCY        (516) 785-4690

---

Williams 158

2    after I got to West Virginia until -- I can't

3    really remember the dates.

4        Q.    Did you work for him for more than

5    a year?

6        A.    I don't know. It didn't take long

7    to construct a Holiday Inn Express. That's what

8    we was constructing.

9        Q.    Six months?

10        A.    Less than that. Right after I left

11    there--

12        Q.    Let me ask you some questions about

13    that. What kind of work did you do for Clyde

14    Hyde; was it physical labor?

15        A.    Actually, it wouldn't be considered

16    physical labor, because I was doing drywall

17    and--

18        Q.    You weren't sitting at a desk is

19    what I meant?

20        A.    No.

21        Q.    You were using your hands to build

22    something?

23        A.    Yes.

24        Q.    You were installing drywall,

25    spackling and taping and painting, things like

J & M REPORTING AGENCY        (516) 785-4690

---

Williams 159

2    that?

3        A.    Yes.

4        Q.    Did you work consistently for him

5    during the time period that you were there; in

6    other words, you were able to do the job?

7        A.    Yes. Until a certain period.

8    Until certain things came upon me, yes.

9        Q.    What things came upon you?

10        A.    Like interaction with people on a

11    large scale. Whenever it comes down to my

12    having to interact with other people, because of

13    my diagnosis given to me by St. Clare's, it

14    threw me into a tailspin. I couldn't achieve

15    anything more, because now the issues of my

16    being infected was a problem. I couldn't

17    interact and eventually I had to give up my job

18    because of that.

19        Q.    You said interaction on a large

20    scale?

21        A.    Yes.

22        Q.    Did you have a disagreement with

23    somebody on the job?

24        A.    No, it wasn't that.

25        Q.    With your employer?

J & M REPORTING AGENCY        (516) 785-4690

Williams 160

A.    It wasn't that.

Q.    Can you tell me what it was?

A.    I'll tell you exactly what it is.
Living with the virus, you just can't live a
normal life. You know, you have to be
conscious, you know, if you bleed, you don't
want anyone to come near that blood, because if
they have an open wound they can become
infected. You can't have a normal relationship.
So it's just best to be abstinent, celibate.

Q.    You said you weren't with any women
at that time?

A.    I haven't been with any women from
the time St. Clare's gave me those results until
the time that I was released on August 8 of
2005.

Now, when I say that interaction on a
larger scale, I mean I began to get too much
attention from female counterparts, which would
cause problems. Because I know that I couldn't
function on a normal level, like other people in
a relationship.

Q.    What does that have to do with you
working in a construction job?

Williams 161

A.    This was where a lot of the
meetings would go on. Other guys work there,
their friends come with their friends, their
wives come with their friends, making inquiries
about me. My giving them the cold shoulder
didn't sit well, not only with the females but I
was beginning to experience accusations of being
gay, you know, because of my lack of
association.

You have to understand. I'm in West
Virginia and it's not like the city here. It
was very hard for me to associate with people,
knowing that I could be stigmatized because of
the disease I have.

Q.    Did you tell anybody at Clyde Hyde
that you were HIV positive?

A.    I told no one.

Q.    You said your health was getting
better, you had been physically able to do the
job and gain some weight. I gather you didn't
look sick anymore?

A.    That's not the point of looking
sick.

Q.    How would that, if you can explain

Williams 162

it, how would that affect your ability to work
on the job during -- I assume it was a daytime
job?

A.    It was a daytime job.

Mr. Silverson, I don't think you're
familiar with construction work. I'll give you
a little preamble here.

Q.    But whether I'm familiar with it or
not--

A.    Because when people work some
construction, during breaks and during lunch
hour, other people are around, people like your
friends and stuff.

MR. SILVERSON: Off the record.

(Whereupon, a discussion was held
off the record.)

MS. LINDSAY: Can I have the
question read back, please.

(Whereupon, the prior question was
read back by the reporter.)

Q.    If you would like to tell me,
that's fine.

A.    Trying to work with people in a
small company like Clyde Hyde Construction,

Williams 163

you're interacting with their family members,
with their friends and everything
else. When an individual is single, people in
West Virginia feel that they have to do their
little Christian duties and hook you up with
someone and things of that nature. I couldn't
go to that level. It creates a problem.

Q.    So, was that the reason you left
the job, or something else?

You mentioned this large scale thing. It
must have been your opinion, that's a large
scale thing?

A.    One thing led to another. My being
antisocial then, it didn't really matter whether
I was a single father or not. I was still
classified as gay. The next thing, I was a
racist. It just went on and on and on.

Q.    I'm going to ask you a question
about racist. Were your co-workers Caucasian or
black or mixed?

A.    I was the only African-American man
in the county.

Q.    Was it an expressed racism towards
you or something subtle you felt?

Williams                    164

1
2    A.    It was both expressed and subtle.
3    You know, especially when a lot of the females
4    that my boss and his sons tried to hook me up
5    with were their friends.  They felt that I had a
6    great disposition of their character and I
7    should be with someone, I suppose, and my being
8    antisocial -- in fact, I can remember a time
9    where I literally told them I don't want to get
10   involved with you, period.  This created a
11   problem because, you know, here they're giving
12   me employment.  Not only are they giving me
13   employment, we eat lunch together.  Now their
14   friends are coming over.  Now I stopped eating
15   with them, I stopped socializing--
16       Q.    Were you the only black man on the
17   job?
18       A.    Not only was I the only black man
19   on the job, I was the only black man in the
20   county.
21       Q.    The social engagements that they
22   were going to hook you up with, these must have
23   been women from outside the county somewhere?
24       A.    What?
25       Q.    Some of the women that they wanted

J & M REPORTING AGENCY          (516) 785-4690

---

Williams                    165

1
2    to introduce you to, their friends, were these
3    African-American woman or white women?
4        A.    No, white women.
5        Q.    In terms of the -- and again, I'm
6    not going to go into this much -- you said there
7    was this sort of underlying racism.  If they
8    were trying to encourage you to date or to seek
9    and have social interaction with the white
10   women, why would that be racial in your opinion?
11       A.    Because I wasn't interacting with
12   them.  The racial part was on my behalf, not
13   theirs.
14       Q.    Obviously, if the white women had
15   no problems with dating a man of another race or
16   color, how would that be antisocial or racist in
17   any way?
18            MS. LINDSAY:  I think you're--
19            MR. GELLER:  I think you're
20   mischaracterizing his testimony.  Give
21   him a chance to explain.
22       Q.    Please, explain.
23       A.    The thing of it is, since I didn't
24   want to socialize with them, I was the one who
25   was considered the racist.

J & M REPORTING AGENCY          (516) 785-4690

---

Williams                    166

1
2        Q.    I see.
3        A.    Not them.
4        Q.    That you didn't want to date other
5    than someone of your own race?
6        A.    That wasn't the issue.  Had I
7    wasn't--
8        Q.    In fear of this?
9        A.    Right, you know.
10       Q.    You left Clyde Ryde; right?
11       A.    Yes.
12       Q.    This is in what time period; this
13   is in '99 sometime?
14       A.    This is '98.
15       Q.    What was your next job after that?
16       A.    L & J Construction.
17            MR. SILVERSON:  Just so we don't
18   have to go through this, have we
19   requested--
20            MR. GELLER:  You've requested the
21   records--
22            MR. SILVERSON:  --for L & J, all
23   these companies that he's mentioned?
24            MR. GELLER:  Yes.
25       A.    Yes.

J & M REPORTING AGENCY          (516) 785-4690

---

Williams                    167

1
2        Q.    So L & J was what type of work and
3    where was it?
4        A.    L & J Construction was based in
5    Charleston, West Virginia.
6        Q.    Charleston is a good distance away
7    from Jane Lew?
8        A.    Yes.  Jane Lew.  Of course, Jane is
9    J-A-N-E.  Lew is L-E-W.
10       Q.    What type of work did you do for
11   L & J?
12       A.    They hired me to do a foundation
13   with rebar.  Since that particular duty required
14   very little manpower and it didn't take long,
15   they gave me other duties, such as plastering
16   and drywall.
17       Q.    They paid you by check each week?
18       A.    L & J?
19       Q.    Yes.
20       A.    40 hours, by check.  Yes.  Anything
21   over was--
22       Q.    How long did you work for them,
23   roughly, in terms of time, into 1999?
24       A.    Into and towards the end of '99,
25   yes.

J & M REPORTING AGENCY          (516) 785-4690

Williams 168

Q. So that was a little bit longer of employment than you had with Clyde Hyde?

A. Actually, I would say L & J -- I started at L & J just before Christmas of '98. I worked there until midsummer of '99.

While I was employed at L & J, I took on a second job at Fifth Quarter Restaurant.

Q. That's sounds like a place you go after a football game?

A. No. Fifth Quarter was prime rib and lobster. West Virginians consider that a five-star restaurant.

MR. SILVERSON: Off the record.

(Whereupon, a discussion was held off the record.)

Q. What did you do there?

A. I was a cook. So I worked construction in the daytime, then I cooked at night.

Q. How many days a week did you work as a cook, weekends?

A. I worked full-time there.

Q. How long did you work at Fifth Quarter?

J & M REPORTING AGENCY        (516) 785-4690

---

Williams 169

A. I worked at Fifth Quarter until interaction with the waitresses became a problem.

Q. When you say interaction -- you've used that a couple of times, what do you mean by interaction?

A. Anytime people are ready to socialize with me on another level that can lead to intimacy, I have to back off. I know what it's like for someone to tell you, look, you have AIDS, I mean HIV that can lead to AIDS.

To get involved with a relationship, knowing that that person can contract that very disease, that would be very insensitive. I mean, that would be something so low. So, in order to protect that person, you know, without having to reveal my medical status, I just have to back off.

In doing that, by not socializing with these people, not interacting with these people, you know, again, a stigma is placed upon me. I'm anti-social, gay, or anything that they would assume would be the problem, for me not interacting with them. My life was -- the full

J & M REPORTING AGENCY        (516) 785-4690

---

Williams 170

course that I could have led my life was hindered because of the diagnosis that I was given while in New York.

Q. Did you have any concern while being a cook for a restaurant, that because you were HIV positive that you could cause infection to other persons?

A. How?

Q. I'm asking you.

A. I didn't have no concerns at all about that.

Q. Did you tell anyone at the Fifth Quarter that you had been diagnosed HIV positive?

A. No, I did not.

Q. How many months did you work for them, roughly, if you know?

A. Several. Exact, I don't know.

Q. Why did you leave?

Is it because of this that you wanted to leave or did they ask you to leave?

A. Oh, no. I don't recall being terminated from any employment in West Virginia.

Q. You left voluntarily from Fifth

J & M REPORTING AGENCY        (516) 785-4690

---

Williams 171

Quarter. The L & J job ended because it ended; right?

A. No. L & J job ended because of the -- L & J had a construction site right next to a hospital. The hospital was in front and actually Shawnee Hills where I was going, was right behind them. The nurses used to come over and have lunches on some picnic benches. And again, I was somewhat a popular individual.

Q. Popular?

A. I was very popular for some of the female staff there and by me not wanting to socialize, the pressure on the construction job became unbearable, you know.

Q. This was due to the nurses having lunch on a bench near the construction site?

A. Yes, because, you know, they would make inquiries about me. When the other guys might show an interest in them, they showed an interest in me. I'm not showing no interest in them. I just want to get a job done, get my paycheck, go home, and sulk or whatever, but--

Q. It's very possible -- would you agree, it's possible that maybe they could have

J & M REPORTING AGENCY        (516) 785-4690

Williams                    172

1
2    considered that you were married or had a
3    girlfriend and not interested in them for that
4    reason?·
5        A.    I'm absolutely sure everyone knew I
6    wasn't married.
7        Q.    How do you know that?
8        A.    For some, the guys on the job knew.
9    They, like women, they gossip.  No offense, they
10   gossip.  They just put your information out
11   there.  What you don't want -- what you don't
12   want known, you just don't say it.
13       Q.    Did they know you had a ten-year
14   old son?
15       A.    He used to come to my job site on
16   days when he had half a day of school.  On days
17   when he had no school, because West Virginia
18   have a lot of days where kids are just out of
19   school and Andre was going to a Catholic school
20   at the time, St. Anthony's.  And he would come
21   over to my job.  And, yes, people knew that I
22   was a single parent.  And they knew that I was
23   single.  In fact, I remember times when Andre
24   was already posed that question, is that your
25   father?  Yes, that's my dad.  Does he have a

J & M REPORTING AGENCY            (516) 785-4690

Williams                    173

1
2    girlfriend, no.
3        Q.    They would ask that of your son?
4        A.    They would ask that of my son.
5        Q.    Your son was living with his mother
6    at that time?
7        A.    No.
8        Q.    With someone else?
9        A.    With me.
10       In the beginning, when he first came to
11   West Virginia -- when I went to Newport News to
12   get him, he was going to school in Richwood,
13   West Virginia.
14       Q.    Newport News, isn't that in
15   Virginia?
16       A.    That's in Virginia.
17       Q.    That's where he was living?
18       A.    With his mother.
19       He was going to school in Richwood, West
20   Virginia.  When the problem of my mental
21   problems got, you know, as bad as it did--
22       Q.    This was in '98?
23       A.    Right.  He was going to school in
24   Richwood.  He began to exhibit problems from the
25   pressure that I was on from the diagnosis that I

J & M REPORTING AGENCY            (516) 785-4690

Williams                    174

1
2    was given at St. Clare's.  So he had to
3    eventually leave school in Richwood and I
4    brought him to Charleston with me.  He was
5    enrolled in St. Anthony's Catholic School until
6    I went to prison.
7        Q.    Then he went back?
8        A.    To Newport News.
9        Q.    After you left Fifth Quarter and
10   the job ended at L & J, where did you go next?
11       This is midsummer of '99 and I think
12   you--
13       A.    I quit L & J and I went to TNS
14   Telecommunications.  TNS stands for Taylor
15   Nielsen, Sofries, S-O-F-R-I-E-S.
16       Q.    What type of business is that?
17       A.    Telecommunications.
18       Q.    What did you do for them?
19       A.    I took surveys regarding politics,
20   sports, new products on the market.
21       Q.    Was this on the telephone?
22       A.    Telemarketing.
23       Q.    How long did that job last or how
24   long did you stay there?
25       A.    This was one of the jobs where I

J & M REPORTING AGENCY            (516) 785-4690

Williams                    175

1
2    worked around a lot of females.  So there has
3    been times that I've taken off days at a time to
4    regroup.  But I worked there.  I stayed there
5    for -- say, I got sentenced about February of
6    2000.
7        But there were times when I didn't go to
8    work and I would go to work at another place
9    called Ready Labor.  Ready Labor was more
10   conducive to my situation, because I was always
11   out working in remote areas.
12       Q.    Just so I'm clear, the
13   telecommunications job, this wasn't out of your
14   home, it was a location, a business location?
15       A.    Yes, it was.  It was in the heart
16   of Charleston, West Virginia.
17       Q.    It was an office?
18       A.    Yes.
19       Q.    Did you have cubicles where you
20   would make your calls from?
21       A.    Yes.
22       Q.    You said, if I'm understanding you
23   correctly, that you had this interaction problem
24   again with females at the job?
25       A.    Yes.

J & M REPORTING AGENCY            (516) 785-4690

Williams    176

Q.    Them wanting to date and you didn't
want to?

A.    It's not that I didn't want to.  I
really wanted to, but I couldn't.

Q.    You felt because of the HIV
positive situation, you didn't want to get
involved or have a social interaction or a
physical interaction with any of the females?

A.    That is correct.

Q.    That caused you to leave the job
from time to time, as you call it to regroup?

A.    Yes.

Q.    When you say regroup, did you seek
medical attention or psychological counseling?

A.    No.

Q.    Other than the time that I was
going to Shawnee Hills.  There was a time that I
did go to Shawnee Hills and no one was there to
see me, but I think it was probably because my
mom didn't pay the medical bill or something,
that it went delinquent or something to that
effect.  Then they had referred me to call
Alliance, a place which I never went.  This was
while I was at TNS.

J & M REPORTING AGENCY          (516) 785-4690

---

Williams    177

Q.    The Shawnee Hills experience that
you had, where they wanted you to take the blood
test and you refused to take it.  After that,
you did go back to them from time to time to get
counseling?

A.    I needed it, yes.

Q.    Did they ask you to take the blood
test again?

A.    No.

Q.    Did you take any blood test in the
year 1999 at all?

A.    No.

Q.    In terms of your physical health,
was that staying pretty stable at that point, in
the year 1999?

In other words, you weren't getting
frequent infections, you weren't sick with a
cold or flu-like symptoms or anything of that
nature, missing a lot of time from work because
of illness?

A.    Repeat that.

MR. SILVERSON:  Could you read that
back.

(Whereupon, the prior question was

J & M REPORTING AGENCY          (516) 785-4690

---

Williams    178

read back by the reporter.)

A.    Did I miss a lot of times because
of illness?

MR. GELLER:  Off the record.

(Whereupon, a short recess was
taken.)

MR. SILVERSON:  Read the question
back.

(Whereupon, the prior question was
read back by the reporter.)

A.    No, I was not missing a lot of
times because of illness.

Q.    When did you leave Taylor, Nielsen
& Sofries?

A.    I said earlier that it was in
February of 2000, but it wasn't 2000, it was in
'99.  But it wasn't -- it was in '99.  Because I
recall, after I started working with Ready
Labor.  That was the place where I focused my
employment at.

Q.    What did you do for Ready Labor?

A.    Labor.

Q.    Construction jobs or something
else?

J & M REPORTING AGENCY          (516) 785-4690

---

Williams    179

A.    Whatever was required.  It was
always physical labor.

Q.    Was it a full-time job?

A.    It could have been.  But I didn't
work full-time.

Q.    When you say not full-time, what do
you mean; how many hours a week did you work for
Ready Labor?

A.    24 sometimes.  Maybe 32.

Q.    Was your job at one location, or
did you go to job sites to do this work or
something else?

A.    Various locations.

Q.    On this particular job, did you
have any trouble with the job or did you leave
of your own accord?

A.    No.  I don't understand your
question.

Q.    How long did you work for Ready
Labor; you said you started in '99, sometime?

A.    I started sometime towards the end
of '99.

Q.    How long did you work for them?

A.    Just before the time I went to

J & M REPORTING AGENCY          (516) 785-4690

Williams    160

1  prison.

2       Q.   Which was?

3       A.   In March.

4       Q.   March of 2000?

5       A.   Yes.

6       Q.   That was the reason for leaving the

7  job, I assume?

8       A.   Yes.

9       Q.   Prior to going to prison -- I

10  assume you were indicted and had a trial

11  somewhere between late '99 and March of 2000?

12      A.   My trial was when?

13      Q.   If you went to prison in the year

14  2000, March of 2000 -- by the way, are you sure

15  about that?

16      A.   Yes.

17      Q.   You're sure it wasn't 2001?

18      A.   In 2001 I was already in prison for

19  a year or better.

20      Q.   I'm just referring to my records,

21  it seems to have something different.

22           During the course of time between the

23  time you left Ready Labor and went to prison,

24  were you under the care of any doctor?

J & M REPORTING AGENCY          (516) 785-4690

---

Williams    161

1       A.   No.

2       Q.   Would it be fair to say Mr.

3  Williams, that other than the Shawnee Hills

4  Center or facility and your some treatments that

5  you had there, that you never treated with

6  another physician up until the time of your

7  incarceration?

8       A.   You are losing me.

9       Q.   From October of '98 when you went

10  to Shawnee Hills, you had some consultations and

11  this thing about the blood test. After that, up

12  until the time you went to prison in March of

13  2000, you never saw a doctor for any major

14  medical condition or--

15           MS. LINDSAY:  Objection to form.

16      Q.   Did you see a doctor at all from

17  the dates of October 1998 to March of 2000,

18  other than doctors at Shawnee Hills?

19      A.   No.

20      Q.   Did you take any prescribed

21  medication other than that which might have been

22  prescribed for you at Shawnee Hills between 1998

23  and 2000?

24      A.   No.

J & M REPORTING AGENCY          (516) 785-4690

---

Williams    162

1       Q.   Would you say that your physical

2  health, I'm not talking about your emotional

3  state, but your physical health from October of

4  '98 to March of 2000 was generally good?

5       A.   Generally good.

6       Q.   When you went to Huttonsville

7  Correctional Center in 2000, did they do an

8  intake medical examination?

9       A.   All facilities take an intake

10  examination.

11      Q.   Is a blood test part of that

12  examination; urine test, blood test?

13      A.   I know they took a urinalysis.

14  Yes.

15      Q.   How about a blood test?

16      A.   I don't recall a blood test, no.

17      Q.   Did you tell the people at the

18  intake, I assume you talked to somebody about

19  your medical history, medical problems, since

20  you were going to be incarcerated for a period

21  of time; did you tell them about the fact that

22  you had been diagnosed with HIV positive?

23      A.   No.

24      Q.   Is there a reason that you didn't

J & M REPORTING AGENCY          (516) 785-4690

---

Williams    163

1  tell them that you had been diagnosed HIV

2  positive?

3       A.   Yes.

4       Q.   What's the reason?

5       A.   This is lengthy.

6       Q.   It's your examination. Whatever

7  you want.

8       A.   You don't tell people, just

9  anybody, your medical condition, because it

10  doesn't stay in the confidence of just them. It

11  gets around the whole facility. And fortunately

12  for me I was apprised of this dysfunctional

13  professionalism about the institution before I

14  got there. So I knew best to just keep my mouth

15  shut. However, it didn't help, because it was

16  already out that I had been HIV positive or was

17  HIV positive.

18      Q.   When you say it was already out, I

19  don't follow you. Out in the prison already?

20      A.   Yes.

21      Q.   If you didn't tell anybody and you

22  didn't tell them, how would they know?

23      A.   Nicholas County Circuit Court.

24      Q.   It's the name of a courthouse. Was

J & M REPORTING AGENCY          (516) 785-4690

Williams    184

1    that where you were tried?

2    A.    That where was I had my first

3    trial, yes.

4    Q.    There was more than one trial?

5    A.    Yes.

6    Q.    Regarding the same case?

7    A.    Yes.

8    Q.    One trial there was a hung jury and

9    you had to be retried?

10    A.    No.  First trial was for the

11    abduction.  And the second trial was for third

12    degree sexual assault.

13    Q.    During the course of that trial,

14    did it come out that you were HIV positive?

15    A.    In the course of that trial, I

16    tried to put forth to the Court that it was

17    impossible for me to have had any intimate

18    relations with this 15 year old Caucasian girl

19    for the numerous times that she has alleged.

20    And to prove this, I asked the court to give

21    this -- to allow an order to take a blood test.

22    The prosecution stated that it's

23    irrelevant, because it takes several years for

24    antibodies to be shown in the blood of an

25

---

Williams    185

1    alleged victim and that since the jury of

2    Nicholas County had already came back of verdict

3    of guilty, that the court should go ahead and

4    impose sentence.

5    When the court imposed sentence, they

6    made sure that they put on top of the folder

7    that Mr. Jimmie Meccya Williams is to be handled

8    with caution, double latex gloves.  This

9    information was forwarded to the prison even

10    before I got there.  Which meant that a large

11    portion of the inmate population knew of me

12    before I even got there.

13    Q.    Did you testify in the trial?

14    A.    Which one?

15    Q.    The first trial, the abduction.

16    A.    No.

17    Q.    Did you testify at the second

18    trial?

19    A.    I represented myself.

20    Q.    Did you testify?

21    A.    Absolutely not.

22    Q.    Was there any evidence at either

23    trial put forward to show that you were HIV

24    positive, either by the prosecution or the

25

---

Williams    186

1    defense?

2    A.    I don't understand that.

3    Q.    Was there medical evidence offered

4    at either trial, to show that you were HIV

5    positive?

6    A.    The only evidence that I presented

7    to the court was at my sentencing hearing in the

8    first trial.  And that was the buried paperwork

9    that I got from St. Clare's Hospital and Health

10    Center.  Though sent me my medical records, what

11    they considered to be my medical records at the

12    time.

13    Q.    Such as what we have here today,

14    the hospital record?

15    A.    It wasn't quite as--

16    Q.    There was something that came from

17    St. Clare's?

18    A.    Yes.

19    Q.    At or before your sentencing?

20    A.    No, before the sentencing.

21    Q.    So the judge or whoever, the

22    probation department could take a look at--

23    A.    I purposely had it for the judge to

24    look at.

25

---

Williams    187

1    Q.    The reason being that it showed

2    that you were with HIV positive.

3    A.    I could not have had--

4    Q.    If you had relations with the girl

5    it would have shown positive on her, that was

6    your argument?

7    A.    Yes.  Because it was alleged that

8    we have been involved 3 -- 4 to 5 times a day.

9    4 to 5 times makes 36 to 45 times.

10    Q.    That's Nicholas County, West

11    Virginia?

12    A.    Yes.

13    Q.    That would be people against?

14    A.    No, not the people.  The state of

15    West Virginia versus Jimmie Meccya Williams.

16    Q.    So that when you got to

17    Huttonsville you're claiming that they already

18    knew that you were HIV positive?

19    A.    A large portion of the population,

20    yes.

21    Q.    Yet, you never told anyone at the

22    intake that you were?

23    A.    Never.

24    Q.    Despite the fact that it was double

25

Williams 188

2 gloved stamped on your file?

3     A.   Yes.

4     Q.   Did anyone ask you about the reason

5 that it was stamped, either a doctor or any of

6 the nurses there?

7     A.   No.

8     Q.   Did you give them any medical

9 history about your past medical conditions at

10 all?

11     A.   Several years later, yes.

12     Q.   In 2000 you did not?

13     A.   2001, 2002, 2003 and first brief

14 part of 2004 I never told anyone anything. I

15 never gave them any documentation of anything.

16     Q.   By the way, did you, by virtue of

17 your conviction and the fact that you were going

18 to offer that you wanted the woman to take a

19 blood test, that you in fact admitted having

20 sexual relations with the person?

21     A.   Excuse me?

22     Q.   At your trial, in Nicholas County,

23 by virtue of the fact that you wanted the judge

24 to consider giving the victim of this crime a

25 blood test, you were admitting that you had

J & M REPORTING AGENCY    (516) 785-4690

---

Williams 189

2 sexual relations?

3     A.   No, I was not admitting.

4     MR. GELLER:  Objection to form.

5 Is that a question or a statement?

6     MR. SILVERSON:  I thought it was

7 question.

8     MR. GELLER:  Could you read it

9 back.

10     (Whereupon, the prior question was

11 read back by the reporter.)

12     MR. GELLER:  It was a question.

13     If you understand the question you

14 can answer.

15     A.   I absolutely did not.

16     Q.   Did you also not tell the people at

17 Huttonsville Correctional Center that you had no

18 prior drug use history or mental treatment?

19     A.   Yes.

20     Q.   What was the reason for not telling

21 them about your I.V. drug use with heroin and

22 your various depression problems over the years,

23 since they were asking about it?

24     A.   I didn't need those type of

25 rehabilitative courses. Every thing you tell

J & M REPORTING AGENCY    (516) 785-4690

---

Williams 190

2 them that you have an issue with on the outside

3 world is an extra class that you have to take.

4 I wasn't interested in taking any classes. So,

5 no, I did not have any problems for the last 20

6 years.

7     Q.   You really weren't telling them the

8 truth, were you?

9     A.   No, I was not. I was intentionally

10 deceiving them, because I didn't want to go

11 through their rehabilitative classes. In fact,

12 I felt I wasn't supposed to be there.

13     Q.   The other question I have for you

14 Mr. Williams is that, you indicated that you

15 were living with this fear of dying of AIDS and

16 all the things that go with that, not having

17 interaction with females, basically isolating

18 yourself from people.

19     During the time you were at Huttonsville

20 Correctional Center, did you need the services

21 of a psychologist to help you with this

22 depression or had your depression gone away at

23 that point?

24     MR. GELLER:  Object to the form.

25     Those aren't mutually exclusive.

J & M REPORTING AGENCY    (516) 785-4690

---

Williams 191

2     Q.   Other than being in jail, were you

3 depressed as a result of the HIV situation at

4 Huttonsville Correctional Center?

5     A.   Periodically.

6     Q.   Were you depressed to the extent

7 that you needed to seek medical attention for

8 it?

9     A.   That needs to be elaborated.

10 Again, certain times you just can't reveal,

11 certain things about yourself, because it will

12 be used against you.

13     No, I did not tell anyone. If I needed

14 some psychiatric evaluation or consultation, I

15 couldn't get it. I mean it was just not

16 conducive for me to do that.

17     Q.   You hadn't been at Huttonsville

18 Correctional Center before this had you?

19     A.   No.

20     Q.   You are aware that they offered

21 mental health consultation, whether it would be

22 with a psychiatrist or a psychologist, to those

23 persons that were in need of it, were you not;

24 you aware that those services were

25 available to you at the prison?

J & M REPORTING AGENCY    (516) 785-4690

Williams    192

```
 1                    Williams
 2       A.    I've been there for quite some
 3    years.  I've been there for quite some years,
 4    what they considered help, I don't.
 5       Q.    Aren't you substituting your
 6    judgment against a medical doctor?
 7       A.    I'm giving you the facts that I see
 8    that other people have gone through.  Facts.
 9    You do not get the type of medical attention
10    that they say you would get when you're
11    sentenced.  No, you don't get it.
12       A.    If you are depressed and that you
13    do seek help, to help your depression, you could
14    have taken advantage of having some type of
15    drugs to help you through the depression such as
16    some type of antidepressant drug, you could be
17    given that while you were in prison, so you
18    wouldn't be as depressed as a result of the HIV
19    virus.
20            MS. LINDSAY:  Objection.
21            MR. GELLER:  Objection.
22       Q.    Mr. Williams, what I'm trying to
23    ask you is, you had the opportunity while at
24    Huttonsville to seek out mental health
25    counseling and you didn't do that; correct?
```

Williams    193

```
 1                    Williams
 2       A.    Did I have an opportunity -- see I
 3    would say, did I have a fair opportunity.  There
 4    is always an opportunity for anything, but was
 5    it a fair opportunity.  No, it was not a fair
 6    opportunity.  The opportunity was there, yes.
 7       Q.    Had you taken advantage of that
 8    opportunity, could you have gotten some type of
 9    medication to help you with your depression?
10       A.    I can't answer that.
11       Q.    Because you didn't do that, right?
12       A.    Not only didn't I do that, but if I
13    did do that I don't know if they would give me
14    the type of medical treatment that I needed.
15       Q.    I guess we're running in circles,
16    you wouldn't know that unless you tried.  Was
17    there any reason not to try that?
18       A.    Yes.
19       Q.    The reason was?
20       A.    Many other inmates -- out of 968
21    inmates 300 of them needed psychiatric help and
22    didn't get it.
23            Most of the people that needed
24    psychiatric help ended up in what they call
25    segregation.  I'm not trying to live my sentence
```

Williams    194

```
 1    in segregation.  If you call that assistance,
 2    then you can call it assistance, but I don't
 3    call it assistance.
 4       Q.    Did anyone ask you while at
 5    Huttonsville Correctional Center to take a blood
 6    test?
 7       A.    I was ordered by the court.
 8       Q.    To take a blood test at
 9    Huttonsville?
10       A.    While in receiving.
11       Q.    While at Huttonsville?
12       A.    Yes.  While in receiving.
13       Q.    I'm not sure what receiving is?
14       A.    It's when you go into -- when
15    you're initially go into jail.  Do you remember
16    earlier we talked about lockdown.
17       Q.    Yes.
18       A.    That's considered receiving.
19       Q.    So this way they were evaluating
20    you to determine where to send you to do your
21    sentence?
22       A.    Right.
23       Q.    This was probably in the early part
24    of 2000 sometime; right?
```

Williams    195

```
 1                    Williams
 2       A.    I guess.  I can't remember, but I
 3    remember being ordered.
 4       Q.    The court ordered you to take a
 5    blood test.  Did you refuse?
 6       A.    No, you can't.
 7       Q.    You can't refuse?
 8       A.    No.
 9       Q.    The blood test was given to you?
10       A.    They took blood.
11       Q.    Do you know if part of that blood
12    testing was to determine whether you had the HIV
13    virus?
14       A.    No, they couldn't do that.
15            The blood that was taken from you is to
16    be in a DNA databank.
17       Q.    Other than that, was there any
18    medical request while at Huttonsville to take
19    your blood, other than to DNA type you?
20       A.    No.
21       Q.    At any time during your sentence at
22    Huttonsville Correctional Center did you seek
23    the services of either a psychologist or a
24    psychiatrist or any of the programs they had for
25    psychological counseling?
```

Williams                    196

    A.    Can you repeat that.

          MR. SILVERSON:  Could you read that

    back.

          (Whereupon, the prior question was

    read back by the reporter.)

    A.    Yes.

    Q.    When was that?

    A.    I couldn't recall, but it was

within the time frame that I was there.  Which

is why I didn't pursue it.

    I did not pursue it for the simple fact

of what I said to you earlier.  You know you

start giving these people--

    Q.    These people, meaning corrections?

    A.    Yes.  You start giving them

information about your having mental problems

and psychological problems, you become

segregated.  And, I did not want to endure any

part of my sentence under segregation.

    Q.    So that your answer was yes, you

started out, but you didn't seek it out?

    A.    Yes, I made--

    Q.    You made an attempt to do it and

you didn't follow through?

J & M REPORTING AGENCY          (516) 785-4690

---

Williams                    197

    A.    I didn't follow through.

    Q.    It was your fear that you would be

segregated or the information would be--

    A.    I would be segregated or would be

moved to Quilliams, Quilliams 3, which is in a

maximum security prison at Mount Olive.  It's

called AGSAG (phonetic).  Those initials stand

for Administrative Segregation, AGSAG.

    Q.    Have you also been know by the name

of Jimmie Glover?

    A.    Yes.

    Q.    Was that another name that you've

used in your life?

    A.    No.  Yes it was another name that I

used in my life, but that was a name that in my

childhood I was led to believe was my name.

    Q.    Did you use the name Jimmie Glover

as an adult?

    A.    I can't remember.  I can't recall.

    Q.    So, you didn't take advantage of

this.  Did there come a time when they

transferred you from Huttonsville to someplace

called Southern Regional Jail, Prime Care

Medical?

J & M REPORTING AGENCY          (516) 785-4690

---

Williams                    198

    A.    Humm?

    Q.    Did there come a time while you

were serving your sentence at Huttonsville that

you were transferred to another jail called

Southern Regional Jail?

    A.    No.

          MR. GELLER:  Can we take a break.

          (Whereupon, a short recess was

    taken.)

    Q.    Do you want to explain to me--

    A.    Sure.  Southern Regional Jail was

years later.  Southern Regional jail was

actually this year.  Huttonsville didn't

transfer me.  This was the only time I violated.

I was on parole.  I got on parole on August of

2005.  I violated it in February of this year of

2006.  I was at Southern Regional Jail.

    Q.    During the time you were at

Huttonsville you weren't hospitalized in their

facility for any illness of any kind?

    A.    During my incarceration.

    Q.    Other than something minor?

    A.    During my whole bit, yes I was

hospitalized, once.

J & M REPORTING AGENCY          (516) 785-4690

---

Williams                    199

    Q.    What was that for?

    A.    They said I fainted.

    Q.    Had you lost consciousness at some

point?

    A.    I woke up in the clinic.  They kept

me there for about a week.

    Q.    The diagnosis was?

    A.    I don't know, because they don't

tell you.

    Q.    Did you get any medications at all

while you were there?

    A.    No.  Excuse me, I don't recall.

    Q.    Did you ever have any problem with

your liver at all during the time you were at

Huttonsville Correctional Center?

    A.    No.

    Q.    You're sure of that?

    A.    Absolutely.

    Q.    Did there come a time at

Huttonsville Correctional that you received a

blood test?

    A.    What?

    Q.    Did there come a time at

Huttonsville Correctional Center that you

J & M REPORTING AGENCY          (516) 785-4690

Williams    200

underwent a voluntary HIV test?

    A.    Yes.

    Q.    Was that in April of 2004?

    A.    On or about.

    Q.    You were still having to serve out your sentence was that right, during that time?

    A.    Yes.

    Q.    Why had you changed your mind about having a blood test in the prison during that time?

    A.    I don't understand.

    Q.    This was a voluntary HIV test, was it not?

    A.    Yes.

    Q.    It wasn't court ordered?

    A.    No.

    Q.    It wasn't a doctor trying to do it?

    A.    Right.

    Q.    You volunteered?

    A.    Yes.

    Q.    Why did you volunteer?

    A.    During the course of my incarceration I lived on a unit with 44 to 53 individuals. I was very germaphobic, because I

---

Williams    201

didn't want to get sick. I was very conscious of filth, because I didn't want to catch any bacteria -- any germs and bacteria.

    So I was very conscious. And during the course of my stay on that unit, everybody got sick. Everybody got colds, pneumonia, staph infections.

    Q.    How about you?

    A.    I didn't.

    Q.    Why the blood test?

    A.    Because I needed to know why is everybody getting sick. This what I posed to the doctor, Dr. Proctor.

    I went to the clinic and I asked him why was -- how come everyone is getting sick and not me. I asked him something to the effect, I said, doc, everybody is getting sick but me and I'm supposed to be the main one getting sick. He said, like why, because I'm HIV positive. Oh no, you are not HIV positive.

    I went to explain some of the medication that I was given and when I mentioned the cocktail that was given to me, you know it fully alerted him and nurse that was on duty. He

---

Williams    202

immediately summoned a test. When he ordered the test he called me back up. He was like, I knew it, you are not HIV positive. So I go to the records, the very records that I saw at Nicholas County Court. I looked through the records. That's when he said, somebody made a grave error.

    Q.    Who was this doctor?

    A.    Dr. Proctor.

    Q.    Do you know a first name?

    A.    No.

    Q.    Just so I understand this clearly, you want to voluntarily, he didn't--

    A.    Because everybody was getting sick but me. If anybody should get sick it should be me. I'm the one that's HIV positive.

    Q.    Why would that impel you to go forward and have a test if you were safe and you weren't sick?

    A.    I wasn't safe. I wasn't -- although I wasn't sick, I wasn't safe.

    Q.    Let me ask you this Mr. Williams. This is four years after you were incarcerated. The rest of the unit -- were you in that same

---

Williams    203

unit all these years or was there another unit you were in?

    A.    Not only was I in that unit, but I controlled this unit.

    Q.    What does that mean?

    A.    If I didn't like you sleeping next to me, you got to move.

    If I didn't like the way you carry yourself, if you were a filthy individual you got to move.

    Q.    Was this a dormitory setup or did you have individual cells?

    A.    It was a dormitory setup, but I controlled the joint. And like I said, you had people that come in, they were filthy, they were like savages, they had to go to another unit. Because I'm not going to get sick, because of your filth. I'm not going to get sick because of your salacious practices. If you're going to do that, take it to another unit.

    Q.    When you say you controlled, did you have a hierarchy of people -- did you sort of unofficially have leadership there or did somebody take a voice vote, or you just said I'm

Williams                    204

the man and that's it?

A.    No.  Actually I was officially,
officially -- I mean officially not only through
the administration by warden William Haynes
himself, I was on the inmate committee.  I was
the dorm representative.  So, yes, whatever I
said it goes.  I didn't want no one next to me
who was sick.

Q.    That unit that you were in, did it
have a name or a designation; did it have a
block number?

A.    A.

Q.    It was called unit A?

A.    It's been so long I forgot.  Dorm
3.

Q.    You were in Dorm 3 from once you
were assessed, you remained in Dorm 3 until you
were let out?

A.    I was in Dorm 3 during my entire
bit at Huttonsville.

Q.    After a period of I guess it would
be about four years, you reached the point where
you felt there was such filth and contamination
that you needed to go and get a test?

J & M REPORTING AGENCY         (516) 785-4690

---

Williams                    205

A.    No, that wasn't it.

Q.    Am I characterizing it improperly?

A.    Yes.

Q.    What I'm trying to saying is, if
you got in there in the beginning, after year
number one, was the place clean?

A.    No, not really.

Q.    Did it get worse in year number
two?

A.    It stayed about the same.

Q.    People were getting sick during
years one and two?

A.    Yes.

Q.    Yet, you didn't go to the doctor,
did you?

A.    Actually I didn't take notice then.

Q.    You said you were germaphobic?

A.    Yes.

Q.    Did that just occur in 2004 or had
you always been that way?

A.    No, it occurred -- actually my
being germaphobic occurred after the assessment
of St. Clare's Hospital.

Q.    So when you went into the prison in

J & M REPORTING AGENCY         (516) 785-4690

---

Williams                    206

2000, you had this fear of getting the germs and
getting sick, because you believed you were HIV
positive.  Yet, even though the conditions were
less than optimum or less than you liked, you
put up with it for four years?

A.    Actually--

Q.    Do you see my point?

A.    No, I don't.

Because you are not really trying to see
the picture that I'm trying to paint here.  When
I said that I had actually controlled the unit,
I mean, I actually controlled the unit.  If I
needed disinfectants, I'd get it.  If I needed
anything in order to satisfy my desires, my
needs, the counselors would get it for me.

MR. GELLER:    I'd like to take a
break.

(Whereupon, a short recess was
taken.)

MR. SILVERSON:    Repeat the last
question and answer, please.

Q.    So, there came a time in 2004 that
you went to this Dr. Proctor and you had a test,
and found that you were not HIV positive?

J & M REPORTING AGENCY         (516) 785-4690

---

Williams                    207

A.    Right, because for four years the
number of people that came on Dorm 3 were
contracting staph infections, the flu,
pneumonia, cold, numerous things.  And I didn't
contract any of this.

Q.    That's a good thing wasn't it?

A.    Yes, it is a good thing, but it's
not real good when you watch everybody get sick
and you're being germ phobic, you're being very
cautious and everyone around you is getting sick
but you're the one -- I'm the one who has an
immune deficiency.

Since I have an immune deficiency and I
am susceptible to contracting just about
anything at any given time, then if anyone is to
get sick, it should be me.  Not everybody who
goes out there and lifts 300 pounds a day, day
in and day out, jogging in the winter.  I should
be the one that's getting sick, but I'm the one
that is remaining most healthy.

Q.    Like I said, it's a good thing is
it not?

A.    In the end, yes.

Q.    Let's just go year by year.  The

J & M REPORTING AGENCY         (516) 785-4690

Williams    208

1 first year when you said that the conditions
2 weren't very nice, they weren't good, it was
3 filthy. You wanted disinfectant, you wanted to
4 keep germ free. Wouldn't it have made sense to
5 tell somebody that you were HIV positive?
6 A.    No.
7 Q.    Before that, so that they could
8 protect you against getting infections?
9 A.    No.
10 Q.    Why?
11 A.    The reason why is, because I was
12 already stigmatised for being HIV positive.
13 Q.    They thought you were any way
14 because of the -- most inmates thought you were?
15 A.    And they used the term Ninja to say
16 that I was HIV positive. Why the term, I don't
17 know.
18 Q.    Is that a prison term meaning AIDS,
19 or HIV positive?
20 A.    Yes.
21 Q.    Ninjas are supposed to be deadly,
22 may be that was the reference?
23 A.    Yes.
24      Since that I've endured those accusations

Williams    209

1 and stuff like that, I had to just protect
2 myself, you know, from the environment. I had
3 to make sure that I didn't get sick.
4 Q.    Wouldn't it have made sense at the
5 time to tell people in the administration, since
6 you were active in -- as you say, you were on
7 the committee, because you were HIV positive,
8 that the conditions were not optimal for you to
9 be living in that kind of the condition, because
10 of the risk of infection?
11 A.    The committee wasn't formed until
12 late 2003, early 2004.
13 Q.    Did you tell anybody then that you
14 were HIV positive?
15 A.    I spoke with an officer. His name
16 was Angel, and I asked him. I told him one day,
17 you know have you ever heard anything about --
18 read anything in my file. He was like, no, not
19 particularly. And he was like, why. And I had
20 told Angel, you know that my immune system has
21 been compromised and that if anybody should be
22 getting sick it should be me. But at this
23 particular time everybody was getting staph
24 infections.

Williams    210

1 Q.    Not you?
2 A.    Not me. I mean people were going
3 to quarantine and things of that nature and not
4 me.
5 Q.    Weren't you happy about that, that
6 you weren't getting sick?
7 A.    Of course I'm happy about it, but
8 the thing of it is, my immuned system was
9 compromised and I'm not getting sick, you know,
10 I need to know why. So it took me four years to
11 realize this and I finally decided, you know, I
12 want to find out what's going on. I want to
13 take a test.
14 Q.    That's when you found out that you
15 weren't HIV positive?
16 A.    That's correct.
17 Q.    You were released from Huttonsville
18 in August of 2005?
19 A.    Yes.
20 Q.    Did you ever end up going back to
21 prison after that?
22 A.    I violated February of this year.
23 Q.    What was the violation?
24 A.    Leaving the state without

Williams    211

1 permission. Possession or consumption of
2 marijuana, open container of alcohol, failure to
3 report -- I mean it was like five violations and
4 I can't remember them all.
5 Q.    Did you have to go back to
6 Huttonsville or someplace else?
7 A.    No.
8 Q.    What happened?
9 A.    In order to go back to the penal
10 system you have to be proven to be a threat to
11 society. I was a full-time college student and
12 I worked full-time. The violations that I
13 incurred were not serious enough for them to
14 render a decision to put me back in prison. So,
15 they opted to giving me what I would consider a
16 second shot.
17 Q.    Was there any administrative
18 sanctions against you; did you have to do a
19 certain amount of days before you were released
20 again or they just had a hearing and that was
21 it?
22 A.    No, we had a parole revocation
23 hearing and an individual had conducted a
24 hearing and she, during the course of her

Williams                                    212

1
2    examination, the evidence that was presented
3    against me, she determines whether I am fit to
4    go back to society.
5         Q.   Of the charges that you were cited
6    with, did they sustain any of the charges
7    against you at the hearing?
8         A.   Well, they didn't really have to
9    sustain any of the charges against me.  I pled
10   guilty to all of them, with an explanation.
11        Q.   As a result of that, was your
12   parole revoked?
13        A.   No.
14        Q.   You were able to stay out?
15        A.   I'm here, yes.
16        Q.   Are you still under parole as of
17   this time?
18        A.   Yes.  I anticipate being on parole
19   for about a year.
20        Q.   Since the test in April of 2004
21   have you had any other blood tests, HIV test for
22   HIV?
23        A.   Yes.
24        Q.   When was that?
25        A.   I don't know.  I would have to look

Williams                                    213

1
2    at that court order that you and my counsel got.
3         Q.   Court order.
4              MR. GELLER:  He's referring to --
5    Miss Poritz and I stipulated that he
6    should undergo further testing for HIV to
7    confirm his status.
8              MR. SILVERSON:  He did.
9         Q.   That test was negative;
10   correct?
11        A.   Yes.
12        Q.   Would it refresh your memory if I
13   said it was done in either January of '06 or May
14   of '06?
15             MS. LINDSAY:  I think it was July.
16             MR. GELLER:  I think, we can just
17   put on the record, so it's clear.  This
18   test was done, pursuant to an order of
19   Judge Baer who is presiding over this
20   action, while at the Prime Care
21   Medical Facility, which is part of the
22   Southern Regional Jail.
23             MR. SILVERSON:  That test under
24   court order was done and you received the
25   results.

Williams                                    214

1
2              MR. GELLER:  Yes, that's right.
3         Q.   How is your health generally today,
4    are you in good health; would you consider
5    yourself to be in good health?
6         A.   I consider myself in good health.
7    Yes.
8         Q.   Are you currently under the care of
9    a psychiatrist or a psychologist?
10        A.   I'm under the care of no one.
11        Q.   Are you currently employed?
12        A.   Yes.
13        Q.   What do you do?
14        A.   I fry chickens for KFC.  And I am
15   going to start doing individual home care.
16        Q.   As a home care attendant?
17        A.   Yes.  This would comprise of
18   administering medication to a particular
19   individual named Thelma Boston.  I would cook
20   her food, take her shopping, take her to her
21   doctors appointments, stuff of this nature.
22        Q.   Are you being licensed for that?
23        A.   I've already been certified.
24        Q.   As of today you're in generally
25   good health, other than this deposition today?

Williams                                    215

1
2         A.   I am in excellent health.  I get up
3    every morning, I do my calisthenics, once a week
4    I go jogging.  I'm in fine health.
5              MR. SILVERSON:  Do you have any
6    questions?
7              MR. GELLER:  I don't think we have
8    anything to add right now.  We ask for
9    the opportunity to review the transcript
10   and sign it.
11             MR. SILVERSON:  Yes, absolutely.  I
12   don't think I have anything else.
13             MR. GELLER:  Maybe we'll confer for
14   a second with our client.
15             Off the record.
16             (Whereupon, a discussion was held
17   off the record.)
18   EXAMINATION BY
19   MR. GELLER:
20        Q.   Mr. Williams, I would like you to
21   explain what happened after you were in
22   Huttonsville, you were released and then you
23   violated parole.  Were you again incarcerated?
24   Did you understand my question?
25        A.   I understand the question.

Williams                                        216

1   I left Huttonsville Correctional Facility

when I did I was violated for parole in February

of 2006.

Q.   After you were violated, were you

incarcerated again as a result of the violation;

yes or no?

A.   Yes.

Q.   Where?

A.   At Southern Regional Jail.

Q.   When were you released?

A.   I was released October 13, 2006.

MR. GELLER: That's all.

*   *   *

(Whereupon, the deposition is

concluded on the following page to allow

for a jurat.)

---

Williams                                        217

CONTINUED EXAMINATION BY

MR. SILVERSON:

Q.   You were in from February to

October -- you violated?

A.   From February?

Q.   '06 to October of '06?

A.   Correct.

Q.   Where is Southern Regional Jail?

A.   Beckley, West Virginia -- excuse

me, it's in Beaver, West Virginia.

MR. SILVERSON:  Thank you.

MR. GELLER:  Nothing further.

(Time concluded:  4:15 p.m.)

*

_____

JIMMIE MECCYA WILLIAMS

Subscribed to and sworn to before me

this___day of _____, 2006.

_____

---

Williams                                        218

I N D E X

WITNESS

Jimmie Meccya Williams

EXAMINATION BY                          PAGE NO.

Mr. Silverson                        4, 216

Mr. Geller                           215

E X H I B I T S

DEFENDANT'S                             PAGE NO.

A                                    81

Information To Be Supplied

17-3; 35-4; 35-17; 127-16; 142-6; 142-19;

144-19; 166-16

---

Williams                                        219

C E R T I F I C A T E

STATE OF NEW YORK )

)SS.:

COUNTY OF NASSAU  )

I, JOSEPH MALTZMACHER, a shorthand

reporter and Notary Public within and for the

State of New York, do hereby certify;

That JIMMIE MECCYA WILLIAMS, the witness

whose examination before trial is hereinbefore

set forth, was duly sworn by me and that such

examination before trial is a true record of the

testimony given by such witness.

I further certify that I am not related

to any of the parties to this action by blood or

marriage; and that I am in no way interested in

the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set

my hand this  /  day of _December_, 2006.

_____

JOSEPH MALTZMACHER

**ERRATA SHEET FOR THE TRANSCRIPT OF:**
Jimmie Mecoya Williams
November 17, 2006
*Jimmie Mecoya Williams v. Tadd Lazarus and St. Clare's Hospital and Health Center*

| Page | Line | From | To | Reason |
|------|------|------|-----|--------|
| 17 | 3 | (INSERT) | October 1995 | Insertion |
| 28 | 11 | Berry | Bear | Transcription error |
| 140 | 23 | 1996 | 1986 | Transcription error |

Subscribed and sworn to before
me this 9th day of January 2007.



_____
Jimmie Mecoya Williams


Notary Public
My commission expires on
01/26/2016

[Notary seal]