UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------X

JIMMIE MECCYA WILLIAMS,

                                 Plaintiff,

                 vs.

TADD LAZARUS, M.D., P.C., ET AL.

              and

ST CLARE'S HOSPITAL AND HEALTH
CENTER,

                          Defendants.

------------------------------------------------------------------x

Case No.: 05 Civ. 5909 (HB)

**PLAINTIFF'S REPLY TO DEFENDANT ST. CLARE'S HOSPITAL AND HEALTH
CENTER'S OPPOSITION TO PLAINTIFF'S MOTION IN LIMINE TO EXCLUDE
EVIDENCE OF OR REFERENCE TO ANY PRIOR OR SUBSEQUENT "BAD ACTS"
BY OR CRIMINAL CONVICTIONS OF PLAINTIFF**

SIMPSON THACHER & BARTLETT LLP

Paul C. Gluckow (PG-0159)
Joshua R. Geller (JG-0187)
Emma Lindsay (EL-0604)

425 Lexington Avenue
New York, NY 10017-3954
Telephone:  (212) 455-2000
Facsimile:   (212) 455-2502

Attorneys for Plaintiff

# TABLE OF AUTHORITIES

## Cases

*Celebrity Cruises Inc. v. Essef Corp.*, 434 F. Supp. 2d 169 (S.D.N.Y. 2006).................................................................................4

*Daniels v. Loizzo*, 986 F. Supp. 245 (S.D.N.Y. 1997) ................................5

*Hygh v. Jacobs*, 961 F.2d 359 (2d Cir. 1992) ........................................4

*Jones v. New York City Health & Hosp. Corp.*, No. 00 Civ. 7002 (CBM), 2003 WL 21289653 (S.D.N.Y. June 3, 2003) ............................................................................3

*Lee Kwong Nom v. United States*, 20 F.2d 470 (2d Cir. 1927) ..................................................................................5

*Lewis v. Velez*, 149 F.R.D. 474 (S.D.N.Y. 1993)..............................3, 5

*Mills v. Estelle*, 552 F.2d 119 (5th Cir.), *cert. denied*, 434 U.S. 871 (1977) ..........................................................2, 3

*Nimely v. City of New York*, 414 F.3d 381 (2d Cir. 2005)..........................4

*TIG Ins. Co. v. Newmont Mining Corp.*, No. 04 Civ. 4105 (SAS), 2005 WL 2446234 (S.D.N.Y. Oct. 4, 2005) ................................4

*United States v. Bensimon*, 172 F.3d 1121 (9th Cir. 1999) ......................4

*United States v. Cobb*, 588 F.2d 607 (8th Cir. 1978), *cert. denied*, 440 U.S. 947 (1979) .............................................2

*United States v. Crumbly*, No. 06-11387, 2007 WL 328813 (11th Cir. Feb. 2, 2007)...................................................5

*United States v. Hans*, 738 F.2d 88 (3d Cir. 1984) ...............................2

*United States v. Mahler*, 579 F.2d 730 (2d Cir. 1978) ...........................2

*United States v. Pope*, 132 F.3d 684 (11th Cir. 1998)............................3

*United States v. Portillo*, 633 F.2d 1313 (9th Cir. 1980), *cert. denied*, 450 U.S. 1043 (1981)...........................................2

*United States v. Rubio-Gonzalez,* 674 F.2d 1067 (5th Cir. 1982) ..................................................................................2

*United States v. Thompson*, 806 F.2d 1332 (7th Cir. 1986) .....................2

*United States v. Tomaiolo*, 249 F.2d 683 (2d Cir. 1957)...........................5

i

*Zinman v. Black & Decker (U.S.), Inc.*, 983 F.2d 431 (2d
    Cir. 1993) ................................................................................................ 1

## Rules

Fed. R. Evid. 609(b) ............................................................................1, 2, 3, 5

## Other Authorities

Fed. R. Evid. 609(b) advisory committee's note ......................................... 3

Plaintiff Jimmie Meccya Williams, by his attorneys, Simpson Thacher & Bartlett LLP, respectfully submits this Reply to Defendant St. Clare's Hospital and Health Center, n/k/a St. Vincent's Midtown Hospital's ("St. Clare's") Memorandum of Law in Opposition to Plaintiff's Motion in Limine to Exclude Evidence of or Reference to Any Prior or Subsequent "Bad Acts" or Criminal Convictions of Plaintiff ("Def.'s Opp'n").

## PRELIMINARY STATEMENT

In its Opposition to Plaintiff's Motion, St. Clare's concedes that it would be improper to admit any evidence of Plaintiff's post-July 1999 convictions for abduction and sexual assault and of parole violations or other bad acts. Def.'s Opp'n at 1. Thus, Plaintiff's 1993 fraud conviction is the only remaining issue. The fraud conviction should be excluded based upon its age. St. Clare's cannot overcome Rule 609(b)'s clear proscription against stale convictions. In determining the age of Plaintiff's fraud conviction under Rule 609(b), the Court should measure time from the date of the conviction or from the date of release from prison, whichever is later, until the beginning of the trial. Here, this means that the conviction is more than eleven years old, as Plaintiff was released in October 1995. Furthermore, as discussed more fully in Plaintiff's Motion papers, introduction of evidence regarding the fraud conviction would be highly prejudicial to Plaintiff, such that it should properly be excluded. St. Clare's may not bolster its argument that the probative value of the conviction substantially outweighs its prejudicial effect with the inadmissible testimony of its expert.

## ARGUMENT

St. Clare's concedes that "exceptional circumstances" must exist to warrant admission of evidence of a stale conviction. Def.'s Opp'n at 10; *see also Zinman v. Black & Decker (U.S.), Inc.*, 983 F.2d 431, 434 (2d Cir. 1993) ("We have recognized that Congress intended that convictions over ten years old be admitted very rarely and only in exceptional

1

circumstances.") (internal quotation marks omitted). However, in trying to establish such exceptional circumstances, St. Clare's mischaracterizes Rule 609(b). Def.'s Opp'n at 11. In an attempt to circumvent the plain meaning and generally-accepted interpretation of Rule 609(b), St. Clare's asserts that "[t]he 1993 conviction (with a release date of 1995) is <u>not</u> stale with respect to this case stemming from events in 1996/97." *Id.* However, the events at issue in the case are not the point at which the clock stops running for a determination of whether or not a conviction is stale under Rule 609(b), and St. Clare's does not cite a single case in support of such a characterization of the Rule. Courts, when discussing the time elapsed since a witness's prior conviction, consistently use language which makes clear that the time is to be measured either to the commencement of trial or to the time the witness testifies at trial. *See, e.g., United States v. Thompson*, 806 F.2d 1332, 1339 (7th Cir. 1986) (defendant's "last day in confinement . . . was on February 22, 1976. The trial in the present case began on September 30, 1985, within the ten-year limitation for the admission of evidence . . . ."); *United States v. Hans*, 738 F.2d 88, 93 (3d Cir. 1984) (evidence admissible "only if either the conviction or the witness' release from prison occurred within 10 years of the trial"); *United States v. Rubio-Gonzalez,* 674 F.2d 1067, 1075 (5th Cir. 1982) (prior act occurred "slightly more than ten years prior to trial, and was hence outside the time limit" of Rule 609(b)); *United States v. Portillo*, 633 F.2d 1313, 1323 n.6 (9th Cir. 1980) (conviction more than ten years old "at the time of trial"), *cert. denied*, 450 U.S. 1043 (1981); *United States v. Mahler*, 579 F.2d 730, 734 (2d Cir. 1978) ("[A]t the time of the second trial, [the convictions] were more than ten years old."); *United States v. Cobb*, 588 F.2d 607, 612 n.5 (8th Cir. 1978) (time period measured "to the date of his trial"), *cert. denied*, 440 U.S. 947 (1979); *Mills v. Estelle*, 552 F.2d 119, 120 (5th Cir.) (Rule 609(b) generally prohibits

2

use of prior conviction if witness was released from confinement "more than ten years before the witness testifies in the current trial"), *cert. denied*, 434 U.S. 871 (1977).

The mischaracterization of Rule 609(b) that St. Clare's urges upon the Court cannot overcome the presumptive bar of Rule 609(b). *Lewis v. Velez*, 149 F.R.D. 474, 482 (S.D.N.Y. 1993) ("[N]one of the convictions at issue is more than ten years old; thus, evidence of the crimes is not presumptively barred under Rule 609(b)."); *Jones v. New York City Health & Hosp. Corp.*, No. 00 Civ. 7002 (CBM), 2003 WL 21289653, at *1–2 (S.D.N.Y. June 3, 2003) (noting that "there is a presumption against admissibility" under Rule 609(b) and finding that defendants "cannot overcome the sizeable hurdle erected by" the Rule, thus rendering stale embezzlement conviction inadmissible); *see also United States v. Pope*, 132 F.3d 684, 687 (11th Cir. 1998) ("Federal Rule of Evidence 609(b) creates a strong presumption against the use for impeachment purposes of stale convictions"). The stale conviction is subject to Rule 609(b)'s stringent balancing test: only if the probative value of the conviction *substantially* outweighs its prejudicial effect is the conviction admissible. Fed. R. Evid. 609(b). In this regard, "[t]he implicit judgment of the Federal Rules is that evidence of convictions over a decade old is generally more prejudicial to the side which calls the witness than it is helpful to the jury in evaluating the witness' credibility." *Mills*, 552 F.2d at 120.

St. Clare's asserts that evidence of the fraud conviction should be admitted because Plaintiff's credibility is central to its theory of the case. This argument is unavailing as it is inconsistent with the advisory committee notes to Rule 609(b), which clearly state "that convictions over 10 years old will be admitted *very rarely and only in exceptional circumstances*." Fed. R. Evid. 609(b) advisory committee's note (emphasis added). As the Court of Appeals for the Ninth Circuit has explained, "[t]he intended scope of Rule 609(b) would

3

be defeated if a [witness] could be impeached with a stale, prior conviction every time his story differed materially from that of [adverse] witnesses." *United States v. Bensimon*, 172 F.3d 1121, 1126–27 (9th Cir. 1999) (holding admission of stale mail fraud conviction improper). This Court should not determine the probative value of Plaintiff's prior conviction by how important Plaintiff's credibility is to St. Clare's. *Id.*

Furthermore, in ruling on the instant Motion, the Court should not consider the inadmissible opinion of Dr. Alexander McMeeking, expert for St. Clare's, that Plaintiff's credibility is at issue in this case.[1] Def.'s Opp'n, Ex. A ¶ 45. The importance of Plaintiff's credibility to the case is a legal issue as to which expert testimony is inadmissible. *See, e.g.*, *Celebrity Cruises Inc. v. Essef Corp.*, 434 F. Supp. 2d 169, 191 (S.D.N.Y. 2006) ("Expert testimony that merely states a legal conclusion must be excluded."); *TIG Ins. Co. v. Newmont Mining Corp.*, No. 04 Civ. 4105 (SAS), 2005 WL 2446234, at *2 (S.D.N.Y. Oct. 4, 2005) ("While an expert may opine on an issue of fact, an expert may not give testimony stating ultimate legal conclusions based on those facts.") (internal quotation marks omitted); *accord Hygh v. Jacobs*, 961 F.2d 359, 363 (2d Cir. 1992) ("This circuit is in accord with other circuits in requiring exclusion of expert testimony that expresses a legal conclusion.").[2]

---

[1]    In an attempt to focus the Court upon its allegations of fraud and culpable conduct by Plaintiff and to highlight the alleged relevance of Plaintiff's fraud conviction, St. Clare's attaches as an exhibit to its Opposition the report of its expert Dr. McMeeking. Def.'s Opp'n, Ex. A. While St. Clare's refers to the opinions of both Dr. McMeeking and Plaintiff's expert Dr. Jay Dobkin, St. Clare's puts before the Court only Dr. McMeeking's report. For completeness, Dr. Dobkin's report is submitted herewith as Exhibit A to the Declaration of Emma Lindsay in Support of Plaintiff's Motion in Limine to Exclude Evidence of or Reference to Any Prior "Bad Acts" by or Criminal Convictions of Plaintiff.

[2]    Plaintiff intends to make a separate motion in limine to exclude any improper opinions of Dr. McMeeking as to the importance of Plaintiff's credibility to the case. Plaintiff will also move to exclude any opinion of Dr. McMeeking as to whether Plaintiff's testimony is credible. As Second Circuit authority clearly establishes, it is for the jury to evaluate Plaintiff's credibility at trial. *Nimely v. City of New York*, 414 F.3d 381, 397–98 (2d Cir. 2005) ("It is a well-recognized principle of our trial system that determining the weight and credibility of [a witness's] testimony . . . belongs to the jury, who are presumed to be fitted for it by their natural

4

Another factor weighing against admission is the degree of similarity between Plaintiff's past crime and the fraudulent conduct alleged by St. Clare's. Convictions for crimes or other bad acts that bear a close resemblance to actions alleged in the case at bar should be excluded "because they cause unfair prejudice to the party against whom they are offered by suggesting that the party has a propensity to commit such acts." *Lewis*, 149 F.R.D. at 483; *cf. Daniels v. Loizzo*, 986 F. Supp. 245, 250 (S.D.N.Y. 1997) (dissimilarity of conduct at issue and prior conviction weighed in favor of admitting evidence of conviction).[3]

Finally, St. Clare's attempts to excuse its untimely compliance with the "mandatory" requirement of sufficient advance written notice of intent to use a stale conviction under Rule 609(b), *United States v. Crumbly*, No. 06-11387, 2007 WL 328813, at *5–6 (11th Cir. Feb. 2, 2007), by stating that "there has been absolutely no showing of prejudice or harm" by Plaintiff. Def.'s Opp'n at 12. However, the plain language of the Rule does not require any such showing. Fed. R. Evid. 609(b); *see also Crumbly*, 2007 WL 328813 at *5–6 (implicitly rejecting proponent's argument that failure to give advance written notice did not prejudice the party against which stale conviction was sought to be used). In this regard, St. Clare's draws the Court's attention to "[t]he unique circumstances of this case" and suggests that "the 'rush' to

---

intelligence and their practical knowledge of men and the ways of men . . . .") (alteration in original) (internal quotation marks omitted).

[3]    However, should the Court decide to allow St. Clare's to introduce evidence of the conviction, the evidence which St. Clare's is permitted to put before the jury must be strictly circumscribed. In those instances in which criminal convictions are permitted to be used to attack credibility pursuant to Rule 609, the evidence to be elicited is limited to the fact of conviction, the date, and the charge—not details of the conduct underlying the conviction. *See United States v. Tomaiolo*, 249 F.2d 683, 687 (2d Cir. 1957) (reversing conviction where trial court "permitted lengthy and needlessly detailed examination into the circumstances" of a criminal conviction that was used solely to impeach the witness); *Lee Kwong Nom v. United States*, 20 F.2d 470, 472 (2d Cir. 1927) (trial court properly prevented cross examination as to the length of witness's imprisonment for a crime, as the witness was "sufficiently impeached . . . by the question and answer which brought forth the admission of his conviction"); *see also Daniels*, 986 F. Supp. at 251 (offsetting danger of unfair prejudice by "limiting Defendants' use of the conviction to the fact and date of the conviction").

complete discovery was caused by plaintiff's incarceration." Def.'s Opp'n at 12. St. Clare's remarks that "the deposition of defense witness Diana McLaughlin . . . was only just conducted on February 5, 2007." *Id.*, n.7. However, the delay in conducting Ms. McLaughlin's deposition was in no way due to Plaintiff's incarceration. Plaintiff served his Rule 30(b)(6) deposition notice on St. Clare's on September 28, 2006—prior to Plaintiff's release from custody—and the matters as to which Ms. McLaughlin testified were clearly noticed therein. It is hardly Plaintiff's fault that St. Clare's took over four months to offer a witness competent to testify as to matters specified in Plaintiff's September 28 deposition notice. Moreover, any delays in discovery cannot excuse the failure of St. Clare's to give proper notice of its intent to use Plaintiff's stale fraud conviction under Rule 609(b).

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court exclude evidence of or reference to any prior or subsequent bad acts by or criminal convictions of Plaintiff, including his stale fraud conviction.

Dated: New York, New York
        March 28, 2007

SIMPSON THACHER & BARTLETT LLP

By: _____/s/_____
    Paul C. Gluckow (PG-0159)
    Joshua R. Geller (JG-0187)
    Emma Lindsay (EL-0604)

    425 Lexington Avenue
    New York, New York 10017-3954
    Telephone:  (212) 455-2000
    Facsimile:   (212) 455-2502

    Attorneys for Plaintiff

6

UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------X

JIMMIE MECCYA WILLIAMS,          :

                              : Case No.: 05 Civ. 5909 (HB)

              Plaintiff,    :

                              :

        vs.                : **DECLARATION OF EMMA**

                              : **LINDSAY IN SUPPORT OF**

TADD LAZARUS, M.D., ET AL.      : **PLAINTIFF'S MOTION IN LIMINE**

                              : **TO EXCLUDE EVIDENCE OF OR**

        and              : **REFERENCE TO ANY PRIOR OR**

                              : **SUBSEQUENT "BAD ACTS" BY OR**

ST CLARE'S HOSPITAL AND HEALTH  : **CRIMINAL CONVICTIONS OF**

CENTER,                        : **PLAINTIFF**

                              :

            Defendants.    :

                              :

                              :

----------------------------------------------------------------x

       I, Emma Lindsay, submit this declaration pursuant to 28 U.S.C. § 1746 and declare as follows:

       1.     I am an associate of the law firm Simpson Thacher & Bartlett LLP, counsel for Plaintiff Jimmie Meccya Williams in the above-captioned action.  I make this declaration in support of Plaintiff's Motion in Limine to Exclude Evidence of or Reference to Any Prior or Subsequent "Bad Acts" by or Criminal Convictions of Plaintiff.  I have personal knowledge of the facts stated herein, and, if called to testify as a witness, I could and would testify competently thereto.

       2.     Attached hereto as Exhibit A is a true and correct copy of the Expert Report of Jay F. Dobkin, MD in this case.

       I declare under penalty of perjury that the foregoing is true and correct.

Executed on March 28, 2007

_____

Emma Lindsay

*WILLIAMS V. LAZARUS*

**EXPERT REPORT OF JAY F. DOBKIN, MD**

## I.     BACKGROUND

### A.     QUALIFICATIONS

1.     I am the Arnold P. Gold Foundation Associate Professor of Clinical Medicine at the College of Physicians and Surgeons of Columbia University, where I have served on the faculty since 1979.  I have also been the Director of the AIDS program at Columbia University Medical Center since 1988.  I graduated with a Bachelor of Medical Sciences degree from Dartmouth Medical School in 1970 and received my medical degree from Harvard Medical School in 1972.

2.     I completed internship and residency training in Internal Medicine in 1975 at Montefiore Hospital, Bronx, NY, an affiliate of the Albert Einstein College of Medicine.  I then completed subspecialty training in Infectious Diseases at Albert Einstein in 1977.

3.     My curriculum vitae is attached as Exhibit A.

### B.     PRINCIPAL AREAS OF PRACTICE AND RESEARCH

4.     My specialty area of research and teaching is antiretroviral therapy.  I am the principal investigator of an ongoing series of quantitative assessments of interventions to promote improved adherence to antiretroviral therapy.  I am also currently developing assessment strategies for antiretroviral programs targeting injection drug users in the former Soviet Union in collaboration with several non-governmental organizations active in these areas, including the Open Society Institute (New York) and the Open Health Institute (Moscow).

5.     I am the Chief of the Infectious Diseases inpatient service at the Columbia University Medical Center and personally conduct weekly teaching activities for the medical students, interns, residents and postdoctoral fellows who rotate through this service.  In addition, I am part of the teaching faculty for the second-year medical student course on Infectious Diseases at Columbia.

6.     For the past six years, I have served as a consultant to the World Health Organization on care and treatment of HIV-infected injection drug users.  I am also the principal investigator of several industry-sponsored studies of new antiretroviral agents.

### C.     PUBLICATIONS

7.     I have authored or co-authored over 25 scientific publications on original research, focusing principally on HIV, tuberculosis and other infectious diseases.  My curriculum vitae provides a complete list of my publications.

    **D.**   **PRIOR TESTIMONY**

8.    In the last four years, I have given testimony at deposition in two medical malpractice cases: *Powell v. Quigley*, No. 2 CVS 16253, Superior Court of North Carolina, Wake County; and *Yarbrough v. Bell*, No. 4 CVS 001738, Superior Court of North Carolina, Forsyth County.

## II.   SCOPE OF REPORT

9.    I have been retained by counsel for Mr. Jimmie Meccya Williams, the plaintiff in this action, to opine as to whether the HIV testing and treatment of Mr. Williams by St. Clare's Hospital and Health Center ("St. Clare's") were consistent with accepted medical practice. I have also been asked to evaluate Mr. Williams' medical records from St. Clare's in light of subsequent HIV tests performed on Mr. Williams. Finally, I have been asked to give an opinion as to the consistency of the symptoms that Mr. Williams attributes to antiretroviral drugs prescribed to him by St. Clare's with the known side effects of those medications. I am acting as an expert in this case on a pro bono basis.

    **A.**   **MATERIALS REVIEWED**

10.   I have reviewed the following documents:

      a.  Mr. Williams' medical records from St. Clare's;

      b.  Mr. Williams' medical records from the State of New York Department of Correctional Services;

      c.  Mr. Williams' medical records from Huttonsville Correctional Center;

      d.  The results of the HIV tests performed on Mr. Williams in July 2006;

      e.  The complaint in this action; and

      f.  The transcript of the deposition of Mr. Williams conducted on November 17, 2006.

## III.  SUMMARY OF MY CONCLUSIONS AND OPINIONS

11.   Based on my review of the documents described in paragraph 10 above and my experience and expertise in the field, I conclude that:

      a.  A battery of tests conducted in 2006 demonstrates that Mr. Williams has never been infected with HIV.

      b.  The lab report of a positive test for HIV antibodies was not present in Mr. Williams' record or apparently available to the St. Clare's clinicians who provided care to him. St. Clare's did not obtain such documentation or repeat the

test in order to confirm his diagnosis as would have been consistent with standard practice.

c. The HIV viral load test results attributed to Mr. Williams are inconsistent with one another, suggesting specimen mishandling. The three reports with high levels of detectable HIV are incompatible with Mr. Williams' documented lack of HIV infection.

d. The wide variation in reported CD4 counts further suggests that some or all of these results were those of other patients, mistakenly attributed to Mr. Williams.

e. The regularity of Mr. Williams' appointments at St. Clare's was not consistent with the standard practice for monitoring treatment of HIV-infected patients.

f. The side effects reported by Mr. Williams are consistent with the known side effects of the antiretroviral drugs that he was prescribed by St. Clare's.

g. Mr. Williams would have had no reason to suspect that he was not infected with HIV until he received the results of testing conducted in 2004, which documented that he was not infected with HIV.

## IV.  DISCUSSION

### A.  CONSISTENCY OF MR. WILLIAMS' CURRENT HIV STATUS WITH THAT SHOWN IN THE MEDICAL RECORDS FROM ST. CLARE'S

12.  The results of tests documented in the St. Clare's records are incompatible with those conducted in 2006 which clearly document that Mr. Williams is not now nor has he been in the past infected with the Human Immunodeficiency Virus, type 1 (HIV).

### B.  FAILURE TO ADMINISTER ANTIBODY TEST

13.  Antibody tests are measurements of the immune system's response to foreign agents such as microorganisms. Antibodies are proteins secreted by immune system cells that have been exposed to exogenous or foreign materials termed "antigens". The standardized measurement of antibody levels has been the backbone of diagnosis of viral infections in humans for more than fifty years. The antibody test for HIV was introduced into widespread use in 1985 within two years of the discovery of HIV as the cause of AIDS and is an extremely sensitive and specific test for the presence of this infection.

14.  It has long been standard practice to obtain written confirmation of patient self-reported HIV positive status in cases where the clinician has not performed the HIV antibody test himself or herself. Where this is not possible, the clinician should repeat the antibody test. Patients are often confused about what, if anything, they have been told about an HIV test, so to rely on self-reported data is irresponsible.

15.  It does not appear in the St. Clare's records that such confirmation of Mr. Williams' HIV status was obtained.

C.   VARIANCE IN RESULTS OF VIRAL LOAD TESTS

16.   The technical ability to accurately quantitate the amount of HIV in the blood was achieved in the mid-1990's with the application of technology known as the polymerase chain reaction (PCR), which was first developed in the late 1980's. This quantitative measurement of HIV nucleic acid particles in blood is commonly referred to as a "viral load" measurement. The availability of this technology revolutionized the understanding of HIV infection and has become a vital tool in successful treatment of HIV infection with anti-viral drugs.

17.   The HIV viral load measurements attributed to Mr. Williams in the St. Clare's records are inconsistent with each other and with his current clinical status. It seems likely that some or all of these results are actually those of another person.

18.   Four measurements of HIV viral load are present in the St. Clare's records I reviewed:

| Log in date | Result (copies per ml) |
| --- | --- |
| 11/14/96 | <400 |
| 11/19/96 | 34,927 |
| 12/17/96 | 91,588 |
| 1/8/97 | 22,663 |

19.   It is highly unusual for an HIV-infected person to have a viral load so low that it is beneath the limit of detection for the assay (<400 in this case) without any treatment as was the case for Mr. Williams in November 1996. Furthermore, if the second and third values were in fact from an HIV-infected person before treatment was begun, it would be surprising that the fourth value recorded several weeks after beginning a 3-drug combination HIV treatment regimen is essentially unchanged. Viral load values within a range of threefold of each other are within the limits of assay variation while treatment-induced changes typically begin with declines of five- to tenfold in the first several weeks and eventually reach 100-fold or greater.

20.   Given that it has been recently established that Mr. Williams is not now and has never been HIV infected, only the first value of <400, which is negative for the presence of HIV, could be correct. There is no biologically plausible way to associate the last three values with Mr. Williams. Although it is true that a test such as the viral load assay which relies on many rounds of amplification of a minute amount of HIV material can occasionally produce a "false positive" result, these are nearly always of far lower magnitude, typically in the range of several hundred to several thousand copies. Therefore, the only plausible explanation for the three positive viral load results in this case is that they were mixed up with the samples of another patient.

21.   Finally, the question of whether HIV infection could have been cured by treatment or spontaneously resolved must be addressed with the statement that there is no precedent

5

for this.  Many thousands of patients have been evaluated, leading to the universal conclusion that HIV infection cannot be eradicated by current treatment, only suppressed. While individuals on long term, successful treatment often achieve undetectable viral loads and may recover CD4 cell counts that reach the normal range, these individuals remain HIV antibody positive and, more significantly, they will experience a rebound rise in viral load to pre-treatment levels within days to weeks of discontinuing treatment.

22.    Therefore, if Mr. Williams had ever been HIV infected and especially if the reported viral load values in 1996 and 1997 were really his, it is implausible that he would be HIV-antibody negative and viral load undetectable nearly ten years after his last treatment with anti-HIV therapy.

23.    Unusual or inconsistent variation of laboratory results such as those reflected in Mr. Williams' records would have been reviewed with the patient and efforts made, including repeating the supposedly positive HIV antibody test, in the standard course of routine practice.  These steps do not appear to have occurred.

### D.    VARIANCE IN CD4 COUNTS

24.    The CD4 count is a key measurement of the extent of immune system damage caused by HIV infection.  It is widely used as the primary means of staging HIV infection for prognostic purposes and to determine the optimal timing of interventions such as the use of prophylactic medications that prevent or delay the infectious complications that characterize AIDS and the initiation of anti-HIV therapy.  Measurement of CD4 cell counts has been well established, standardized and widely available in the US since the first AIDS cases were reported in 1980 and 1981.  Normal adults typically have CD4 counts in the range of 800-1200 (the St. Clare's lab report form indicates a wider range of normal, 315-2462).  HIV infection leads to progressive loss of CD4 cells with counts reaching 200 after a decade of infection or longer on average.  Below this level, infections and other AIDS complications become increasingly frequent.

25.    The two CD4 values included in the St. Clare's records seem unlikely to have come from the same person.  The first value, marked as drawn on November 12, 1996, is reported as 975.  The second report, annotated as drawn on November 19, 1996, indicates a CD4 count of 324.  Although there can be substantial biologic variability in CD4 counts, this change in the space of one week is implausible.  In addition, the corresponding change in another measurement referred to as CD8 and the calculated ratio of CD4 to CD8 which dropped from 2.1 to 0.61 in one week is also implausible.  These two reports most likely reflect the results from two different patients.

26.    It was accepted practice in 1996-7 to discuss variance such as that seen in Mr. Williams' CD4 counts with the patient.  From the records, it does not appear that the variance was discussed with Mr. Williams.

### E.    MONITORING TREATMENT

27.    After beginning antiretroviral therapy, it was standard practice in 1996-7 to repeat measurements of viral load and CD4 count at frequent intervals to assess response to treatment. Usually repeat values would be obtained after one month of treatment and, if an adequate response was documented, then subsequent determinations could be done every three or four months. It does not appear that Mr. Williams' values were rechecked after January 1997.

### F.    SIDE EFFECTS OF ANTIRETROVIRAL DRUGS

28.    The drugs prescribed to Mr. Williams for HIV infection were AZT (Retrovir), lamivudine (Epivir) and saquinavir (Invirase). The first two act by blocking a vital HIV enzyme known as reverse transcriptase, while the third inhibits the action of the viral protease enzyme.

29.    The side effects reported by Mr. Williams in his complaint and deposition, specifically nausea, vomiting, abdominal pain and headache, are consistent with the known side effects of the antiretroviral drugs that he was prescribed by St. Clare's.

30.    It was accepted medical practice in 1996-7 to explain potential side effects of drugs to patients to whom they were prescribed. Mr. Williams reported that the potential side effects were never explained to him.

### G.    MR. WILLIAMS' BELIEF THAT HE WAS HIV POSITIVE

31.    Mr. Williams reported that he stopped taking antiretroviral drugs in late 1997. Even having discontinued medication, Mr. Williams would have had no reason to suspect that he was not infected with HIV until he received the results of testing conducted in 2004, which documented that he was not infected with HIV. Even had Mr. Williams known the exact time of his supposed HIV infection, the average patient does not progress to an AIDS-defining event for over eleven years. Furthermore, at the time Mr. Williams was treated at St. Clare's new scientific evidence began appearing that would allow experts to establish a prognosis based on the two pieces of data that were available in this case: CD4 count and viral load. Few, if any, AIDS experts – and certainly not Mr. Williams himself – could have performed this analysis on Mr. Williams' data in 1996-7. In truth, the factors that lead to wide variability in the rate of progression of HIV disease remain largely unknown to this day and are the subject of intense research efforts. Therefore, there was no way Mr. Williams could have deduced anything about his situation from the lack of symptoms over the ensuing decade.

## V.    CONCLUSION

32.    Mr. Williams was treated for HIV infection without proper confirmation of this diagnosis and suffered physical side effects as well as emotional trauma from this erroneous management. It appears that mishandling of specimens and laboratory results contributed to the confusion and mismanagement of his case.

33.   The opinions stated in this report are my own and represent my complete professional
      opinion. To the extent that they are within my knowledge, I believe the facts stated in
      this report are true.


February 6, 2007                                   Jay F. Dobkin, MD

# EXHIBIT A

CURRICULUM VITAE
JAY F. DOBKIN, MD

BIRTHDAY:     June 17, 1946

EDUCATION:

Columbia College
New York, N.Y.                         A.B.        1968

Dartmouth Medical School
Hanover, New Hampshire                 B.M.S.      1970

Harvard Medical School
Boston, Massachusetts                  M.D.        1972

LICENSE:     New York #118279

RESIDENCY:

Montefiore Hospital
Bronx, New York
Internal Medicine                      1972-1975

FELLOWSHIP:

Albert Einstein College of Medicine
Infectious Diseases Training Program
Bronx, New York                        1975-1977

CERTIFICATION:     Internal Medicine    1975
                   Infectious Diseases  1982

HOSPITAL APPOINTMENTS:

Associate Attending Physician
Department of Medicine
Harlem Hospital
New York, New York                     1979-1987

Associate Director
Department of Medicine
Harlem Hospital
New York, New York                     1983-1987

Chief, Infectious Disease Division
Department of Medicine
Harlem Hospital
New York, New York                          1984-1987

Program Director
Internal Medicine Residency
Harlem Hospital
New York, New York                          1985-1987

Director
AIDS Program
Presbyterian Hospital
New York, New York                          1988-present

Associate Attending Physician
Department of Medicine
Division of Infectious Diseases
Presbyterian Hospital                       1988-present

RESEARCH SUPPORT:

Principal Investigator
Columbia-Presbyterian AIDS
Clinical Trials Unit
National Institutes of Health               1992-1996

ACADEMIC APPOINTMENTS:

Assistant Professor of Clinical Medicine
College of Physicians and Surgeons
Columbia University                         1979-1987

Associate Professor of Clinical Medicine
College of Physicians and Surgeons
Columbia University                         1988-1996

Arnold P. Gold Foundation
Associate Professor of Clinical Medicine
College of Physicians and Surgeons
Columbia University                         1996-present

ADVISORY PANELS, CONSULTANTSHIPS:

➢ Advisor on HIV Treatment Issues
International Harm Reduction Development/Open Society Institute, New York
1999-present

➢ Member
World Health Organization Panel on HIV Protocol Development for the States of the Former
Soviet Union
Geneva, May 2003

➢ Member
World Health Organization Consultation on HIV Protocol Development for the Central
Asian Region
Almaty, Kazakhstan, October 2003

➢ Member
New York City Mayoral Commission on AIDS
2003-present

➢ Author, Monograph on Care and Treatment of HIV infected injection drug users.
World Health Organization Office of HIV Care and Treatment
Geneva, 2004

➢ Technical Advisor
Project GLOBUS
(Antiretroviral therapy for Russian IDUs)
Open Health Institute, Moscow
2004-present

ORGANIZATION MEMBERSHIPS:  Fellow, Infectious Diseases Society of America

PUBLICATIONS:

1. Dobkin JF, MH Miller, NH Steigbigel.  Septicemia in patients on chronic hemodialysis.
*Annals of Internal Medicine*.  1978;88:28-33.

2. Dobkin JF, JR Saha, VP Butler, Jr., HC Neu, J. Lindenbaum.  Inactivation of digoxin by
Eubacterium lentum, an anaerobe of the human gut flora.  *Trans Assoc Am Physicians*.
1982;95:22-29.

3. Dobkin JF, JR Saha, VP Butler, Jr., HC Neu, J. Lindenbaum.  Digoxin inactivating
bacteria:  identification in human gut flora.  *Science*.  1983;220:325-327.

4. Rund DG, J Lindenbaum, JF Dobkin, VP Butler, Jr., JR Saha.  Decreased digoxin
cardioinactive reduced metabolites after administration as an encapsulated liquid concentrate.

*Clin Pharmacol Ther.* 1983;34:738-743.

5.  Dobkin JF, EB Healton, PCT Dickinson, JCM Brust.  Nonspecificity of ring enhancement in "medically cured" brain abscess. *Neurology.* 1984;34:139-144.

6.  Dobkin JF, J. Lindenbaum.  Inactivation of digoxin by the gut flora and its reversal by antibiotics.  In *Pediatric Cardiology.*  Ed. Doyle et al; New York, Springer Verlag.  1985, 1242-1243.

7.  Linday L, JF Dobkin, TC Wang, JR Saha, J. Lindenbaum.  Digoxin inactivation by the gut flora in infancy and childhood.  *Pediatrics.*  1987;79:544-548.

8.  Alam AN, JR Saha, JF Dobkin, J Lindenbaum.  Interethnic variation in the metabolic inactivation of digoxin by the gut flora.  *Gastroenterology.*  1988;95:117-123.

9.  Raucher B, JF Dobkin, L Mandel, S. Edberg, M Levi, M Miller.  Occult polymicrobial endocarditis with Haemophilus parainfluenzae a new clinical syndrome intravenous drug abusers.  *American J Medicine.*  1989;86:169-172.

10.  Mathan VI, J Wiederman, JF Dobkin, J Lindenbaum.  Geographic differences in digoxin inactivation, a metabolic activity of the human anaerobic gut flora.  *Gut.*  1989;30:971-977.

11.  Dobkin JF, Infections in Parenteral Drug Abusers.  *In Principles and Practice of Infectious Diseases.*  Ed. Mandell, Douglas, Bennett.  New York, Churchill Livingstone, Inc. 1989;2276-2280.

12.  Malouf R, G Jacquette, J Dobkin, JC Brust.  Neurologic Disease in Human Immunodeficiency Virus-Infected Drug Abusers.  *Arch Neurol* 1990;47(9):1002-1007.

13.  Garrett TJ, G Selnow, JF Dobkin, C Healton.  Computer-Assisted Instruction in AIDS Infection Control for Physicians.  *Teaching and Learning in Medicine.*  1990;2:215-218.

14.  Gorman JM, R Kertzner, G Todak, RR Goetz, JB Williams, J Dobkin, et al.  Multidisciplinary baseline assessment of homosexual men with and without human immunodeficiency virus infection.  I.  Overview of study design.  *Arch Gen Psychiatry.* 1991;48:120-123.

15.  Brudney K, J Dobkin.  "Resurgent Tuberculosis in New York City:  HIV Homelessness and the decline of TB control programs."  *Am Rev Respir Dis.*  1991;144(6):745-749.

16.  Brudney K, J Dobkin.  "A Tale of Two Cities:  TB Control in Nicaragua and New York."  *Sem Resp Inf.*  1991;6(4):261-272.

17.  Dobkin J.  The Approach to Infectious Diseases.  In *Principles and Practice of Medical Therapy in Pregnancy.*  Ed. Gleicher.  Appleton & Lange, East Norwalk, Connecticut. Second edition 1992;455-462.

18.  Dobkin J.  Chemotherapy of Bacterial Infection.  In *Principles and Practice of Medical Therapy in Pregnancy*.  Ed. Gleicher.  Appleton & Lange, East Norwalk, Connecticut. Second edition 1992;473-487.

19.  Cohn D, J Dobkin.  Treatment and prevention of tuberculosis in HIV infection.  *AIDS*. 1993;7(suppl 1):S195-S202.

20.  Brunswick A, A Aidala, J Dobkin, J Howard, S Titus, J Banaszak-Holl.  HIV_1 Seroprevalence and Risk Behaviors in an Urban African-American Community Cohort.  *Am J Public Health*.  1993;83:1390-1394.

21.  Gorman JM, R Kertzner, R Spitzer, G Todak, J Dobkin, M Lange, Z Stein, M Begg. Development and characteristics of a medical staging system for HIV infection.  International *Journal of Methods in Psychiatric Research*.  1993;2:117-124.

22.  Thomas C, J Dobkin, O Weinberger.  TAT-mediated transcellular activation of HIV-1 long terminal repeat directed gene expression by HIV-1 infected peripheral blood mononuclear cells.  *J. Immunology*.  1994;153:3831-3839.

23.  Lutfey M, P Della-Latta, V Kapur, A Palumbo, D. Gurner, G Stotzky, K Brudney, J Dobkin, A Moss, J Musser, B Kreiswirth.  Independent origin of Mono-rifampin-resistant Mycobacterium tuberculosis in patients with AIDS.  *Am J Respir Crit Care Med*. 1996;153:837-840.

24.  Simpson D, D Dorfman, R Olney, G McKinley, J Dobkin, Y So, J Berger, M Ferdon, B Friedman.  Peptide T in the treatment of painful distal neuropathy associated with AIDS: Results of a placebo-controlled trial.  *Neurology* 1996;47:1254-1259.

25.  Bangsberg  D, K Crowley, A Moss, J Dobkin, C McGregor, H Neu. Reduction in Tuberculin skin-test conversions among medical house staff associated with improved tuberculosis infection control practices. *Infection Control and Hospital Epidemiology* 1998;18:566-570.

26.  Yin M, Dobkin JF, Brudney KF, Becker C, Zadel JL, Manandhar M, Addesso-Dodd V, Shane E. Bone mass and mineral metabolism in HIV infected postmenopausal women. *Osteoporosis International*, 2005 16:1345-52.